22-1445 and 23-1002

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

KALEY CHILES,

      Plaintiff-Appellant,

v.

PATTY SALAZAR, in her official
capacity as Executive Director of
the Department of Regulatory
Agencies; et al.,

      Defendants-Appellees.

On Appeal from the United States District Court
for the District of Colorado

The Honorable Judge Charlotte N. Sweeney
District Judge

D.C. No. 1:22-cv-02287-CNS-STV

## APPELLEES' PRINCIPAL AND RESPONSE BRIEF

PHILIP J. WEISER
Attorney General
SHANNON WELLS STEVENSON*
Solicitor General
HELEN NORTON*
Deputy Solicitor General
ROBERT FINKE*
First Assistant Attorney General
BIANCA E. MIYATA*
JANNA K. FISCHER*
Assistant Solicitors General

ABBY CHESTNUT*
BRIANNA S. TANCHER*
Assistant Attorneys General
Department of Law
1300 Broadway, 8th Floor
Denver, Colorado 80203
720-508-6651
*Counsel of Record
*Attorneys for Defendants-
Appellees/Cross-Appellants*

Oral Argument Requested

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ........................................................ 1

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 3

STATEMENT OF THE ISSUES .............................................................. 4

STATEMENT OF THE CASE ................................................................. 5

SUMMARY OF THE ARGUMENT ..................................................... 11

ARGUMENT ......................................................................................... 13

I.   Ms. Chiles failed to show the factors necessary for pre-
enforcement First Amendment standing on her claims. ................... 13

    A.   Standing is reviewed de novo ..................................................... 13

    B.   Ms. Chiles does not have standing because she has not
established an injury in fact. ............................................................ 14

        1.   Ms. Chiles does not allege that she has engaged in past
conduct that would constitute "conversion therapy" under the
Law. ............................................................................................ 15

        2.   Ms. Chiles does not allege that she presently seeks to engage
in any conduct that would violate the Law. ................................ 17

        3.   Ms. Chiles cannot establish an objectively credible threat of
prosecution. ............................................................................... 21

II.   The District Court properly denied Ms. Chiles' Motion for
Preliminary Injunction because she failed to establish likelihood of
success on the merits for each of her constitutional claims. .............. 25

    A.   This Court reviews orders denying preliminary injunctions for
abuse of discretion. ......................................................................... 25

B.   Ms. Chiles failed to show that she was likely to succeed on the merits of her free speech challenge to the Law because the Law regulates professional conduct and survives rational basis review. ......................................................................................27

   1.   The Law regulates professional conduct, not speech.............27

   2.   Because the Law regulates professional conduct, it is subject to rational basis review. ...........................................................39

   3.   Colorado's interest in protecting children is legitimate, substantial, and even compelling. ................................................48

   4.   The relationship between the Law and Colorado's interest is rational, substantial, and even narrowly tailored. ......................50

C.   Ms. Chiles failed to show that she was likely to succeed on the merits of her free exercise claim because the Law is neutral and generally applicable and survives rational basis review. ...............54

   1.   The Law does not target religious practice. ...........................55

   2.   The Law does not provide for individualized exemptions that favor secular practice over religious practice. ..............................60

   3.   Because the Law is neutral and generally applicable, it is subject to and survives rational basis review. .............................61

D. The remaining *Beltronics* factors weigh against preliminarily enjoining the Law and the District Court's order should be upheld. ..........................................................................................................62

CONCLUSION .........................................................................................64

STATEMENT REGARDING ORAL ARGUMENT ................................66

CERTIFICATE OF COMPLIANCE.......................................................66

ADDENDUM[1]

Colo. Rev. Stat. § 12-245-101 ...................................... Addendum 1

Colo. Rev. Stat. § 12-245-202 .................................. Addendum 2-4

Colo. Rev. Stat. § 12-245-217 .................................. Addendum 5-6

Colo. Rev. Stat. § 12-245-224 ................................ Addendum 7-10

Colo. Rev. Stat. § 12-245-225 .............................. Addendum 11-12

Order Denying Motion for Preliminary Injunction, Doc. 55, Case No. 1:22-cv-02287-CNS-STV

---

[1] The addendum is prepared pursuant to Fed. R. App. P. 28(f).

# TABLE OF AUTHORITIES

**Cases**

*Animal Legal Defense Fund v. Kelly (ALDF)*, 9 F.4th 1219
(10th Cir. 2021) .................................................................. 44, 45

*Aptive Envir., LLC v. Town of Castle Rock, CO*, 959 F.3d 961
(10th Cir. 2020) ........................................................................ 13

*Ashaheed v. Currington*, 7 F.4th 1236 (10th Cir. 2021) ......................... 54

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) ............................................ 46

*Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*,
562 F.3d 1067 (10th Cir. 2009) ........................................... 26, 62

*Benisek v. Lamone*, 138 S. Ct. 1942 (2018) ........................................ 25

*Billups v. City of Charleston*, 961 F.3d 673 (4th Cir. 2020) .................. 47

*Bronson v. Swensen*, 500 F.3d 1099 (10th Cir. 2007) ........................... 14

*Cap. Assoc. Ind., Inc. v. Stein*, 922 F.3d 198 (4th Cir. 2019) ................. 41

*Capital Assoc. Ind., Inc. v. Stein*, 922 F.3d 198 (4th Cir. 2019) ............. 52

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ........................................................... 58, 59

*Clark v. Dist. Ct.*, 69 P.2d 3 (Colo. 1983) .......................................... 36

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) ............................ 45, 46

*Courthouse News Serv. v. N.M. Admin. Off. of Cts.*, 53 F.4th 1245
(10th Cir. 2022) ........................................................................ 25

*D.L.S. v. Utah*, 374 F.3d 971 (10th Cir. 2004) ................................ 12, 22

*Del Castillo v. Sec'y Fla. Dep't. of Health*, 26 F.4th 1214
(11th Cir. 2022) ........................................................................ 43

*Denver Homeless Out Loud v. Denver, CO*, 32 F.4th 1259
(10th Cir. 2022) ............................................................... 26

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ............ 30

*Emp. Div. v. Smith*, 494 U.S. 872 (1990) ................................................. 54

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421
(6th Cir. 2019) ................................................................ 41

*Ferguson v. People*, 824 P.2d 803 (Colo. 1992) ....................................... 50

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792
(10th Cir. 2019) .......................................................... 27, 60

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) ......... 54, 55, 57, 60

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) .............. 29, 33

*Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596 (1982) .................. 49, 64

*Goldfarb v. Va. State Bar*, 421 U.S. 773 (1975) ................................ 49, 64

*Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643
(10th Cir. 2006) ............................................................... 61

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .................................. 52

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ................. 23, 44

*Honeyfund.com, Inc. v. DeSantis*, No. 4:22cv227-MW/MAF,
2022 WL 3486962 (N.D. Fla. Aug. 18, 2022) ...................................... 48

*Initiative and Referendum Inst. v. Walker*, 450 F.3d 1082
(10th Cir. 2006) ...................................................... 14, 15, 22

*Kaufman v. Am. Fam. Mut. Ins. Co.*, 601 F.3d 1088 (10th Cir. 2010) .......
...................................................................... 39

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ...................... 54

*King v. Governor of New Jersey*, 767 F.3d 216 (3d Cir. 2014) ............... 52

*Laird v. Tatum*, 408 U.S. 1 (1972) ........................................................ 22

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .................................... 4, 13

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Com'n*,
    138 S. Ct. 1719 (2018) .......................................................... 56

*McCraw v. City of Okla. City*, 973 F.3d 1057 (10th Cir. 2020) .............. 47

*Morgan v. McCotter*, 365 F.3d 882 (10th Cir. 2004) .............................. 14

*Nat'l Inst. of Fam. and Life Advocs. v. Becerra* (*NIFLA*),
    138 S. Ct. 2361 (2018) ...................................... 28, 40, 41, 52

*New England Health Care Employ. Pension Fund v. Woodruff*,
    512 F.3d 1283 (10th Cir. 2008) ........................................... 14

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................... 26

*Obergefell v. Hodges,* 576 U.S. 644 (2015) ....................................... 51, 52

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) ..............................
    ....................................................... 12, 28, 29, 30, 33, 38, 39, 40, 48, 50

*Otto v. City of Boca Raton*, 41 F.4th 1271 (11th Cir. 2022) .............. 28, 42

*Peck v. McCann*, 43 F.4th 1116 (10th Cir. 2022) .................. 15, 17, 20, 22

*People v. Silva¸* 782 P.2d 846 (Colo. App. 1989) .................................... 35

*People v. Sisneros*, 55 P.3d 797 (Colo. 2002) .......................................... 35

*People v. Taylor*, 618 P.2d 1127 (Colo. 1980) ......................................... 36

*PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182 (10th Cir. 2010) ....... 1, 49, 63

*Planned Parenthood v. Casey*, 505 U.S. 833 (1992) ................................ 30

*Rio Grande Found. v. Oliver*, 57 F.4th 1147 (10th Cir. 2023) .......... 15, 22

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009) ................. 25

*Safe Sts. All. v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017) ............... 13

*Sawyers v. Norton*, 962 F.3d 1270 (10th Cir. 2020) ................................ 10

*Spokeo v. Robins*, 136 S. Ct. 1540 (2016) ................................................ 14

*Susan B. Anthony List v. Driehaus (SBA List)*, 573 U.S. 149 (2014) .........
................................................................................................... 17, 23

*Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25 (10th Cir. 2013) ......... 61

*Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) ...................................
.......................................... 12, 28, 34, 37, 38, 39, 40, 44, 49

*U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886 (10th Cir. 1989) .................... 26

*United States v. Williams*, 553 U.S. 285 (2008) ................................... 52

*Upjohn v. U.S.*, 101 S. Ct. 677 (1981) ................................................. 36

*Upsolve, Inc. v. James*, 604 F. Supp 3d 97 (S.D.N.Y. 2022) (*appeal filed* June 22, 2022) ............................................................ 48

*Vizaline, L.L.C. v. Tracy*, 949 F.3d 927 (5th Cir. 2020) .................. 41, 49

*Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202 (10th Cir. 2003) ..... 26

*Winsness v. Yocom*, 433 F.3d 727 (10th Cir. 2006) .............................. 24

*Winter v. Nat. Res. Def. Couns.*, 555 U.S. 7 (2008) ............................. 25

## Constitutions

U.S. Const. amends. I .................................................................. 27, 54

U.S. Const. amends. XIV .............................................................. 27, 54

## Statutes

28 U.S.C. § 1292(a) (2022) ................................................................. 4

28 U.S.C. § 1331 (2022) ..................................................................... 4

28 U.S.C. § 1343(a)(3) (2022) ............................................................ 4

42 U.S.C. § 1983 (2022) ........................................................................... 4

42 U.S.C. § 1988 (2022) ........................................................................... 4

Colo. Rev. Stat. § 12-245-101 (2022) ...................................................... 6

Colo. Rev. Stat. § 12-245-101(1) (2022) ................................................ 61

Colo. Rev. Stat. § 12-245-101(2) (2022) .................................................. 6

Colo. Rev. Stat. § 12-245-202 (2022) ....................................................... 6

Colo. Rev. Stat. § 12-245-202(3.5) (2022) ...................................... 1, 2, 6, 7

Colo. Rev. Stat. § 12-245-202(3.5)(a) (2022) ........................ 16, 19, 31, 60

Colo. Rev. Stat. § 12-245-202(3.5)(b) (2022) ........................................ 60

Colo. Rev. Stat. § 12-245-202(3.5)(b)(I) (2022) ..................... 15, 16, 18, 19

Colo. Rev. Stat. § 12-245-202(3.5)(b)(II) (2022) .................................. 7, 8

Colo. Rev. Stat. § 12-245-203.5 (2022) .................................................. 53

Colo. Rev. Stat. § 12-245-202(14)(a) (2022) ..................................... 31, 33

Colo. Rev. Stat. § 12-245-217 (2022) ..................................................... 32

Colo. Rev. Stat. § 12-245-217(1) (2022) ..................................... 8, 56, 58

Colo. Rev. Stat. § 12-245-224(1)(t)(V) (2022) ........................... 1, 6, 7, 31

Colo. Rev. Stat. § 12-245-225 (2022) ....................................................... 7

Colo. Rev. Stat. § 12-245-303 (2022) ................................................. 6, 33

Colo. Rev. Stat. § 12-245-403 (2022) ................................................. 6, 33

Colo. Rev. Stat. § 12-245-503 (2022) ................................................. 6, 33

Colo. Rev. Stat. § 12-245-603 (2022) ............................................. 6, 31, 33

Colo. Rev. Stat. § 12-245-703 (2022) ................................................. 6, 33

Colo. Rev. Stat. § 12-245-803 (2022) ....................................................6, 33

Colo. Rev. Stat. § 24-1-110(1)(l) (2022) ...........................................8

Colo. Rev. Stat. § 24-34-101 (2022) ..................................................8

Colo. Rev. Stat. §§ 12-245-101 to -806 (2022) ...............................6, 8, 30

Colo. Rev. Stat. §§ 24-4-104 to -106 (2022) ..................................23

**Rules**

Fed. R. Civ. P. 57 ................................................................................4

Fed. R. Civ. P. 65 ................................................................................4

**Regulations**

4 Colo. Code Regs. § 737-1:1.17 (2020) .......................................57

**Other Authorities**

A.B. 3371, 215th Leg., Reg. Sess. (N.J. 2013).............................50

A00576, Reg. Sess. (N.Y. 2019) ......................................................50

Am. Psych. Ass'n, *APA Resolution on Gender Identity Change Efforts*
(Feb. 2021), https://www.apa.org/about/policy/resolution-gender-
identity-change-efforts.pdf ..............................................................51

Am. Psych. Ass'n, *Task Force on Appropriate Therapeutic Responses to
Sexual Orientation* (2009), available at
https://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf .........2

Am. Psych. Ass'n., https://dictionary.apa.org/art-therapy,
https://dictionary.apa.org/play-therapy (last visited Apr. 25, 2023) ......
.........................................................................................................31

Colo. Dep't of Pub. Health and Envir., *Healthy Kids Colorado Survey
Dashboard* (2019), https://cdphe.colorado.gov/healthy-kids-colorado-
survey-dashboard (For step 1, select the year 2019. For step 2, select
Mental Health).................................................................................6

H.B. 0217, 99th Gen. Assemb., Reg. Sess. (Ill. 2016) .............................50

H.B. 20-1206, 72nd Gen. Assemb., 2d Reg. Sess. (Colo. 2020) ...............6

H.B. 2307, Reg. Sess. (Or. 2015) .............................................................50

H.B. 386, Reg. Sess. (Va. 2020) ...............................................................50

H.B. 664, 30th Leg., Reg. Sess. (Haw. 2019) ...........................................50

H.B. 6695, Reg. Sess. (Conn. 2017) .........................................................50

H.B. 98-1072, 61st Gen. Assemb., Reg. Sess. (Colo. 1998) .....................58

H140, 19th Gen. Ct., Reg. Sess. (Mass. 2019) .........................................50

H5277A, Reg. Sess. (R.I. 2017) ...............................................................50

L.D. 1025, 129th Leg., Reg. Sess. (Me. 2019) .........................................50

*Prohibit Conversion Therapy for a Minor: Hearing on HB 19-1129
Before the H. Comm. on Pub. Health Care & Human Servs.*
70th Sess. (2019) ...................................................................................56

*Prohibit Conversion Therapy for A Minor: Hearing on HB 19-1129
Before the Sen. Comm. On State, Veterans, & Military Affairs*,
70th Sess. (2019) ...................................................................................59

S.132, Reg. Sess. (Vt. 2016) .....................................................................50

S.B. 1028, Reg. Sess. (Md. 2018) .............................................................50

S.B. 1172, Reg. Sess. (Cal. 2012) .............................................................50

S.B. 121, Reg. Sess. (N.M. 2017) .............................................................50

S.B. 201, 79th Leg., Reg. Sess. (Nev. 2017) ............................................50

S.B. 270, 29th Leg., Reg. Sess. (Haw. 2017) ...........................................50

S.B. 5722, Reg. Sess. (Wash. 2018) .........................................................50

S.B. 65, 149th Gen. Assemb., Reg. Sess. (Del. 2018) ..............................50

This Court is considering Kaley Chiles' appeal and the Boards' cross-appeal in this matter together. *Chiles v. Salazar*, Nos. 22-1445 and 23-1002.

# INTRODUCTION

For some young Coloradans, understanding and accepting who they are and how they love others is a process fraught with intense confusion, even fear. Some of these children and their families will seek assistance from licensed professionals to help them navigate this process. Colorado has "a solemn duty to protect the lives and health of the children within [its] borders" and thus to ensure that its licensed professionals only render therapies to children that are safe. *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1198 (10th Cir. 2010). The Minor Conversion Therapy Law, adopted by the Colorado legislature in 2019 (the "Law"), fulfills that duty by prohibiting a form of mental health treatment—conversion therapy for children—that hurts Colorado's youth. Colo. Rev. Stat. §§ 12-245-202(3.5), -224(1)(t)(V) (2022).

Conversion therapy is a practice or treatment that attempts or purports to change a client's sexual orientation or gender identity. § 12-

1

245-202(3.5). The documented harms of conversion therapy efforts are extensive and amplified when applied to children. Children who have been subjected to conversion therapy suffer from depression and anxiety, and experience increased rates of suicidality.[2] Because conversion therapy puts these especially vulnerable young clients at risk, Colorado has properly determined that it is not a therapeutic treatment that its licensing rules can allow to be practiced on children. § 12-245-224(1)(t)(V).

Colorado, like every other state, has established a licensing regime for mental health professionals. Informed by a substantial body of evidence-based, scientific research that shows conversion therapy harms children, the General Assembly added the Law to this regime to prohibit the therapeutic practice of conversion therapy by mental health professionals upon children. The Law is a straightforward exercise of the state's police powers to safeguard the health, safety, and welfare of its citizens by regulating professional conduct.

---

[2] Am. Psych. Ass'n, *Task Force on Appropriate Therapeutic Responses to Sexual Orientation*, 3 (2009), available at https://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf.

If Ms. Chiles' view of the First Amendment is accepted, Colorado (and other states) would be hampered in imposing evidence-based professional licensing or malpractice laws if those laws incidentally impact speech. The First Amendment cannot be used to erode reasonable professional conduct regulations that a state employs to protect the health, safety, and welfare of its citizens. That is not how the First Amendment has ever worked, and it cannot be the law.

Ms. Chiles does not sufficiently allege that she is injured by the Law and so has no standing to bring this lawsuit in the first place. Even if she did have standing, Ms. Chiles has no reasonable likelihood of success on the merits of her First Amendment claims. That is fatal to her request for a preliminary injunction of the Law. This Court has multiple, independent reasons to reject her claims, and the District Court's denial of her Motion for a Preliminary Injunction should be affirmed.

## JURISDICTIONAL STATEMENT

Because Ms. Chiles lacks standing, the federal courts lack Article III subject matter jurisdiction over this dispute. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). This Court's exercise of its appellate jurisdiction should be limited to holding that Ms. Chiles does not have standing.

If this Court nevertheless concludes that Ms. Chiles has standing, the District Court and this Court may properly exercise jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343(a)(3) (2022). Ms. Chiles has asserted constitutional claims under the First and Fourteenth Amendments, and under 42 U.S.C. §§ 1983 and 1988; Fed. R. Civ. P. 57 and 65; App. at 017.[3]

On December 19, 2022, the District Court denied Ms. Chiles' Motion for Preliminary Injunction, which is appealable under 28 U.S.C. § 1292(a) (2022). The parties timely filed their respective Notices of Appeal and Cross-Appeal. App. at 091-92, 093-94.

## STATEMENT OF THE ISSUES

1. Does Ms. Chiles have standing to challenge the Law?

2. Did the District Court abuse its discretion by denying Ms. Chiles' Motion for Preliminary Injunction for failure to demonstrate likelihood of success on the merits of her free speech and free exercise claims?

---

[3] Citations to Ms. Chiles' Appendix and the Boards' Supplemental Appendix shall read, respectively: App. at [page number] and Supp. App. [volume number] at [page number].

**STATEMENT OF THE CASE**

In the face of a growing mental health crisis among Colorado's youth, Colorado passed the Law in 2019 to protect children from the dangerous and clinically unsupported practice of conversion therapy. The Law is based in medical consensus that conversion therapy, which seeks to change a person's sexual orientation or gender identity, is ineffective and harmful. Multiple studies have further found that children's exposure to conversion therapy intensifies depression and increases the risk that children will commit suicide. *See* Supp. App. Vol. I at 133, 136-37, 148-49.

As of 2019 in Colorado, a staggering 17% of high school students aged 15 years or younger seriously considered attempting suicide during the previous year; for LGBT high school students, the numbers virtually triple: 51.5% for transgender students; 44.1% for bisexual students; 35.3% for gay or lesbian students.[4] To help address this crisis in youth

---

[4] Colo. Dep't of Pub. Health and Envir., *Healthy Kids Colorado Survey Dashboard* (2019), https://cdphe.colorado.gov/healthy-kids-colorado-survey-dashboard (For step 1, select the year 2019. For step 2, select Mental Health).

mental health, the Law prohibits licensed and registered[5] mental health professionals[6] from practicing conversion therapy on children. Colo. Rev. Stat.§§ 12-245-101; -202(3.5), -224(1)(t)(V) (2022).

Mental health professionals are subject to professional discipline if they engage in "any practice or treatment [upon minors] . . . that attempts or purports to change an individual's sexual orientation or gender identity, including efforts to change behaviors or gender expressions or

---

[5] To practice mental health care in Colorado, an individual must be licensed or registered to do so with the state. The licenses and registrations under which mental health professionals may provide their professional services can be found at Colo. Rev. Stat. § 12-245-101(2) (2022). The Law also applies to a category of mental health professionals called "unlicensed psychotherapists" formerly known as "registered psychotherapists." But the term "unlicensed" here is something of a misnomer: these psychotherapists must register with the State of Colorado to practice psychotherapy and agree to be bound by the same requirements as other licensed and registered mental health professionals, set forth in the Mental Health Practice Act. Colo. Rev. Stat. §§ 12-245-101 through -806 (2022). Each licensure/registration's scope of practice is well defined in the Act; so long as these mental health professionals are licensed or registered with Colorado, they may all professionally provide psychotherapy to clients. *See* Colo. Rev. Stat. §§ 12-245-202; 12-245-303; -403; -503; -603, -703, -803. Due to a sunset of this designation in 2020, no new unlicensed psychotherapist registrations will be issued. *See* H.B. 20-1206, 72nd Gen. Assemb., 2d Reg. Sess. (Colo. 2020).

[6] Hereinafter, "mental health professionals" will refer to licensed and registered mental health professionals who are subject to the Mental Health Practice Act and the Law.

to eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex." §§ 12-245-202(3.5), -224(1)(t)(V). If a mental health professional violates the Law, similar to other improper conduct, the Boards may pursue a range of different disciplinary measures, from the issuance of a letter of admonition, up to revocation of the mental health professional's license. Colo. Rev. Stat. § 12-245-225 (2022).

The Law's definition of conversion therapy is narrow. Conversion therapy does *not* include "practices or treatment" providing "[a]cceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development[.]" § 12-245-202(3.5)(b)(II). And the Law allows any "interventions to prevent or address unlawful conduct or unsafe sexual practices, as long as the counseling does not seek to change sexual orientation or gender identity." *Id.* The definition of conversion therapy further excludes practices or treatment that provide "[a]ssistance to a person undergoing gender transition." *Id.*

The Law is also narrow in application. It covers only mental health professionals who provide care to minor clients under their licensure or registration, subject to the exemptions described in the Mental Health

Practice Act. Colo. Rev. Stat. §§ 12-245-101 through -806 (2022). One such exemption is the provision of services like conversion therapy through religious ministry. Colo. Rev. Stat. § 12-245-217(1) (2022).

Appellees, the members of and program director for the Board of Professional Counselor Examiners and Board of Addiction Counselor Examiners (the "Boards"),[7] play a critical role in managing licensing and registration of mental health professionals in Colorado, regulating the profession, and enforcing the Law through administrative disciplinary proceedings. Since Colorado's Law took effect in October 2019, the Boards have neither received any complaints concerning alleged violations of the Law nor initiated any disciplinary proceedings related to violations of the Law. Supp. App. Vol. II at 433. Now, nearly four years after the Law was enacted, Ms. Chiles seeks an injunction prohibiting the Boards from carrying out their statutory duties.

Ms. Chiles graduated with a master's degree in clinical mental health in 2014. App. at 041. She is a Licensed Professional Counselor and

---

[7] Also named as an appellee is the Executive Director of the Department of Regulatory Agencies, Colorado's principal department and umbrella agency, that manages licensing and registration for the Boards and various professions and businesses not implicated in this case. *See* Colo. Rev. Stat. §§ 24-1-110(1)(l); 24-34-101 (2022).

Licensed Addiction Counselor in Colorado. According to her Complaint, she has worked with minor clients who identify as gay or gender non-conforming in that licensed capacity. App. at 043. Ms. Chiles claims that the Law prevents her from helping minor clients who wish "to address unwanted sexual attraction, behaviors, or identity." App. at 037-38. In these instances, Ms. Chiles "does not seek to 'cure' clients of same-sex attractions or to 'change' clients' sexual orientation; she seeks only to assist clients with their stated desires and objectives which sometime[s] includes clients seeking to reduce or eliminate unwanted sexual attractions [and] change sexual behaviors[.]" App. at 038. And she wishes to counsel these same clients on the subject of "same-sex attractions, behaviors, or identity" based on her own religious viewpoint. App. at 049.

The Boards have not received any complaint against Ms. Chiles or initiated any disciplinary action against Ms. Chiles. Supp. App. Vol. II at 434. Nevertheless, Ms. Chiles filed this pre-enforcement challenge alleging the Law violates her First Amendment rights to free speech and free exercise.[8] App. at 039-44, 046-48, 049-51. Ms. Chiles asked the

---

[8] Ms. Chiles' Complaint raised two claims before the District Court that she has failed to raise here. She asserted that she had third-party

District Court to issue preliminary and permanent injunctions prohibiting the Boards from enforcing Colorado's Law and a declaratory judgment that the Law is unconstitutional. Ms. Chiles did not request an evidentiary hearing or submit any declarations or affidavits in support of these requests.

On December 19, 2022, the District Court denied Ms. Chiles' Motion for Preliminary Injunction. App. at 090. While the District Court preliminarily found Ms. Chiles had pre-enforcement standing to bring her action, it concluded that she failed to demonstrate likelihood of success on the merits of her First Amendment claims. App. at 067, 080, 087. Specifically, the District Court held that the Law regulates professional conduct, not speech. Thus, it is only subject to rational basis review, which it survives. App. at 070-80. The Court similarly rejected Ms. Chiles' free exercise claims, holding the Law is neutral and generally

---

standing on behalf of her minor clients to allege violations of her clients' First Amendment rights to free speech and free exercise. The District Court rejected her third-party standing claim. App. at 068-69. Ms. Chiles also asserted below that the Law is void for vagueness in violation of Due Process. The District Court held Ms. Chiles failed to show a likelihood of success on the merits of her due process claims. App. at 087-89. Because Ms. Chiles does not raise either of these issues in her Opening Brief, they are abandoned or waived. *See, e.g.*, *Sawyers v. Norton*, 962 F.3d 1270, 1286 (10th Cir. 2020).

applicable. App. at 081-86. Colorado moved to dismiss the case below, and that motion is fully briefed and pending in the District Court. Supp. App. Vol. II at 406.

## SUMMARY OF THE ARGUMENT

Ms. Chiles cannot establish standing to bring this pre-enforcement challenge. Ms. Chiles alleges generally that the Law prohibits her from providing factual information, discussing her religious views (and those held by her clients), and opining on or referring minor clients for conversion therapy. App. at 037, 039, 048-50; Supp. App. Vol. I at 59. But her overstatement of the Law's reach cannot replace the central tenet of standing: injury in fact. The conduct that she has allegedly participated in—or seeks to—is either permitted by the Law or is so vaguely defined by Ms. Chiles that the record is unclear whether that conduct would violate the Law. And for Ms. Chiles to establish standing, the chilling effect of the Law "must arise from an objectively justified fear of real consequences." *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004). Given her lack of concrete, imminent injury, the District Court erred in finding Ms. Chiles had standing supporting its subject matter jurisdiction to

consider the preliminary injunction. This Court's inquiry should end there.

Even if this Court holds that Ms. Chiles has standing, she has failed to meet the burden required to secure a preliminary injunction. She has not demonstrated a likelihood of success on the merits on any of her claims.

First, Ms. Chiles has failed to demonstrate that Colorado's Law infringes her First Amendment rights to free speech because the Law regulates professional conduct that, at most, incidentally involves speech. It is well established that reasonable regulations of professional conduct are not subject to First Amendment scrutiny. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). To hold otherwise would be to call large swaths of professional conduct regulations into question. *Tingley v. Ferguson*, 47 F.4th 1055, 1082 (9th Cir. 2022) ("[A ruling for the plaintiff] would . . . endanger centuries-old medical malpractice laws that restrict treatment and the speech of health care providers.").

Second, Ms. Chiles has failed to make any showing that the Law violates her free exercise rights. The Law is neutral and does not mention, let alone target, religious practice. The District Court acted well

within its discretion when it denied Ms. Chiles' Motion for Preliminary Injunction.

## ARGUMENT

### I. Ms. Chiles failed to show the factors necessary for preenforcement First Amendment standing on her claims.

#### A. Standing is reviewed de novo.

This Court reviews issues of standing de novo. *See, e.g.*, *Aptive Envir., LLC v. Town of Castle Rock, CO*, 959 F.3d 961, 973 (10th Cir. 2020). Ms. Chiles, as the party invoking the jurisdiction of the court, bears the burden of establishing standing. *Lujan*, 504 U.S. at 561; *Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017).

Colorado properly and timely raised its challenge to standing under Fed. R. Civ. P.12(b)(1) in its Motion to Dismiss.[9] Supp. App. Vol. II at 415-420. A party "can raise the issue of standing for the first time at any stage of the litigation, including on appeal." *New England Health Care Emp. Pension Fund v. Woodruff*, 512 F.3d 1283, 1288 (10th Cir. 2008).

---

[9] Colorado's Motion to Dismiss was timely filed on December 6, 2022, and available for the District Court's consideration before it entered its order denying Ms. Chiles' Motion for Preliminary Injunction on December 19, 2022. Supp. App. Vol. II at 406; App. at 059-90.

This is because Article III standing is jurisdictional. *Initiative and Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006). If this Court concludes that Ms. Chiles does not have standing, it may not address Ms. Chiles' issues related to the denial of the preliminary injunction. *See Morgan v. McCotter*, 365 F.3d 882, 891 (10th Cir. 2004).

### B. Ms. Chiles does not have standing because she has not established an injury in fact.

To establish standing to bring an action, a plaintiff must establish three elements: an injury in fact, causation, and redressability. *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007). To establish injury in fact, a plaintiff must show that they have suffered injury to a legally protected interest that is concrete and imminent. *Spokeo v. Robins*, 136 S. Ct. 1540, 1548 (2016). For an injury to be concrete, "it must actually exist." *Id*.

A plaintiff can sufficiently allege an injury based on the First Amendment in the pre-enforcement context, by presenting "(1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so

*because of* a credible threat that the statute will be enforced." *Walker*, 450

F.3d at 1089 (emphasis in original); *Peck v. McCann*, 43 F.4th 1116, 1129-

30 (10th Cir. 2022). Ms. Chiles has not done so here.

> **1. Ms. Chiles does not allege that she has engaged in past conduct that would constitute "conversion therapy" under the Law.**

To establish standing on her pre-enforcement First Amendment

claim, Ms. Chiles may point to past evidence that she has engaged in

conduct affected by the Law. *Walker*, 450 F.3d at 1089. This factor alone

is not dispositive—"people have a right to speak for the first time"—but

it lends concreteness and specificity to the claimed injury. *Id.*; *Rio Grande*

*Found. v. Oliver*, 57 F.4th 1147, 1161 (10th Cir. 2023).

The District Court erred in finding that Ms. Chiles met her burden

under this requirement. It held that Ms. Chiles engaged in the conduct

regulated by section 12-245-202(3.5)(b)(I)[10] when she employed practices

providing "understanding for the facilitation of an individual's coping."

App. at 064. As support, the Court cited Ms. Chiles' allegation that she

helps clients "explore certain . . . bodily experiences," including any

---

[10] The District Court's order cites to section 12-245-202(3)(b)(I). This appears to be a typographical error, as no such subsection exists and the quoted language appears instead Colo. Rev. Stat. § 12-245-202(3.5)(b)(I).

"unwanted sexual attraction[s]" that "may arise" during her counseling sessions." *Id*. But the Law does not prohibit this. The Law's plain language expressly *carves out* the conduct Ms. Chiles describes, exempting "practices or treatments that provide . . . understanding for the facilitation of an individual's coping, social support, and identity exploration and development." § 12-245-202(3.5)(b)(I).

Under the Law's plain language, the conduct Ms. Chiles has engaged in with her minor clients is not conversion therapy. Ms. Chiles does not allege that she has engaged in any practices or treatments "that attempt[] or purport[] to change an individual's sexual orientation or gender identity." § 12-245-202(3.5)(a). Instead, she alleges that she discusses her clients' "bodily experiences" or "unwanted sexual attractions" during therapy. App. at 064. The Law allows licensed therapists to discuss such matters with their minor patients. It only prohibits Ms. Chiles, as a licensed therapist, from employing therapeutic treatment to try to change a child's sexual orientation or gender identity in response to those conversations.

Without allegations describing her past conduct that would violate Colorado's Law, and absent any further factual development, Ms. Chiles' claims of injury lack concreteness and specificity.

## 2. Ms. Chiles does not allege that she presently seeks to engage in any conduct that would violate the Law.

To satisfy the injury in fact requirement, Ms. Chiles must state with certainty that she wishes to engage in the conduct prohibited by the Law and definitively plans to do so upon a lifting of the government restriction. *Peck*, 43 F.4th at 1130. She can do so through averments in a sworn declaration, or pleadings alleging specific statements she intends to make that would violate the Law. *See Susan B. Anthony List v. Driehaus (SBA List)*, 573 U.S. 149, 161 (2014); *see also Peck*, 43 F.4th at 1130.

Ms. Chiles has not established such present intent. She denies a present desire to engage in conversion therapy, stating she "does not seek to 'cure' clients of same-sex attractions or to 'change' clients' sexual orientation." App. at 038. She also denies using "aversive techniques" and states that she "does not imply that categorical change in attractions is a therapeutic goal." App. at 036. She "does not begin counseling with any predetermined goals," and provides supportive therapy to clients who are

content with their sexual identity. App. at 037-38. Taking these allegations as true, Ms. Chiles' practice complies with Colorado's Law.

The conduct Ms. Chiles wrongly alleges would result in her violating the Law is explicitly permitted as therapeutic "identity exploration and development" by section 12-245-202(3.5)(b)(I). *See, e.g.*, App. at 036-37, 040, 044-45, and 047-49. For example, she mischaracterizes the Law as preventing minors from seeking the counseling she wishes to provide, including "counseling to address conflict about, or questions concerning, [a client's] unwanted same-sex attractions, behaviors, and identities." App. at 015. But the Law allows mental health professionals to provide such counseling to a minor client if the counseling provides "acceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development." § 12-245-202(3.5)(b)(I). Ms. Chiles can and should help her clients "understand the sources, causes, and origins of their feelings," including feelings of distress arising from conflicts and concerns over any "unwanted" same-sex attractions, behaviors, and identities. App. at 036-37, 040. She just cannot use conversion therapy to do so.

The closest Ms. Chiles comes to alleging a desire to offer conversion therapy is her statement that she seeks to "assist clients with their stated desires and objectives in counseling, which sometime[s] includes clients seeking to reduce or eliminate unwanted sexual attractions, change sexual behaviors, or grow in the experience of harmony with one's physical body." App. at 038. However, Ms. Chiles failed to provide a clear explanation of what this "assistance" entails. The term "assistance" could be construed to encompass permitted conduct described under section 12-245-202(3.5)(b)(I), such as helping clients to explore their identity, accept their feelings or sexual attractions, or cope with feelings of conflict arising from family attitudes or tenets of faith. In this pre-enforcement context, and without any affidavits or further information concerning what actions Ms. Chiles wishes to take when treating children in accordance with their "stated desires and objectives," it is not discernable whether she would be attempting to engage in prohibited sexual orientation or gender identity change efforts under section 12-245-202(3.5)(a). This assistance could include therapeutic interventions in the form of sexual-orientation-neutral encouragement toward abstinence

or discussion of methods by which minors can healthily express their sexuality, which would not be prohibited by the Law.

Without a concrete, particularized statement of what Ms. Chiles wants to do, this Court is left to guess whether and how her actions would violate the Law. A plaintiff cannot assert an immediate desire to violate the law while obfuscating the manner in which they intend to do so. Such strategic ambiguity would prevent a full adjudication of the merits, for example, by impairing the state's ability to explain why the unlawful conduct is not part of an appropriate treatment by a state-licensed mental health professional. While standing doctrine does not require a plaintiff to detail specific plans regarding what they want to do, a plaintiff must at least facially, and with certainty, state a desire to engage in the conduct prohibited by Colorado's Law. *Peck*, 43 F.4th at 1131-32.

Next, Ms. Chiles alleges that the Law prohibits her from discussing her religious views (and those held by her clients), opining on the value of conversion therapy, or referring minor clients for conversion therapy. App. at 37, 39, 48-50. Again, Ms. Chiles misstates the Law's scope. It does not prevent her from expressing her opinions on conversion therapy's

value or her religious beliefs about sexual orientation or gender identity, either with her clients or in the public square. Nor does it prevent her from referring her minor clients to a religious leader who is not bound by the Law. What she cannot do under the Law is engage in therapeutic practice with her minor clients in an effort to change their sexual orientation or gender identity based on her views.

The practices Ms. Chiles describes wanting to engage in while counseling children are either not prohibited by the Law, or her allegations are too general to allow any meaningful assessment of whether they would be prohibited. She has presented an underdeveloped record for any court to rule on her present desire to engage in conduct prohibited by the Law. The District Court erred in finding that she had satisfied the second factor required to show an injury in fact sufficient to support standing for either of her First Amendment claims.

### 3. Ms. Chiles cannot establish an objectively credible threat of prosecution.

While Ms. Chiles claims to fear Colorado's enforcement of the Law against her, this fear is based on an unreasonable misinterpretation of the Law. "If all it took to summon the jurisdiction of the federal courts were a bare assertion that, as a result of government action, one is

discouraged from speaking, there would be little left of the Article III threshold in First Amendment cases." *Walker*, 450 F.3d at 1089. Rather, in a chilled speech claim, the chilling effect must arise "from an *objectively justified* fear of real consequences." *D.L.S.*, 374 F.3d at 975 (emphasis added). It is not enough for Ms. Chiles to claim to be deterred by the Law; she must show that the Law "would plausibly deter a reasonable person in [her] position." *Rio Grande Found.*, 57 F.4th at 1164. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm[.]" *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).

As explained above, Ms. Chiles does not allege an intent to engage in conduct that would violate the Law. Any fear she asserts is derived from a subjective and erroneous view of the Law's scope. To establish pre-enforcement standing, a plaintiff must show a credible fear of enforcement by demonstrating (1) past enforcement against the same conduct; (2) that the authority to initiate charges was not limited to a prosecutor or an agency; and (3) that the state has not disavowed future enforcement. *Peck*, 43 F.4th at 1132 (citation omitted); *SBA List*, 573 U.S.

at 159. Under this test, Ms. Chiles cannot establish an objectively justified fear of enforcement.

This is especially true because in the nearly four years the Law has been effective, the Boards have not enforced it against any mental health professionals. Supp. App. Vol. II at 433. Ms. Chiles thus cannot show past enforcement against the conduct identified in her complaint. *See SBA List*, 573 U.S. at 164; *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010). Nor can Ms. Chiles point to any signs of imminent enforcement, like an administrative agency's finding of probable cause that her speech violated the Law or any other pending administrative action against her or anyone else. *SBA List*, 573 U.S. at 159.

Moreover, the Law does not create a private right of action. *Id*. at 164 (credibility of the threat of prosecution was bolstered by the fact that "any person" could file a complaint, as opposed to only a prosecutor or an agency). Only the Boards may pursue an administrative disciplinary action against a licensed or registered mental health professional for violating the Law, and they must comply with the procedures of the Colorado Administrative Procedure Act in doing so. Colo. Rev. Stat. §§ 24-4-104 through -106 (2022). Even if Ms. Chiles were to violate the Law,

she would not face broad-reaching exposure under laws that may be enforced in a private action initiated by any Colorado citizen.

Finally, while Colorado has not disavowed enforcement of the Law, the District Court erred in the weight it assigned to this factor. In the absence of the other two factors—past enforcement and broad enforcement authority like a private right of action—whether the state has disavowed future enforcement should be of little weight to a reviewing court. To hold otherwise would allow any plaintiff to establish a credible fear of enforcement simply by showing there is a law on the books that the plaintiff may violate, rendering the other *SBA List* factors meaningless. *See Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006) ("The mere presence on the statute books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct prohibited by the statute."). This cannot be what the Supreme Court intended in establishing this test.

Because Ms. Chiles has not established an intent to engage in the conduct violative of Colorado's Law or an objective, credible threat of enforcement of the Law, the District Court erred in finding she

demonstrated the injury in fact required for Article III standing. This Court lacks subject-matter jurisdiction and should reverse the District Court's ruling as to standing.

## II. The District Court properly denied Ms. Chiles' Motion for Preliminary Injunction because she failed to establish likelihood of success on the merits for each of her constitutional claims.

### A. This Court reviews orders denying preliminary injunctions for abuse of discretion.

A preliminary injunction is an extraordinary remedy, never awarded as of right. *Winter v. Nat. Res. Def. Couns.*, 555 U.S. 7, 24 (2008). This Court reviews a District Court's denial of a preliminary injunction for abuse of discretion. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018). "A district court's decision crosses the abuse-of-discretion line if it rests on an erroneous legal conclusion or lacks a rational basis in the record." *Courthouse News Serv. v. N.M. Admin. Off. of Cts.*, 53 F.4th 1245, 1254 (10th Cir. 2022) (citation omitted). This Court reviews factual findings for clear error and legal conclusions de novo. *Id.* at 1255. The standard for abuse of discretion is high, requiring "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing

*Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1205-06 (10th Cir. 2003)).

A preliminary injunction should only be granted where the need for it is clearly established. *U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir. 1989). A party seeking a preliminary injunction must show (1) a substantial likelihood of success on the merits; (2) irreparable injury that (3) outweighs any injury to the defendant, and (4) that the injunction sought is not adverse to the public interest. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). When a government party opposes the injunction, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435-36 (2009); *Denver Homeless Out Loud v. Denver, CO*, 32 F.4th 1259, 1277-78 (10th Cir. 2022). Failure to establish any one of the four *Beltronics* factors requires a court to deny a motion for preliminary injunction.

Here, Ms. Chiles faces an even heavier burden, as she seeks to disturb the status quo: Colorado's Law was in effect for nearly four years before Ms. Chiles filed her Complaint in the District Court. Accordingly, she must make a "strong showing" that the likelihood of success on the

merits and balance of harms factors both weigh in her favor. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (when seeking a "disfavored injunction" that changes the status quo, a party faces a heavier burden on likelihood of success and balance of harms). In this case, the District Court correctly held that Ms. Chiles failed to make the required showing that she was likely to prevail on the merits of her claims.

> **B. Ms. Chiles failed to show that she was likely to succeed on the merits of her free speech challenge to the Law because the Law regulates professional conduct and survives rational basis review.**

Under the Free Speech Clause of the First Amendment, applicable to the states through the Fourteenth Amendment, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amends. I, XIV. Ms. Chiles has not met her burden of showing that Colorado's Law implicates her free speech rights.

### 1. The Law regulates professional conduct, not speech.

States may regulate professional conduct, even when that conduct incidentally involves speech, without triggering heightened scrutiny. *Nat'l Inst. of Fam. and Life Advocs. v. Becerra* (*NIFLA*)*, 138 S. Ct. 2361,

2372 (2018); *Ohralik*, 436 U.S. at 456. This is for good reason. Licensed professional services require special training and expertise to earn the "imprimatur" of the state when serving the public. *Tingley*, 47 F.4th at 1082 (quoting *Otto v. City of Boca Raton*, 41 F.4th 1271, 1294 (11th Cir. 2022) (Rosenbaum, J., joined by Pryor, J., dissenting in the denial of rehearing *en banc*)). This is because the very characteristics that set licensed professionals apart create potential for harmful behavior. "The State bears a special responsibility for maintaining standards among members of the licensed professions." *Ohralik*, 436 U.S. at 460. For these reasons, the First Amendment does not—and should not—present an unnecessary obstacle to the state's regulation of professional conduct to protect clients and patients and ensure adequate and safe professional services. Ms. Chiles attempts to characterize her services as speech protected by the First Amendment. Opening Br. at 15-26. But the Law does not regulate speech, it regulates professional conduct.

The Supreme Court has twice considered free speech challenges to regulations of professional conduct incidentally involving speech. In both instances, the Court concluded that because the laws regulated conduct

engaged in by licensed professionals within the scope of their licensure, they were not subject to heightened scrutiny.

First, the Supreme Court considered state rules that limited attorneys' engagement in in-person solicitation of clients. *Ohralik*, 436 U.S. at 457-58. The attorney in *Ohralik*, without invitation, visited two eighteen-year-old car accident victims, one of whom was immobilized in traction in the hospital, and the other who had just been released from the hospital. *Id*. at 450-51. During his visits, he attempted to secure representation agreements from both victims. *Id*. The Court noted that the "State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity," emphasizing that the "State bears a special responsibility for maintaining standards among members of the licensed professions." *Id*. at 456, 460. The fact that the conduct of soliciting was "in part initiated, evidenced, or carried out by means of language" did not transform regulation of the conduct into "an abridgement of freedom of speech." *Id*. (*quoting Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). Applying rational basis scrutiny, the Supreme Court concluded the state's rules regulating the professional conduct of attorneys were

reasonably related to the goal of preventing harm by licensed professionals before it occurs. *Id.* at 466-67.

Second, the Supreme Court took a similar approach in *Planned Parenthood v. Casey*, where it upheld a state law that required doctors to disclose certain information prior to performing an abortion. 505 U.S. 833, 844 (1992) (overruled on other grounds by *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022)). The Court reasoned that the law required doctors to provide certain information to women as part of obtaining consent for that medical procedure, and thus only regulated speech "as part of the practice of medicine, subject to reasonable licensing and regulation by the state." *Id*. at 884.

Here, the Law, like the regulations in *Ohralik* and *Casey,* regulates the practice of licensed mental health professionals, implicating speech only as part of the practice of mental health care. By its plain language, the Law is part of the more comprehensive Mental Health Practice Act that regulates a wide array of conduct mental health professionals engage in when treating clients. §§ 12-245-101 through -806. The Law specifically prohibits mental health professionals from engaging in "conversion therapy" in the course of any "practice or

treatment" with clients under the age of eighteen. §§ 12-245-202(3.5)(a), -224(1)(t)(V). Practice and treatment may take many forms, all of which fall under the regulable umbrella of professional conduct for mental health professionals.

Psychotherapy is one form of "practice or treatment" and may include assessment, testing, or counseling, which all may take place in a single intervention or over time. § 12-245-202(14)(a). A licensed professional counselor, like Ms. Chiles, may provide psychotherapy, as well as engage in other forms of practice or treatment that include planning, consultation, education, supervision, research, making referrals, and implementing crisis intervention. Colo. Rev. Stat. § 12-245-603 (2022).

And in practice, popular forms of psychotherapy used with minor clients may include art therapy or play therapy, which are not limited to the mere exchange of spoken words.[11] Nothing in the language or thrust of the Law is aimed at mental health professionals' speech as speech: it

---

[11]   Am.   Psych.   Ass'n.,   https://dictionary.apa.org/art-therapy, https://dictionary.apa.org/play-therapy (last visited Apr. 25, 2023).

simply prohibits mental health professionals from administering a specific therapeutic practice to children.

Equally important, the Law, by its plain language, does *not* prevent mental health professionals from discussing conversion therapy, communicating about sexuality, sexual orientation, and gender identity, and sharing religious beliefs or ideals. A professional may still:

- Communicate with the public about conversion therapy;

- Speak to minor or adult clients about conversion therapy;

- Speak to minor or adult clients about the professional's views on sexual orientation or gender identity, if not part of a therapeutic treatment;

- Engage in conversion therapy with any person over the age of eighteen; or

- Refer minor clients to a personal coach or person engaged in the practice of religious ministry, who are exempted from the Law by the Mental Health Practice Act. § 12-245-217.

These communications are not subject to regulation as professional conduct because either (1) licensure or registration are not required to carry out the above types of communications; or (2) these

communications do not necessarily take place within the confines of a mental health professional's engagement in practice or treatment with a client.

Ms. Chiles attempts to persuade this Court that the Law is a regulation of speech by incorrectly limiting the Law's scope to "talk therapy"—in other words, only one facet of professional counseling, which itself is only one facet of professional treatment or practice. Opening Br. at 16-22. This is wrong. The Law prohibits mental health professionals from engaging in *any* therapeutic modalities—including the use of testing, assessments, interventions, or other treatments—that seek or purport to change her minor clients' sexual orientation or gender identity. Colo. Rev. Stat. §§ 12-245-202(14)(a), -303, -403, -503, -603, -703, -803 (2022). The mere fact that professional conduct is "in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed" does not mean regulating that conduct infringes upon a professional's freedom of speech. *Ohralik*, 436 U.S. at 456 (quoting *Giboney,* 336 U.S. at 502). Even Ms. Chiles admits that "[n]o doubt [her] practice involves some activity." Opening Br. at 28. And while Ms. Chiles

may choose to offer only one type of counseling at this time, that fact is not determinative here.

Ms. Chiles also argues that the Law regulates speech because counseling carried out by means of talk therapy is no different from casual discussions between laypeople. Not so. Ms. Chiles seeks to minimize the distinction between the therapeutic sessions she conducts with clients and conversations a lay person might engage in with a peer to bolster her argument that therapy cannot be conduct. Ms. Chiles, a licensed mental health professional with a master's degree in clinical mental health and nine years of professional experience, compares her interactions with clients to conversations a college student might have with a peer. She goes so far as to describe those communications as "identical." Opening Br. at 23, n.4.; App. at 041-42.

But "[t]he work that [a therapist] does is different than a conversation about the weather, even if he claims that all he does is 'sit and talk.'" *Tingley*, 47 F.4th at 1082. This is so because the relationship between patient and licensed therapist, like other relationships between professionals and their clients or patients, involves a significant power disparity that is absent from a typical relationship between a lay person

and a peer. A client may divulge deeply personal information to a mental health professional in search of treatment or support, but therapists do not share the same with their clients. In fact, this one-sided self-disclosure is among the reasons for the therapist-client privilege. *See People v. Silva¸* 782 P.2d 846, 849 (Colo. App. 1989) (clients may be embarrassed or humiliated by disclosure of information imparted to a therapist for treatment). This privilege enhances the effective diagnosis and treatment of illness by encouraging patients to divulge sensitive information without fear it could be shared outside the professional relationship. *People v. Sisneros*, 55 P.3d 797, 800 (Colo. 2002).

Other regulated professional relationships, including physicians and attorneys, involve similar dynamics of trust and dependence. Here too, states routinely regulate professional conduct within these relationships to protect vulnerable patients and clients through, for example, recognizing privileged communications and imposing malpractice liability for substandard care. Along these lines, the attorney-client privilege's "purpose is to encourage full and frank communication between attorneys and their clients . . . advice or advocacy depends upon the lawyer's being fully informed by the client."

*Upjohn v. U.S.*, 101 S. Ct. 677, 682 (1981). Likewise, the purpose of the physician-patient privilege "is to enhance the effective diagnosis and treatment of illness by protecting the patient from embarrassment and humiliation that might be caused by the physician's disclosure of information imparted to him by the patient." *Clark v. Dist. Ct.*, 69 P.2d 3, 8 (Colo. 1983); *see also People v. Taylor*, 618 P.2d 1127, 1140 (Colo. 1980). For these reasons, professional relationships, including those between mental health professionals and their clients, are fundamentally distinct from relationships formed between lay persons and their peers. And because professionals engage with vulnerable parties—clients and patients—with the gravitas of state licensure, states routinely regulate professional conduct to maintain the integrity and safety of these relationships.

Patients also trust their therapists in ways they do not trust casual acquaintances, particularly when therapists are licensed by the state. Licensed mental health professionals receive reputational and often financial benefits from holding professional licensure. "When a health care provider acts or speaks about treatment with the authority of a state license, that license is an imprimatur of a certain level of competence."

*Tingley*, 47 F.4th at 1082 (internal quotes omitted). The regulation of professional conduct also seeks to ensure that licensed professionals engage in practice or treatment consistent with this level of competence.

Mental health care professionals provide a wide range of services, all of which constitute professional conduct subject to the state's regulation to protect clients and patients. For example, considering Washington's functionally identical minor conversion therapy law, the Ninth Circuit Court of Appeals explained that when minor patients seek help with treating a mental health condition, the state may regulate a licensed provider's treatment of that condition whether a physician is prescribing antidepressant medication or a therapist is providing psychotherapy. *Id.* at 1083. And that law, like Colorado's Mental Health Practice Act, defined Washington's regulated activity—psychotherapy—as more than talking. *Id.* at 1082. The Ninth Circuit held that "[w]hat licensed mental health providers do during their appointments with patients for compensation under the authority of a state license is treatment" and can be regulated as such without triggering heightened scrutiny. *Id.* at 1082-83.

In its analysis, the Ninth Circuit also noted that "psychotherapy is not different from other forms of medicine simply because it uses words to treat ailments." *Id.* at 1082. And it recognized that holding the law to be an unconstitutional restriction on the speech of licensed health care professionals could have dangerous consequences for other reasonable health and welfare laws that regulate professional conduct, like malpractice laws. *Id.* Applying rational basis scrutiny, the Ninth Circuit concluded that Washington's law was constitutional. *Id.* at 1078-79. As in *Tingley*, the Law governs the professional conduct of mental health professionals and does not implicate the First Amendment merely because the conduct incidentally involves speech.

Regulations of the legal profession provide a helpful illustration as to why Ms. Chiles' proposed rule could not stand. No doubt the legal profession's bread and butter lies in communication through oral advocacy or written word. Even so, as with mental health professionals, the state has a special responsibility to maintain standards and regulate lawyers. *Ohralik*, 436 U.S. at 460. For that reason, courts have upheld state regulations of conduct where "speech is an essential but subordinate component" such as lawyers' in-person solicitation, use of

confidential client files in solicitation, and other conduct that harms the public without subjecting those regulations of professional conduct to heightened First Amendment scrutiny. *Ohralik*, 436 U.S. at 457; *see also Kaufman v. Am. Fam. Mut. Ins. Co.*, 601 F.3d 1088, 1094 (10th Cir. 2010).

In short, the regulation of professional conduct seeks to protect clients and patients (particularly minor clients and patients) who are in relationships of trust, dependence, and vulnerability with respect to professionals like licensed or registered mental health professionals. Ms. Chiles' proposal to subject any regulation of professional conduct incidentally involving speech to heightened scrutiny would have devastating consequences to states' ability to regulate licensed professional activity to protect their citizens' safety and welfare, or other laws implicating professional conduct such as malpractice law. *Tingley*, 47 F.4th at 1082. This Court should apply established precedent and common sense in holding that the Law targets professional conduct, not speech.

### 2. Because the Law regulates professional conduct, it is subject to rational basis review.

Because the Law targets professional conduct—even if speech is an "essential but subordinate component" of that conduct—it is subject to

rational basis scrutiny. *Ohralik*, 436 U.S. at 457; *see also Tingley*, 47 F.4th at 1078-79. Both the Supreme Court in *NIFLA* and the Ninth Circuit in *Tingley* recognize this longstanding rule. *NIFLA,* 138 S. Ct. at 2372; *Tingley*, 47 F.4th at 1078-79. Ms. Chiles suggests that the Ninth Circuit's ruling in *Tingley* is at odds with the Supreme Court's opinion in *NIFLA*, which rejected the idea that professional *speech* was categorically exempt from First Amendment protection. But Ms. Chiles reads *NIFLA* too narrowly. She correctly cites *NIFLA*'s holding that "[s]peech is not unprotected merely because it is uttered by professionals." *NIFLA,* 138 S. Ct. at 2371-72. But the Court also went on to acknowledge that a state regulation of professional conduct incidentally involving speech does not trigger First Amendment scrutiny. *Id*. at 2372.

In *NIFLA*, California law required licensed crisis pregnancy centers to post notices about state-provided services available to pregnant women, including abortions, while unlicensed centers were required to post notices about their licensure status. Because the notices did not regulate the centers' own provision of a professional service or treatment, the Court concluded that California's law did not regulate professional conduct, and thus applied heightened scrutiny. *Id*. at 2373-74, 2378. But

unlike California's law in *NIFLA*, both Washington's law in *Tingley* and Colorado's Law are directly aimed at the treatment or practice provided by a mental health professional. Accordingly, the Law is a regulation of professional conduct that incidentally involves speech and is subject to rational basis scrutiny. *Id.* at 2373.

Other circuit courts addressing professional licensing requirements have begun their First Amendment analyses with the same threshold question: whether a law regulates professional conduct. *See Vizaline, L.L.C. v. Tracy*, 949 F.3d 927, 933 (5th Cir. 2020) (occupational licensing requirements are not per se immune from First Amendment scrutiny, but turn on the traditional distinction between speech and conduct); *Cap. Assoc. Ind., Inc. v. Stein*, 922 F.3d 198, 207 (4th Cir. 2019) (declining to apply strict scrutiny to a ban on unauthorized practice of law by corporations because the law was a regulation of professional conduct that incidentally burdens speech); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 429 (6th Cir. 2019) (under *NIFLA,* informed-consent law is a regulation of professional conduct that only incidentally burdens speech).

Ms. Chiles urges this Court to reject these circuits' approach and look instead to the Eleventh Circuit Court of Appeals' opinion in *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020). With cursory analysis, the *Otto* court presumed that Florida's conversion therapy law prohibiting "counseling, practice or treatment" with the goal of changing an individual's sexual orientation or gender identity regulated speech. *Otto*, 981 F.3d at 865. But the court in *Otto* failed to fully consider the threshold question set forth in *NIFLA* and *Ohralik*: whether the law at issue regulated professional conduct incidentally involving speech or instead targeted speech.

The Eleventh Circuit concluded that Florida's law directly, rather than incidentally, regulated speech. *Id.* at 866. The court summarily concluded that this speech was not connected to any regulation of separately identifiable conduct. *Id.* at 865. It then held that Florida's law was content-based and failed to withstand strict scrutiny. The District Court here correctly rejected the *Otto* court's reasoning as unpersuasive because *Otto* failed to engage in the first analytical step required by *NIFLA*.

In fact, the Eleventh Circuit itself has not extended its analysis in *Otto* to other professional license contexts. When asked to consider a First Amendment challenge to a law requiring licensure for those engaging in nutrition counseling or dietetics, the Eleventh Circuit properly analyzed whether the law primarily regulated professional conduct or speech. *Del Castillo v. Sec'y Fla. Dep't. of Health*, 26 F.4th 1214, 1225 (11th Cir. 2022). In *Del Castillo*, it considered *NIFLA* and concluded that the law in question governed professional conduct and its regulation of speech only extended to the assessment of clients' needs and to communicate information and advice. *Id.* As such, this speech was only incidental to regulating professional conduct. *Id.* Without distinguishing its decision in *Otto*, the Eleventh Circuit concluded the law was a regulation of professional conduct that only incidentally affected speech and was constitutional under the First Amendment. *Id.* at 1226.

Next, Ms. Chiles cites to other circuit cases analyzing statutes that facially regulate conduct and argues these cases compel application of strict scrutiny here. These cases are inapposite because they do not involve regulations of professional conduct. First, Chiles erroneously relies upon *Holder v. Humanitarian Law Project*, in which plaintiffs

challenged a law prohibiting the provision of, among other things, "material support" to certain organizations identified as engaging in terrorist activity. 561 U.S. at 7. There, the plaintiffs wished to provide training and expert advice or assistance to certain prohibited groups. *Id.* at 21-22. The Supreme Court framed the question presented as whether the government could prohibit "material support . . . in the form of speech" and thus applied strict scrutiny. *Id.* at 28. But *Holder* is distinct from the situation facing this Court here. Even though the *Holder* plaintiffs sought to provide expert assistance and training, they would not have been doing so with the "imprimatur of a certain level of competence" conferred upon them by the government through a professional license. *Tingley*, 47 F.4th at 1082 (internal quotes omitted). As such, the Supreme Court's application of strict scrutiny in *Holder* does not govern the appropriate standard of review here.

Ms. Chiles also seeks purchase in this Court's ruling in *Animal Legal Defense Fund v. Kelly*, which applied strict scrutiny to a Kansas law prohibiting the use of deception to gain consent to access an animal facility. 9 F.4th 1219, 1223 (10th Cir. 2021) (*ALDF)*. There, the non-profit organization Animal Legal Defense Fund wished to covertly plant its

investigators as employees at animal facilities to document animal abuse. *Id.* Because Kansas' law limited not only what the Fund's investigators were allowed to do, but also what they were allowed to say to gain access to facilities, this Court held the law was subject to strict scrutiny. *Id.* at 1223, 1235. But this Court's ruling in *ALDF* is even more attenuated from this case than *Holder*. The law in *ALDF* did not concern the conduct of professionals or even speech in the context of a professional relationship. Rather, the law regulated "what may be permissibly said to gain access to or control over an animal facility." *Id.* at 1232. The law was not subject to lesser scrutiny under *NIFLA* and *Ohralik* because it did not implicate professional conduct or speech in a professional context.

*Conant v. Walters*, also cited by Ms. Chiles, is more analogous to this case. 309 F.3d 629 (9th Cir. 2002). But *Conant* is consistent with Colorado's position. In *Conant*, the Ninth Circuit considered whether the federal government could discipline a physician who recommended patients seek medical marijuana on their own if the patients thought that to be a reasonable alternative to treat their ailments. *Id.* at 632-33. The parties agreed that a physician would violate federal law by prescribing or providing medical marijuana directly to their patients—a critical fact

not addressed in Ms. Chiles' brief. *Id.* at 634. The Ninth Circuit affirmed that making a recommendation that the patient could consider seeking medical marijuana on their own, even though a physician could not prescribe medical marijuana, was protected under the First Amendment and subject to strict scrutiny. *Id.* at 637.

Here, a mental health professional like Ms. Chiles is free to tell any minor client that conversion therapy may serve their goals and refer the client to a religious minister who can provide that service. Consistent with *Conant*, Colorado's Law does not regulate Ms. Chiles'—or any mental health professional's—ability to have that conversation with their minor clients. The Law merely prohibits Ms. Chiles from herself providing conversion therapy to that client.

Ms. Chiles cites to several additional cases; all are inapposite to the appropriate level of constitutional scrutiny for a regulation of licensed professional conduct where the professional practice may involve speech. First, Ms. Chiles cites cases applying strict scrutiny to laws regulating speech, but where professional conduct was not at issue. In *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001), for example, the Supreme Court applied strict scrutiny to a law that prohibited any individual from disclosing the

contents of illegally intercepted communications. And this Court, reviewing a time, place, and manner restriction that prohibited pedestrians from standing on medians, even when engaging in speech, applied heightened scrutiny. *McCraw v. City of Okla. City*, 973 F.3d 1057, 1062, 1070 (10th Cir. 2020). But the application of heightened scrutiny in those cases, where professional conduct was not implicated, is not analogous to the case here.

Next, Ms. Chiles relies on cases analyzing laws requiring licensure for certain types of conduct or addressing unlicensed conduct to argue that strict scrutiny should be applied to Colorado's Law. But the laws in those cases did not regulate the conduct of individuals engaged in professions involving relationships of trust and dependence between clients and professionals. In *Billups v. City of Charleston*, 961 F.3d 673, 676, 684-85 (4th Cir. 2020), the Fourth Circuit considered a city law requiring prospective tour guides to pass a written examination and obtain a license. Once licensed, the city law did not regulate or restrict what a tour guide was permitted to say. *Id.* at 677. Because the law did not even survive intermediate scrutiny, the court declined to opine on whether it was subject to strict scrutiny. *Id.* at 684. The district court in

*Upsolve, Inc. v. James*, 604 F. Supp 3d 97, 114 (S.D.N.Y. 2022) (*appeal filed* June 22, 2022), applied heightened scrutiny to a law restricting legal advice given by *unlicensed* individuals. Neither of these laws regulated the actual conduct engaged in by professionals. Nor did the law under consideration in *Honeyfund.com, Inc. v. DeSantis*, No. 4:22cv227-MW/MAF, 2022 WL 3486962 at *9-10 (N.D. Fla. Aug. 18, 2022) involve professionals' conduct of any kind. In that case, the district court applied strict scrutiny to a law prohibiting employers from requiring employees to attend trainings or required activities on certain topics. *Id.*

There is no reason to depart from the standard regarding professional conduct set forth in *Ohralik* and affirmed in *NIFLA*. This Court should follow those cases and analyze Colorado's Law under rational basis review.

### 3. Colorado's interest in protecting children is legitimate, substantial, and even compelling.

Under *Ohralik*, the Law must be a reasonable regulation of professional conduct supported by a legitimate and important state interest. 436 U.S. at 459. As determined by the District Court, the Law meets this standard. Even if this Court were to apply a higher level of

scrutiny[12]—and it should not—the Law would withstand that analysis, which requires a showing that a law is narrowly tailored to a compelling state interest. *See Tingley*, 47 F.4th at 1077. Colorado's interest in preventing harmful therapeutic practices known to increase suicide among youth is not only legitimate, but also important and indeed compelling.

States have a compelling interest in professional regulation as part of their power to protect public health and safety. *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975). States also have a compelling interest in safeguarding the physical and psychological well-being of minor children. *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 608 (1982); *PJ ex rel. Jensen*, 603 F.3d at 1198. And the Colorado Supreme Court specifically has acknowledged Colorado's interest in maintaining the integrity of the

---

[12] In *Vizaline v. Tracy*, 949 F.3d 927, 931 (5th Cir. 2020), the Fifth Circuit Court of Appeals suggested that laws touching on professional conduct could be divided into three tiers: (1) regulations of speech, (2) regulations of conduct incidentally involving speech, and (3) regulations of non-expressive conduct. The Fifth Circuit declined to express what level of scrutiny would apply to each level, but its recognition of three potential categories of laws implies that intermediate scrutiny might be available for the second category of laws. *Id.* at 934. For the same reasons the Law would withstand even strict scrutiny, it would easily pass muster under this test.

mental-health profession. *Ferguson v. People*, 824 P.2d 803, 810 (Colo. 1992).

> **4. The relationship between the Law and Colorado's interest is rational, substantial, and even narrowly tailored.**

The Law is reasonably related to the state's interest in preventing harmful therapy for minors. This prophylactic approach to prevent harm is based on overwhelming scientific research and has been adopted by over half of the states.[13] Supp. App. Vol. I at 103; *see Ohralik*, 436 U.S. at 467 (to satisfy the state's strong interest in regulating professional conduct, it is not unreasonable or unconstitutional for a state to enact "what is in effect a prophylactic rule"). Empirical studies show that conversion therapy is both harmful and ineffective, especially for

---

[13] Similar state laws concerning conversion therapy include: S.B. 1172, Reg. Sess. (Cal. 2012); H.B. 6695, Reg. Sess. (Conn. 2017); S.B. 65, 149th Gen. Assemb., Reg. Sess. (Del. 2018); S.B. 270, 29th Leg., Reg. Sess. (Haw. 2017) (prohibiting sexual orientation change efforts therapy upon minors) and H.B. 664, 30th Leg., Reg. Sess. (Haw. 2019) (amending to include gender identity change efforts); H.B. 0217, 99th Gen. Assemb., Reg. Sess. (Ill. 2016); L.D. 1025, 129th Leg., Reg. Sess. (Me. 2019); S.B. 1028, Reg. Sess. (Md. 2018); H140, 19th Gen. Ct., Reg. Sess. (Mass. 2019); S.B. 201, 79th Leg., Reg. Sess. (Nev. 2017); A.B. 3371, 215th Leg., Reg. Sess. (N.J. 2013); S.B. 121, Reg. Sess. (N.M. 2017); A00576, Reg. Sess. (N.Y. 2019); H.B. 2307, Reg. Sess. (Or. 2015); H5277A, Reg. Sess. (R.I. 2017); S.132, Reg. Sess. (Vt. 2016); H.B. 386, Reg. Sess. (Va. 2020); S.B. 5722, Reg. Sess. (Wash. 2018).

children. Supp. App. Vol. I at 103. The Supreme Court has held that psychiatrists recognize "sexual orientation is both a normal expression of human sexuality and immutable." *Obergefell v. Hodges,* 576 U.S. 644, 661 (2015). And the American Psychological Association has reaffirmed that "diversity in gender identity and expression is part of the human experience."[14]

Conversion therapy is ineffective and lacks clinical utility. Supp. App. Vol. I at 106, 111, 144. And negative side effects of conversion therapy abound, including loss of sexual feeling, depression, suicidality, anxiety, negative changes in family relationships, decreases in self-esteem and self-worth, and loss of faith. Supp. App. Vol. I at 133, 136, 137, 148, 149. Rates of suicidality among children who have received conversion therapy increase significantly. Supp. App. Vol. I at 136, 138, 139.

Even if the Court were to apply a higher burden of scrutiny to Colorado's Law, which it should not, the Law is narrowly tailored to not substantially burden more speech than necessary. *See, e.g., Capital*

---

[14] Am. Psych. Ass'n, *APA Resolution on Gender Identity Change Efforts*, 1-2 (Feb. 2021), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf.

*Assoc. Ind., Inc. v. Stein*, 922 F.3d 198 (4th Cir. 2019) (applying intermediate scrutiny to a ban on practice of law by corporations, who are not licensed members of the bar); *King v. Governor of New Jersey*, 767 F.3d 216, 224 (3d Cir. 2014) (holding conversion therapy is speech, the law survives a free speech challenge under intermediate scrutiny) (*abrogated by NIFLA* concerning recognition of a separate category of professional speech exempt from First Amendment protection).

The Law is clear about what it prohibits. *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972); *United States v. Williams*, 553 U.S. 285, 304 (2008). The Law provides plain definitions for conduct and uses terms that are commonly understood. *See, e.g., Obergefell*, 576 U.S. at 646 (using the term "sexual orientation" without definition). It only restricts a specific therapeutic treatment that mental health professionals employ when working with children, who are most vulnerable to the harms that conversion therapy presents. Supp. App. Vol. I at 122. Accordingly, the District Court aptly found that the Law "narrowly prohibits therapeutic practices that promote particular sexual orientations or gender identities—not practices that support, facilitate, or assist minor clients' exploration of those orientations or identities." App. at 071. It does not

prohibit the "consensual conversations" supportive of a minor client's self-exploration that Chiles claims that she wishes to have.

It does not sweep in those who engage in conversion therapy as part of their roles as religious leaders or religious ministers. Nor does it prohibit mental health professionals from engaging in conversion therapy with adult clients, who are better positioned than children to assess and make informed decisions concerning the risks and perceived benefits of receiving such therapy. Mental health professionals also remain free to discuss the risks and benefits of conversion therapy and refer any minor or adult client to an individual exempted from the Law.

There is no less burdensome alternative that Colorado could employ to achieve its interest in preventing the harms of conversion therapy in children. Other traditional methods of assisting patients in making informed decisions about their care, such as informed-consent requirements would not protect minors, who are subject to influence from their communities, parents, and therapists and, depending on their age, cannot consent to their own care. Colo. Rev. Stat. § 12-245-203.5 (2022).

For these reasons, the Law advances Colorado's compelling interest to protect youth in a way that satisfies any level of scrutiny, especially

the rational basis analysis historically applied to professional conduct regulations. Given the threat conversion therapy poses to children's psychological well-being and very lives, the Law's measures are reasonable, narrowly tailored, and could not be substituted with less restrictive alternatives.

### C. Ms. Chiles failed to show that she was likely to succeed on the merits of her free exercise claim because the Law is neutral and generally applicable and survives rational basis review.

The Free Exercise Clause of the First Amendment, applicable to the states under the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amends. I, XIV. However, a law that is neutral and generally applicable is constitutional if it is rationally related to a legitimate government interest. *Emp. Div. v. Smith*, 494 U.S. 872, 878-82 (1990); *see Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876-77 (2021); *see also Ashaheed v. Currington*, 7 F.4th 1236, 1243 (10th Cir. 2021). To succeed on the merits of her challenge to the Law, Ms. Chiles must show that Colorado has burdened her sincere religious practice pursuant to a policy that is not neutral or generally applicable. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2022).

As the District Court properly determined, Ms. Chiles has failed to meet this burden. She has failed to establish that the Law is not neutral or generally applicable. Accordingly, the Law is subject to rational basis review. The District Court correctly held that the Law satisfies that standard because it is rationally related to the state's legitimate interest in protecting children from the harms of conversion therapy. *Supra* Section II.B.4. For that reason, Ms. Chiles is unlikely to succeed on the merits of her challenge on free exercise grounds. App. at 087.

### 1. The Law does not target religious practice.

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877. Colorado's Law is neutral. It regulates a harmful therapeutic practice for minors, not a religious rite. The Law's prohibition on providing conversion therapy to minors applies to all mental health professionals, no matter their religion or nonreligion. Nor does the Law distinguish between whether religious or secular reasons motivate a professional to administer conversion therapy when working with children.

First, the history of the Law is instructive. *See, e.g.*, *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Com'n*, 138 S. Ct. 1719, 1731 (2018) (noting that the legislative history and contextual background are "relevant to the assessment" of whether a law is neutral). As the legislative history shows, the General Assembly's focus was on preventing harms to children based on scientific evidence, and it explicitly noted that conversion therapy is "a harmful practice wrongfully named therapy."[15] The General Assembly heard testimony about the negative effects of conversion therapy, scientific studies finding conversion therapy ineffective and harmful, and the contribution conversion therapy has in increasing suicidality in youth. *Id.*

What is more, the Mental Health Practice Act, of which the Law is a part, shows a solicitude towards religious practice. The Act contains an express exemption for the practice of religious ministry: "a person engaged in the practice of religious ministry is not required to comply with this article 245." § 12-245-217(1). And the Boards have taken steps

---

[15] *Prohibit Conversion Therapy for a Minor: Hearing on HB 19-1129 Before the H. Comm. on Pub. Health Care & Human Servs.* 70th Sess. (2019) (statement of Dr. Robert Werthwein, Dir. for Off. of Behav. Health, Dep't of Hum. Servs).

to ensure that the contours of the mental health practice regulations are clear. The Boards have each promulgated rules for determining whether a registrant or licensee is engaged in religious ministry, rather than the practices of mental healthcare. When reviewing any requested religious ministry exemption under the Act, the Boards must review fifteen enumerated factors "taken together and placed within the context of the incident in question" to determine whether "the person seeking the exemption was engaged in the practice of religious ministry." 4 Colo. Code Regs. § 737-1:1.17 (2020). And if the Boards determine that this religious ministry exemption applies, the Boards may take no further action. *Id.* Ms. Chiles has not challenged these regulations.

In *Fulton*, the Supreme Court found that "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." 141 S. Ct. at 1877. The Act's exemption for religious ministry is exactly the kind of solicitude towards religion that shows Colorado's Law was intended to be neutral.

Ms. Chiles offers several arguments in response; none are convincing. First, she asserts that Colorado's exemption for religious ministry is "entirely illusory." Opening Br. at 36. Far from it. As applied

to the Law, the exemption allows anyone—whether licensed with the state or not—to provide services akin to conversion therapy, so long as the provision is through *a religious ministry*. What the Law forbids is practicing conversion therapy on minors in the capacity as a licensed or registered mental health professional, because of the unconscionable risks that conversion therapy poses. Such dangers mean that conversion therapy has no place in a state-sanctioned therapeutic practice upon children.[16]

Second, Ms. Chiles asserts that when the Law was enacted, it was generally known that conversion therapy is primarily a religious practice, so the Law must have targeted religion. Opening Br. at 35. In so doing, she asks this Court to analogize the Law to the ordinance passed in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). However, the two cases are quite different.

---

[16] Nor, as Ms. Chiles suggests, was the religious ministry exemption enacted to circumvent issues that could arise with the implementation of the Law. Rather, the religious ministry exemption has been part of the Mental Health Practice Act been for over 20 years and applies to the Act in its entirety, not just the Law. § 12-245-217(1); H.B. 98-1072, 61st Gen. Assemb., Reg. Sess. (Colo. 1998).

In *Lukumi*, the Court found religious animus against Santeria in a law relating to animal slaughter, where the town had passed a resolution shortly before the law's enactment noting concern with the practices of "certain religions" and where the law exempted secular and kosher slaughter. *Id.* at 526. Here, such evidence of selective exemptions is absent from the Law's text or operation.

Additionally, in *Lukumi*, the record of the town's meetings "evidence[d] significant hostility…toward the Santeria religion." *Id.* at 541. By contrast, the legislative history here underscores the Law's neutrality. The Law "does not apply to what goes on inside of a church. It applies to folks who are licensed and regulated by the state of Colorado to provide therapy, mental health services, medicine, etc."[17] Ms. Chiles bears the burden of demonstrating that the Law's legislative history supports her claims of animus. Ms. Chiles cites nothing because no such nefarious legislative history exists. Because Ms. Chiles has not demonstrated that her religious practice is targeted by the Law, she has

---

[17] *Prohibit Conversion Therapy for A Minor: Hearing on HB 19-1129 Before the Sen. Comm. On State, Veterans, & Military Affairs*, 70th Sess. (2019) (statements of Sen. Stephen Fenberg) (emphasis added).

failed to make the necessary "strong showing" that she is likely to succeed on her Free Exercise claim. *Free the Nipple-Fort Collins*, 916 F.3d at 797.

### 2. The Law does not provide for individualized exemptions that favor secular practice over religious practice.

Ms. Chiles argues that the Law's definition of conversion therapy involves too much discretion and so creates individualized exemptions through which Colorado can punish religious speech. This argument is meritless.

The Law both defines conversion therapy in detail and outlines what practices are not included in that definition. § 12-245-202(3.5)(a) - (b). These provisions apply equally to all licensed mental health professionals, regardless of their religious beliefs or affiliations. There is no mechanism for the Boards "to consider the particular reasons for a person's conduct" and determine that providing conversion therapy to children in a professional setting might be permissible. *Fulton*, 141 S. Ct. at 1877. The District Court, citing *Fulton*, correctly found that the Law did not contain any such mechanism for individual exemptions. App. at 085.

It is true that if it were to investigate a future complaint, the Boards would have to examine a mental health professional's conduct to determine whether they are engaging in conversion therapy on minors. That makes the Boards prudent, not prejudiced. The Law is clear: a licensed or registered mental health professional, as part of their professional practice, cannot use therapeutic techniques with minor patients intended to change their sexual orientation or gender identity.

### 3. Because the Law is neutral and generally applicable, it is subject to and survives rational basis review.

The Mental Health Practice Act seeks to "safeguard the public health, safety, and welfare" of Coloradans by regulating "unauthorized, unqualified, and improper application" of mental health care. § 12-245-101(1). Because Ms. Chiles cannot show that the Law is not neutral or generally applicable, the Law is subject to rational basis review. *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006); *see also Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 53 (10th Cir. 2013). It easily passes that level of scrutiny. *Supra* Section II.B.2-4.

The Law advances a legitimate governmental interest: protecting the psychological and physical wellbeing of children. This Law is rationally related to this legitimate interest, as it prohibits the provision of a harmful and unnecessary modality of therapy by registered and licensed mental health professionals to minor clients. The District Court's finding that the Law survives rational basis review is proper, and Ms. Chiles has not provided any evidence to support the contrary. Accordingly, Ms. Chiles cannot show a likelihood of success on the merits of her free exercise claim.

### D. The remaining *Beltronics* factors weigh against preliminarily enjoining the Law and the District Court's order should be upheld.

Even if Ms. Chiles had made a strong showing that she is likely to succeed on the merits of her free speech and free exercise claims, and she did not, Ms. Chiles would still need to show a likelihood that she would suffer irreparable harm absent the injunction, that the threatened injury to her outweighs the potential injury to Colorado, and the preliminary injunction is in the public interest. *Beltronics*, 562 F.3d at 1070. Ms. Chiles cannot do so.

First, to the extent Ms. Chiles alleges the Law will chill her speech, causing irreparable injury, she ignores the fact that the Law has been in effect for nearly four years. To the extent she seeks to disturb the status quo, any irreparable injury she has suffered as a result of the Law would have occurred at the time of its enactment in 2019. Simply, Ms. Chiles argues that she is now suffering an irreparable injury from a Law that prevented her from engaging in conduct she did not engage in historically and does not clearly allege she wishes to take part in moving forward. Because of these deficiencies in her allegations, Ms. Chiles' argument on this factor fails. *Supra* Section I.C.1.-2. But, even if this Court is persuaded that Ms. Chiles is suffering from an ongoing injury caused by the Law, it must turn to the remaining *Beltronics* factors, which merge when the government is the defendant. Opening Br. at 51.

Next, any threat to Ms. Chiles must outweigh the threat posed to Colorado. But, at most, Ms. Chiles' professional conduct as a licensed professional is being limited by the Law—her actions as a private citizen are not. *Supra* Section I.B.1.-2. And it is also of paramount importance for states to protect the "lives and health of the children within their borders." *PJ ex rel. Jensen*, 603 F.3d at 1198. And through the regulation

of professional conduct Colorado has a duty to safeguard the physical and psychological well-being of its minor children. *Goldfarb*, 421 U.S. at 792; *Globe Newspaper Co.*, 457 U.S. at 608. Protecting the lives and well-being of Colorado's children from harmful therapeutic treatments is in the public interest and is not outweighed by Ms. Chiles' desire to engage in a particular modality of psychotherapy.

Because Ms. Chiles has failed to establish any of the factors required for the issuance of a preliminary injunction, this Court should affirm the District Court's order denying her motion.

## CONCLUSION

Ms. Chiles' strained reading of the Law is insufficient to establish the necessary injury in fact to demonstrate standing. As such, this case should be dismissed for lack of subject-matter jurisdiction. Even if this Court finds Ms. Chiles has established standing, the District Court properly denied Ms. Chiles' Motion for a Preliminary Injunction. The Law is a constitutional regulation of professional conduct, which targets professional conduct aimed at the vulnerable minor population, not speech. Nor does the neutral and generally applicable Law implicate Ms. Chiles' free exercise rights. For these reasons, Ms. Chiles failed to make

any showing, much less the strong showing required of a party wishing to disturb the status quo of nearly four years, that her claims were likely to succeed on the merits, or that any other requirements for a preliminary injunction were satisfied. This Court should affirm.

Dated: May 1, 2023

PHILIP J. WEISER
Attorney General

s/ Bianca E. Miyata
SHANNON WELLS STEVENSON*
Solicitor General
HELEN NORTON*
Deputy Solicitor General
ROBERT W. FINKE*
First Assistant Attorney General
BIANCA E. MIYATA*
JANNA K. FISCHER*
Assistant Solicitors General
ABBY CHESTNUT*
BRIANNA S. TANCHER*
Assistant Attorneys General
Telephone: 720-508-6651
E-Mail: bianca.miyata@coag.gov
Department of Law
1300 Broadway, 8th Floor
Denver, CO 80203
*Counsel of Record for Attorneys for
Defendants-Appellees/Cross-
Appellants

## STATEMENT REGARDING ORAL ARGUMENT

Colorado believes that oral argument is appropriate and will assist the Court in reaching a decision.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,810 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2008 in 14-point Century Schoolbook.

Dated: May 1, 2023

s/ Bianca E. Miyata
Bianca E. Miyata
Assistant Solicitor General
Department of Law
1300 Broadway, 8th Floor
Denver, Colorado 80203
Telephone: 720-508-6651
E-Mail: bianca.miyata@coag.gov

---

West's Colorado Revised Statutes Annotated
    Title 12. Professions and Occupations (Refs & Annos)
        Health-Care Professions and Occupations
            Article 245. Mental Health (Refs & Annos)
                Part 1. Legislative Declaration (Refs & Annos)

C.R.S.A. § 12-245-101

Formerly cited as CO ST § 12-43-101

§ 12-245-101. Legislative declaration

Effective: August 10, 2022
Currentness

(1) The general assembly hereby finds and determines that, in order to safeguard the public health, safety, and welfare of the people of this state and in order to protect the people of this state against the unauthorized, unqualified, and improper application of psychology, social work, marriage and family therapy, professional counseling, psychotherapy, and addiction counseling, it is necessary that the proper regulatory authorities be established and adequately provided for.

(2) The general assembly therefore declares that there shall be established a state board of psychologist examiners, a state board of social work examiners, a state board of marriage and family therapist examiners, a state board of licensed professional counselor examiners, a state board of unlicensed psychotherapists, and a state board of addiction counselor examiners with the authority to license, register, or certify, and take disciplinary actions or bring injunctive actions, or both, concerning licensed psychologists and psychologist candidates, licensed social workers and clinical social worker candidates, licensed marriage and family therapists and marriage and family therapist candidates, licensed professional counselors and licensed professional counselor candidates, unlicensed psychotherapists, and licensed and certified addiction counselors and addiction counselor candidates, respectively, and mental health professionals who have been issued a provisional license pursuant to this article 245.

**Credits**

Relocated and amended by Laws 2019, Ch. 136 (H.B. 19-1172), § 1, eff. Oct. 1, 2019. Amended by Laws 2020, Ch. 304 (H.B. 20-1206), § 45, eff. July 14, 2020; Laws 2022, Ch. 207 (H.B. 22-1307), § 2, eff. Aug. 10, 2022.

**Editors' Notes**

**REPEAL**

<For repeal of this section, see § 12-245-234.>

Notes of Decisions (1)

C. R. S. A. § 12-245-101, CO ST § 12-245-101
Current through legislation effective April 25, 2023 of the First Regular Session, 74th General Assembly (2023). Some statute sections may be more current. See credits for details.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Addendum 1

---

West's Colorado Revised Statutes Annotated
   Title 12. Professions and Occupations (Refs & Annos)
     Health-Care Professions and Occupations
       Article 245. Mental Health (Refs & Annos)
         Part 2. General Provisions (Refs & Annos)

C.R.S.A. § 12-245-202
Formerly cited as CO ST § 12-43-201

§ 12-245-202. Definitions

Effective: August 10, 2022
Currentness

As used in this article 245, unless the context otherwise requires:

(1) "Board" includes the state board of psychologist examiners, the state board of social work examiners, the state board of licensed professional counselor examiners, the state board of marriage and family therapist examiners, the state board of unlicensed psychotherapists, and the state board of addiction counselor examiners.

(2) "Certificate holder" means an addiction counselor certified pursuant to this article 245.

(3) "Certified addiction counselor" means a person who is an addiction counselor certified pursuant to this article 245.

(3.5)(a) "Conversion therapy" means any practice or treatment by a licensee, registrant, or certificate holder that attempts or purports to change an individual's sexual orientation or gender identity, including efforts to change behaviors or gender expressions or to eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex.

(b) "Conversion therapy" does not include practices or treatments that provide:

(I) Acceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development, including sexual-orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices, as long as the counseling does not seek to change sexual orientation or gender identity; or

(II) Assistance to a person undergoing gender transition.

(4) "Dementia diseases and related disabilities" has the same meaning set forth in section 25-1-502(2.5).

(5) "Licensed addiction counselor" means a person who is an addiction counselor licensed pursuant to this article 245.

Addendum 2

(6) "Licensed professional counselor" means a person who is a professional counselor licensed pursuant to this article 245.

(7) "Licensed social worker" means a person who:

(a) Is a licensed social worker or licensed clinical social worker; and

(b) Is licensed pursuant to this article 245.

(8) "Licensee" means a psychologist, social worker, clinical social worker, marriage and family therapist, licensed professional counselor, or addiction counselor licensed pursuant to this article 245.

(9) "Marriage and family therapist" means a person who is a marriage and family therapist licensed pursuant to this article 245.

(10) "Professional relationship" means an interaction that is deliberately planned or directed, or both, by the licensee, registrant, or certificate holder toward obtaining specific objectives.

(11) "Provisional license" means a license or certification issued pursuant to section 12-245-208.

(12) "Provisional licensee" means a person who holds a provisional license pursuant to section 12-245-208.

(13) "Psychologist" means a person who is a psychologist licensed pursuant to this article 245.

(14)(a) "Psychotherapy" or "psychotherapy services" means the treatment, diagnosis, testing, assessment, or counseling in a professional relationship to assist individuals or groups to alleviate behavioral and mental health disorders, understand unconscious or conscious motivation, resolve emotional, relationship, or attitudinal conflicts, or modify behaviors that interfere with effective emotional, social, or intellectual functioning. Psychotherapy follows a planned procedure of intervention that takes place on a regular basis, over a period of time, or in the cases of testing, assessment, and brief psychotherapy, psychotherapy can be a single intervention.

(b) It is the intent of the general assembly that the definition of psychotherapy as used in this article 245 be interpreted in its narrowest sense to regulate only those persons who clearly fall within the definition set forth in this subsection (14).

(15) Repealed by Laws 2020, Ch. 304 (H.B. 20-1206), § 46, eff. July 14, 2020.

(16) "Registrant" means a psychologist candidate, clinical social worker candidate, marriage and family therapist candidate, licensed professional counselor candidate, or addiction counselor candidate registered pursuant to section 12-245-304(3), 12-245-404(4), 12-245-504(4), 12-245-604(4), or 12-245-804(3.7), respectively, or an unlicensed psychotherapist.

Addendum 3

(17)(a) "Unlicensed psychotherapist" means a person:

(I) Whose primary practice is psychotherapy or who holds himself or herself out to the public as being able to practice psychotherapy for compensation; and

(II) Who is registered with the state board of unlicensed psychotherapists pursuant to section 12-245-703 to practice psychotherapy in this state.

(b) "Unlicensed psychotherapist" also includes a person who:

(I) Is a licensed school psychologist licensed pursuant to section 22-60.5-210(1)(b);

(II) Is practicing outside of a school setting; and

(III) Is registered with the state board of unlicensed psychotherapists pursuant to section 12-245-703.

**Credits**
Relocated and amended by Laws 2019, Ch. 136 (H.B. 19-1172), § 1, eff. Oct. 1, 2019. Amended by Laws 2019, Ch. 197 (H.B. 19-1120), § 6, eff. Oct. 1, 2019; Laws 2019, Ch. 378 (H.B. 19-1129), § 7, eff. Oct. 1, 2019; Laws 2020, Ch. 304 (H.B. 20-1206), § 46, eff. July 14, 2020; Laws 2022, Ch. 207 (H.B. 22-1307), § 3, eff. Aug. 10, 2022.

**Editors' Notes**

**REPEAL**

<For repeal of this section, see § 12-245-234.>

Notes of Decisions (1)

C. R. S. A. § 12-245-202, CO ST § 12-245-202
Current through legislation effective April 25, 2023 of the First Regular Session, 74th General Assembly (2023). Some statute sections may be more current. See credits for details.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Addendum 4

West's Colorado Revised Statutes Annotated
    Title 12. Professions and Occupations (Refs & Annos)
        Health-Care Professions and Occupations
            Article 245. Mental Health (Refs & Annos)
                Part 2. General Provisions (Refs & Annos)

C.R.S.A. § 12-245-217

Formerly cited as CO ST § 12-43-215

§ 12-245-217. Scope of article--exemptions

Effective: August 10, 2022

Currentness

(1) A person engaged in the practice of religious ministry is not required to comply with this article 245; except that the person shall not publicly claim to hold any title incorporating the term "psychologist", "social worker", "licensed social worker", "LSW", "licensed clinical social worker", "LCSW", "clinical social worker", "licensed marriage and family therapist", "LMFT", "licensed professional counselor", "LPC", "addiction counselor", "licensed addiction counselor", "LAC", "certified addiction counselor", "CAC", "certified addiction specialist", "CAS", "certified addiction technician", or "CAT" unless the person is licensed or certified pursuant to this article 245.

(2) This article 245 does not apply to:

(a) The practice of employment or rehabilitation counseling as performed in the private and public sectors; except that the provisions of this article 245 shall apply to employment or rehabilitation counselors practicing psychotherapy in the field of mental health;

(b) Employees of the department of human services or the behavioral health administration in the department of human services; employees of county departments of human or social services; or personnel under the direct supervision and control of the state department of human services, the behavioral health administration, or any county department of human or social services for work undertaken as part of their employment;

(c) Persons who are licensed pursuant to section 22-60.5-210 and who are not licensed under this article 245 for work undertaken as part of their employment by, or contractual agreement with, the public schools;

(d) Mediators resolving judicial disputes pursuant to part 3 of article 22 of title 13;

(e) A person who resides in another state and who is currently licensed or certified as a psychologist, marriage and family therapist, clinical social worker, professional counselor, or addiction counselor in that state to the extent that the licensed or certified person performs activities or services in this state, if the activities and services:

(I) Are performed within the scope of the person's license or certification;

Addendum 5

(II) Do not exceed twenty days per year in this state;

(III) Are not otherwise in violation of this article 245; and

(IV) Are disclosed to the public that the person is not licensed or certified in this state;

(f) A professional coach, including a life coach, executive coach, personal coach, or business coach, who has had coach-specific training and who serves clients exclusively as a coach, as long as the professional coach does not engage in the practice of psychology, social work, marriage and family therapy, licensed professional counseling, psychotherapy, or addiction counseling, as those practices are defined in this article 245.

(g) Students who are enrolled in a school program and are practicing as part of a school practicum or clinical program; or

(h) A professional practicing auricular acudetox in accordance with section 12-245-233.

(3) Nothing in this section limits the applicability of section 18-3-405.5, which applies to any person while practicing psychotherapy as defined in this article 245.

(4) The provisions of section 12-245-703 do not apply to employees of community mental health centers or clinics as those centers or clinics are defined by section 27-66-101, but persons practicing outside the scope of employment as employees of a facility defined by section 27-66-101 are subject to the provisions of section 12-245-703.

**Credits**

Relocated and amended by Laws 2019, Ch. 136 (H.B. 19-1172), § 1, eff. Oct. 1, 2019. Amended by Laws 2020, Ch. 304 (H.B. 20-1206), § 11, eff. July 14, 2020; Laws 2022, Ch. 207 (H.B. 22-1307), § 5, eff. Aug. 10, 2022; Laws 2022, Ch. 222 (H.B. 22-1278), § 7, eff. July 1, 2022.

**Editors' Notes**

**REPEAL**

<For repeal of this section, see § 12-245-234.>

Notes of Decisions (1)

C. R. S. A. § 12-245-217, CO ST § 12-245-217
Current through legislation effective April 25, 2023 of the First Regular Session, 74th General Assembly (2023). Some statute sections may be more current. See credits for details.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Addendum 6

KeyCite Red Flag - Severe Negative Treatment
Enacted Legislation Amended by 2023 Colo. Legis. Serv. Ch. 6 (H.B. 23-1071) (WEST),

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Colorado Revised Statutes Annotated
Title 12. Professions and Occupations (Refs & Annos)
Health-Care Professions and Occupations
Article 245. Mental Health (Refs & Annos)
Part 2. General Provisions (Refs & Annos)

C.R.S.A. § 12-245-224
Formerly cited as CO ST § 12-43-222

§ 12-245-224. Prohibited activities--related provisions--definition

Effective: July 14, 2020
Currentness

(1) A person licensed, registered, or certified under this article 245 violates this article 245 if the person:

(a) Has been convicted of or pled guilty or nolo contendere to a felony or to any crime related to the person's practice, or received a deferred sentence to a felony charge. A certified copy of the judgment of a court of competent jurisdiction of the conviction or plea is conclusive evidence of the conviction or plea. In considering the disciplinary action, each board is governed by sections 12-20-202(5) and 24-5-101.

(b) Has violated or attempted to violate, directly or indirectly, or assisted or abetted the violation of, or conspired to violate any provision or term of this article 245, an applicable provision of article 20 or 30 of this title 12, a rule promulgated pursuant to this article 245, or any order of a board established pursuant to this article 245;

(c) Has used advertising that is misleading, deceptive, or false;

(d)(I) Has committed abuse of health insurance pursuant to section 18-13-119;

(II) Has advertised through newspapers, magazines, circulars, direct mail, directories, radio, television, or otherwise that the person will perform any act prohibited by section 18-13-119;

(e) Habitually or excessively uses or abuses alcohol, a habit-forming drug, or a controlled substance, as defined in section 18-18-102(5);

Addendum 7

(f)(I) Fails to notify the board that regulates the person's profession of a physical illness, physical condition, or behavioral, mental health, or substance use disorder that affects the person's ability to treat clients with reasonable skill and safety or that may endanger the health or safety of persons under his or her care;

(II) Fails to act within the limitations created by a physical illness, physical condition, or behavioral, mental health, or substance use disorder that renders the person unable to treat clients with reasonable skill and safety or that may endanger the health or safety of persons under his or her care; or

(III) Fails to comply with the limitations agreed to under a confidential agreement entered into pursuant to sections 12-30-108 and 12-245-223;

(g)(I) Has acted or failed to act in a manner that does not meet the generally accepted standards of the professional discipline under which the person practices. Generally accepted standards may include, at the board's discretion, the standards of practice generally recognized by state and national associations of practitioners in the field of the person's professional discipline.

(II) A certified copy of a malpractice judgment of a court of competent jurisdiction is conclusive evidence that the act or omission does not meet generally accepted standards of the professional discipline, but evidence of the act or omission is not limited to a malpractice judgment.

(h) Has performed services outside of the person's area of training, experience, or competence;

(i) Has maintained relationships with clients that are likely to impair the person's professional judgment or increase the risk of client exploitation, such as treating employees, supervisees, close colleagues, or relatives;

(j) Has exercised undue influence on the client, including the promotion of the sale of services, goods, property, or drugs in such a manner as to exploit the client for the financial gain of the practitioner or a third party;

(k) Has failed to terminate a relationship with a client when it was reasonably clear that the client was not benefitting from the relationship and is not likely to gain such benefit in the future;

(*l*) Has failed to refer a client to an appropriate practitioner when the problem of the client is beyond the person's training, experience, or competence;

(m) Has failed to obtain a consultation or perform a referral when the failure is not consistent with generally accepted standards of care;

(n) Has failed to render adequate professional supervision of persons practicing pursuant to this article 245 under the person's supervision according to generally accepted standards of practice;

(*o*) Has accepted commissions or rebates or other forms of remuneration for referring clients to other professional persons;

Addendum 8

(p) Has failed to comply with any of the requirements pertaining to mandatory disclosure of information to clients pursuant to section 12-245-216;

(q) Has offered or given commissions, rebates, or other forms of remuneration for the referral of clients unless the offer or remuneration was for services provided, including marketing, office space, administrative, consultative, and clinical services, and not for the referral itself. A licensee, registrant, or certificate holder may pay an independent advertising or marketing agent compensation for advertising or marketing services rendered on the person's behalf by the agent, including compensation that is paid for the results of performance of the services on a per-patient basis.

(r) Has engaged in sexual contact, sexual intrusion, or sexual penetration, as defined in section 18-3-401, with a client during the period of time in which a therapeutic relationship exists or for up to two years after the period in which a therapeutic relationship exists;

(s) Has resorted to fraud, misrepresentation, or deception in applying for or in securing licensure or taking any examination provided for in this article 245;

(t) Has engaged in any of the following activities and practices:

(I) Repeated ordering or performing demonstrably unnecessary laboratory tests or studies without clinical justification for the tests or studies;

(II) The administration, without clinical justification, of treatment that is demonstrably unnecessary;

(III) Ordering or performing any service or treatment that is contrary to the generally accepted standards of the person's practice and is without clinical justification;

(IV) Using or recommending rebirthing or any therapy technique that may be considered similar to rebirthing as a therapeutic treatment. "Rebirthing" means the reenactment of the birthing process through therapy techniques that involve any restraint that creates a situation in which a patient may suffer physical injury or death. For the purposes of this subsection (1)(t)(IV), a parent or legal guardian may not consent to physical, chemical, or mechanical restraint on behalf of a child or ward.

(V) Conversion therapy with a client who is under eighteen years of age.

(u) Has falsified or repeatedly made incorrect essential entries or repeatedly failed to make essential entries on patient records;

(v) Has committed a fraudulent insurance act, as set forth in section 10-1-128;

Addendum 9

(w) Has sold or fraudulently obtained or furnished a license, registration, or certification to practice as a psychologist, social worker, marriage and family therapist, licensed professional counselor, psychotherapist, or addiction counselor or has aided or abetted in those activities; or

(x) Has failed to respond, in the manner required by the board, to a complaint filed with or by the board against the licensee, registrant, or certificate holder.

(1.5) Any contract entered into by a licensee, certificate holder, or registrant for the purpose of marketing, office space, administrative support, or any other overhead expense shall not provide remuneration for referrals of clients or patients or otherwise create a financial benefit or incentive to the contractor that is tied to or conditioned on the number of clients or patients that the licensee, certificate holder, or registrant sees, the value of the services that the licensee, certificate holder, or registrant provides, or any financial recovery to which the licensee, certificate holder, or registrant is entitled.

(2) A disciplinary action relating to a license, registration, or certification to practice a profession licensed, registered, or certified under this article 245 or any related occupation in any other state, territory, or country for disciplinary reasons constitutes prima facie evidence of grounds for disciplinary action, including denial of licensure, registration, or certification, by a board. This subsection (2) applies only to disciplinary actions based upon acts or omissions in the other state, territory, or country substantially similar to those acts or omissions set out as grounds for disciplinary action pursuant to subsection (1) of this section.

**Credits**
Relocated and amended by Laws 2019, Ch. 136 (H.B. 19-1172), § 1, eff. Oct. 1, 2019. Amended by Laws 2019, Ch. 378 (H.B. 19-1129), § 8, eff. Oct. 1, 2019; Laws 2020, Ch. 304 (H.B. 20-1206), § 15, eff. July 14, 2020.

**Editors' Notes**

**REPEAL**

<For repeal of this section, see § 12-245-234.>

Notes of Decisions (4)

C. R. S. A. § 12-245-224, CO ST § 12-245-224
Current through legislation effective April 25, 2023 of the First Regular Session, 74th General Assembly (2023). Some statute sections may be more current. See credits for details.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.   4

Addendum 10

West's Colorado Revised Statutes Annotated
   Title 12. Professions and Occupations (Refs & Annos)
      Health-Care Professions and Occupations
         Article 245. Mental Health (Refs & Annos)
            Part 2. General Provisions (Refs & Annos)

C.R.S.A. § 12-245-225

Formerly cited as CO ST § 12-43-223

§ 12-245-225. Authority of boards--cease-and-desist orders--rules--fines

Effective: July 14, 2020

Currentness

(1) If a licensee, registrant, or certificate holder violates any provision of section 12-245-224, the board that licenses, registers, or certifies the licensee, registrant, or certificate holder may, in accordance with section 12-20-404:

(a) Issue and send, by certified mail, a letter of admonition to a licensee, registrant, or certificate holder under the circumstances specified in and in accordance with section 12-20-404(4);

(b) Place a licensee, registrant, or certificate holder on probation;

(c) Deny, revoke, or suspend the person's license, registration, or certification;

(d) Deny, revoke, or suspend the listing of an unlicensed psychotherapist in the state board of unlicensed psychotherapists database established pursuant to section 12-245-703;

(e) Issue and send a confidential letter of concern to a licensee, registrant, or certificate holder under the circumstances specified in section 12-20-404(5); or

(f) Apply for an injunction pursuant to section 12-245-230 to enjoin a licensee, registrant, or certificate holder from practicing the profession for which the person is licensed, registered, or certified under this article 245.

(2) When a licensee, registrant, or certificate holder violates an administrative requirement of this article 245, the board regulating the licensee, registrant, or certificate holder may impose an administrative fine on the licensee, registrant, or certificate holder, not to exceed five thousand dollars per violation. Each board shall adopt rules establishing a schedule of fines setting forth different levels of fines based on whether the licensee, registrant, or certificate holder has committed a single violation or subsequent violations of administrative requirements.

(3) A board may issue cease-and-desist orders under the circumstances and in accordance with the procedures specified in section 12-20-405.

Addendum 11

**Credits**

Relocated and amended by Laws 2019, Ch. 136 (H.B. 19-1172), § 1, eff. Oct. 1, 2019. Amended by Laws 2020, Ch. 304 (H.B. 20-1206), § 52, eff. July 14, 2020.

**Editors' Notes**

### REPEAL

<For repeal of this section, see § 12-245-234.>

C. R. S. A. § 12-245-225, CO ST § 12-245-225

Current through legislation effective April 25, 2023 of the First Regular Session, 74th General Assembly (2023). Some statute sections may be more current. See credits for details.

Addendum 12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:22-cv-02287-CNS-STV

KALEY CHILES,

     Plaintiff,

v.

PATTY SALAZAR, in her official capacity as Executive Director of the Department of
Regulatory Agencies; *et al.*,

     Defendants.

---

## ORDER

---

Before the Court is Plaintiff Kaley Chiles' Motion for Preliminary Injunction (ECF No. 29). Ms. Chiles is a licensed professional counselor (ECF No. 1 at 29-30 ¶ 104). Her clients include minors who identify as gay, lesbian, bisexual, transgender, or gender non-conforming (*Id.* at 31 ¶ 109). Ms. Chiles argues that Colorado's regulation of specific therapeutic practices unlawfully abridges what she can say to her minor clients (*See* ECF No. 29 at 2). It does not. As such, and for the reasons set forth below, Ms. Chiles' Motion for Preliminary Injunction (ECF No. 29) is DENIED.

## I. BACKGROUND[1]

Plaintiff Kaley Chiles is a licensed professional counselor in the state of Colorado, as well as a practicing Christian (ECF No. 1 at 6, 29-30 ¶¶ 28-29, 104). Ms. Chiles' client base includes minors seeking counseling related to same-sex attraction and gender identity (*Id.* at 31 ¶ 109). As a counselor, she does not engage in "aversive techniques," and she alleges that she previously "helped clients freely discuss" sexual attractions, gender identity, gender roles, and "root causes of [their] desires [and] behavior" (*Id.* at 24-25 ¶¶ 82-83).[2] Ms. Chiles only pursues the "goals" that her clients "themselves identify and set," rather than "any predetermined goals" for clients' counseling (*Id.* at 25, 31 ¶¶ 85, 108). According to Ms. Chiles, Colorado law prohibits her from "fully explor[ing]" certain clients' "bodily experiences around sexuality and gender," including any client's discussion of their own "unwanted sexual attraction, behaviors, or identity" (*Id.* at 25-26, 32 ¶¶ 86, 88, 113). Many of Ms. Chiles' clients do not initially request counseling to eliminate their attractions or identities (*Id.* at 28 ¶ 96). Instead, discussion of clients' unwanted attractions or identities "may arise" during their counseling with Ms. Chiles (*Id.*)

Colorado enacted its Minor Therapy Conversion Law in 2019. *See, e.g.,* C.R.S. §§ 12–245–202, 12–245–101. Under the Minor Therapy Conversion Law, mental health professionals may not engage in what is commonly known as "conversion therapy" for minors who identify as gay, lesbian, bisexual, transgender, or gender non-conforming (*See* ECF Nos. 1 at 5, 45 at 15). *See*

---

[1] The background facts are taken predominantly from Ms. Chiles' Verified Complaint, the parties' briefs, and the briefs' supporting exhibits. *See Denver Homeless Out Loud v. Denver, Colorado,* 514 F. Supp. 3d 1278, 1285 (D. Colo. 2021), *vacated and remanded on other grounds,* 32 F.4th 1259 (10th Cir. 2022).

[2] "Aversion techniques" include treatments that "induc[e] nausea, vomiting, or paralysis; providing electric shocks; or having the individual snap an elastic band around the wrist when the individual bec[omes] aroused to same-sex erotic images or thoughts" (ECF No. 45-3 at 31).

*also, e.g.,* C.R.S. § 12–245–202(3.5)(a). Ms. Chiles alleges that the Minor Therapy Conversion Law prohibits her ability to assist minor clients "seeking to reduce or eliminate unwanted sexual attractions, change sexual behaviors, or grow in the experience of harmony with [their] physical bod[ies]" (ECF No. 1 at 26-27 ¶¶ 87, 91-92). Consequently, she has "intentionally avoided" certain conversations with her clients that she fears may violate the Minor Therapy Conversion Law (*Id.* at 25 ¶ 83).

Ms. Chiles sued Defendants, alleging the Minor Therapy Conversion Law violates her constitutional rights and bringing claims under the First and Fourteenth Amendments (*See generally* ECF No. 1). She filed her Motion for Preliminary Injunction in September 2022 (ECF No. 29). The Motion is fully briefed (*See* ECF Nos. 45, 49).

## II. LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019) (quotation omitted). To prevail on a preliminary injunction motion, the movant bears the burden of showing that four factors weigh in their favor: (1) they are likely to succeed on the merits; (2) they will suffer irreparable injury if the injunction is denied; (3) the threatened injury outweighs the injury the injunction would cause the opposing party; and (4) the injunction would not adversely affect the public interest. *See Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (citation omitted). "An injunction can issue only if each factor is established." *Denver Homeless Out Loud v. Denver, Colorado*, 32 F.4th 1259, 1277 (10th Cir. 2022) (citation omitted). Where the government is the non-moving party, the last two preliminary injunction factors merge. *See Denver Homeless*, 32 F.4th at 1278 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Preliminary

injunctions changing the status quo are "disfavored," and in these instances, the moving party's burden of establishing that they are likely to succeed on the merits is heightened. *See Free the Nipple*, 916 F.3d at 797 (quotation omitted).

## III. ANALYSIS

Having considered Ms. Chiles' Motion for Preliminary Injunction, the related briefing, and relevant legal authority, the Court denies Ms. Chiles' Motion.

### A. Standing

Ms. Chiles argues that she has standing to pursue her claims, even though Defendants have "not yet threatened" to revoke her professional licenses (ECF No. 29 at 10). She also argues that she has third-party standing to sue on behalf of her clients (*See id.* at 20). The Defendants contend that Ms. Chiles lacks standing to bring this pre-enforcement action, and that she lacks third-party standing (*See* ECF No. 45 at 33, 48). The Court considers Ms. Chiles' standing to bring this suit herself and whether she has third-party standing to sue on behalf of her clients in turn.

#### 1. *Ms. Chiles' Standing*

Ms. Chiles argues that she has standing to sue, given the gravamen of her First Amendment claims, even though Defendants have not yet enforced the Minor Therapy Conversion Law against her (ECF No. 29 at 10-11). Defendants contend that Ms. Chiles has failed to demonstrate that she intends to engage in conduct that violates the Minor Therapy Conversion Law (ECF No. 45 at 48). The Court agrees with Ms. Chiles that she has standing to sue.

For a federal court to exercise jurisdiction over a suit, the plaintiff must have standing to sue. *See, e.g., Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing consists of three elements, and a plaintiff—as the party invoking federal jurisdiction—bears the burden of satisfying

4

them. *See, e.g. Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff must have suffered an "injury in fact" that is "fairly traceable" to the defendant's challenged conduct and that is "likely to be redressed by a favorable judicial decision." *Id.* (citation omitted). If the plaintiff fails to meet this burden, "there is no case or controversy for the federal court to resolve," and the federal court cannot exercise jurisdiction over the plaintiff's claims. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (quotation omitted); *see also* U.S. Const. art. III, § 2.

The analysis changes, however, in the First Amendment context. The First Amendment "creates unique interests that lead [courts] to apply the [constitutional] standing requirements somewhat more leniently, facilitating pre-enforcement suits." *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (citation omitted). One way a plaintiff may establish standing for their First Amendment claim is by "alleging a credible threat of future prosecution plus an ongoing injury resulting" from the statute's "chilling effect" on the plaintiff's desire to exercise their First Amendment rights. *Id.* (quotations omitted). To determine whether a plaintiff's pre-enforcement First Amendment claim has alleged a "chilling effect" that sufficiently demonstrates the plaintiff has suffered an injury in fact, courts consider the following:

> (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that the statute will be enforced.

*Id.* at 1129–30.

Ms. Chiles alleges that the threat of the Minor Therapy Conversion Law's enforcement has created an ongoing injury resulting from the Law's "chilling effect" (*See, e.g.*, ECF No. 1 at 35 ¶ 134). In her preliminary injunction motion, Ms. Chiles argues that—given the nature of her First

Amendment claim—she has satisfied *Peck*'s factors to show that she has suffered an injury in fact (ECF No. 29 at 10). Therefore, the Court considers whether Ms. Chiles has satisfied these three *Peck* factors. For the reasons set forth below, she has.

### a.   Past Engagement

Ms. Chiles has engaged in the type of speech affected by the Minor Therapy Conversion Law.[3] The Minor Therapy Conversion Law implicates speech that purports to "eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex." § 12–245–202(3.5)(a). Further, the Minor Therapy Conversion law contemplates practices that provide "understanding for the facilitation of an individual's coping." *Id.* at § 12–245–202(3)(b)(I). Ms. Chiles alleges her therapeutic practices have concerned these forms of speech. For instance, she alleges that she seeks to help clients "explore certain . . . bodily experiences," including any "unwanted sexual attraction[s]" that "may arise" during her counseling sessions (ECF No. 1 at 25–26, 28, 32 ¶¶ 86, 96, 112). Therefore, she has met her burden of showing that she has in the past engaged in the type of speech "affected" by the Minor Therapy Conversion Law. *Peck*, 43 F.4th at 1129–30.

### b.   Present Desire

Ms. Chiles has shown that she has a present desire to engage in speech affected by the Minor Therapy Conversion Law.[4] For instance, she states in the Verified Complaint that she has

---

[3] As discussed later, the Minor Therapy Conversion Law is a professional conduct regulation that imposes an incidental burden on speech. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018).

[4] Ms. Chiles did not submit an affidavit in support of her preliminary injunction motion. However, the Court construes Ms. Chiles Verified Complaint, submitted under "penalties of perjury," as an affidavit for purposes of its analysis of *Peck*'s second factor (ECF No. 1 at 45-46). *See also, e.g.*, *Controltec, LLC v. Anthony Doors, Inc.*, No. 06-CV-00295-MSK, 2006 WL 8460951, at *1 (D. Colo. Feb. 22, 2006) (concluding that the moving party for a preliminary injunction "must show by Verified Complaint or Affidavit" facts to establish four preliminary injunction factors).

"intentionally avoided conversations with clients" that may be perceived as violating the Minor

Therapy Conversion Law, including conversations related to her practice—counseling clients on

their "sexual attractions, behaviors, and [gender] identity" (ECF No. 1 at 24-25 ¶ 83). Ms. Chiles

wishes to "assist clients with their stated desires," including discussions with certain clients

"seeking to reduce or eliminate unwanted sexual attractions" (*Id.* at 26 ¶ 87). Accordingly, she has

established the specific content of her desired speech for future client interactions, and satisfied

*Peck*'s second factor. *Cf. Peck*, 43 F.4th at 1131 (holding that "First Amendment plaintiffs

generally need not state that they 'have specific plans to engage in XYZ speech next Tuesday' in

order to show standing" (citation omitted)).

### c.   Credible Threat

In determining whether a First Amendment plaintiff has satisfied *Peck*'s third "credible

threat" factor, courts consider the following:

> (1) whether the plaintiff showed past enforcement against the
> same conduct; (2) whether authority to initiate charges was not
> limited to a prosecutor or an agency and, instead, any person
> could file a complaint against the plaintiffs; and (3) whether the
> state disavowed future enforcement.

*Peck*, 43 F.4th at 1132 (quotations omitted). No one "credible threat" factor is dispositive. *See id.*

*See also Scott v. Hiller*, No. 21-CV-02011-NYW-KLM, 2022 WL 4726038, at *6 (D. Colo. Oct.

3, 2022) ("The fact that a prosecutor had never enforced the statute at issue is not dispositive."

(citing *Peck*, 43 F.4th at 1133)). In short, the plaintiff must demonstrate "an objectively justified

fear of real consequences." *Peck*, 43 F.4th at 1132 (quotations omitted).

Regarding the "past enforcement" factor, Ms. Chiles has failed to identify any past

enforcement against the same conduct presented in her Verified Complaint. She argues only that

the Minor Therapy Conversion Law may impose "severe" sanctions if counselors violate it in the future (ECF No. 29 at 11). The "past enforcement" factor weighs against her for this reason.

Under the "prosecution" factor, Ms. Chiles admits that Defendants "are the persons empowered by Colorado to enforce" the Minor Therapy Conversion Law against her as a licensed professional counselor (ECF No. 1 at 40 ¶ 165; *see also id.* at 6-7 ¶¶ 31, 35). Therefore, the second element weighs against her. *See Peck*, 43 F.4th at 1132 (concluding second factor weighed against plaintiff where only "prosecutors c[ould] bring charges" under a statute).

Turning to whether the state has "disavowed" enforcement of the Minor Therapy Conversion Law, there is nothing in the preliminary injunction record to demonstrate that the Defendants "do not disavow an intent to prosecute" Ms. Chiles. *Peck*, 41 F.4th at 1132. Defendants' refusal to explicitly disavow enforcement of the Minor Therapy Conversion Law has "heavy weight" in the Court's assessment of Ms. Chiles' First Amendment claims. *Id.* at 1133. There is "nothing . . . to prevent [Defendants] or another [state entity] from" bringing charges in the future against Ms. Chiles under the Minor Therapy Conversion Law for statements that mirror those she has previously made to clients. *Id.*; *see also id.* at 1133 (concluding that a state's "refusal to provide such an assurance [that it will not enforce] undercu[t]" an argument that the plaintiff's "perception of a threat of prosecution is not objectively justifiable"). Therefore, the "disavowal" factor weighs in Ms. Chiles' favor.

Weighing the "credible threat" factors, Ms. Chiles has met her burden of showing that there is a credible threat that Defendants will enforce the Minor Therapy Conversion Law against her. *Peck*, 43 F.4th at 1129–30. Although only the third factor weighs in favor of Ms. Chiles, demonstrating that she suffers a credible threat of enforcement "is not supposed to be a difficult

bar to clear in the First Amendment pre-enforcement context." *Id.* at 1133. *See also Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003) ("As to whether a First Amendment plaintiff faces a credible threat of prosecution, the evidentiary bar that must be met is extremely low."); *Tingley v. Ferguson*, 47 F.4th 1055, 1066–67 (9th Cir. 2022) ("The unique standing considerations in the First Amendment context tilt dramatically toward a finding of standing when a plaintiff brings a pre-enforcement challenge" (quotations omitted)). Therefore, given the absence of Defendants' explicit disavowal to enforce the Minor Therapy Conversion Law and the "heavy weight" it places on the Court's assessment of whether Ms. Chiles' fears are credible, her fear of enforcement is "objectively justifiable" and therefore satisfies *Peck*'s "credible fear" factor. *See Peck*, 43 F.4th at 1133.

\* \* \*

For the reasons set forth above, Ms. Chiles has satisfied *Peck*'s three factors. She has in the past engaged in the type of speech affected by the Minor Therapy Conversion Law, demonstrated that she has a present desire to engage in speech the Minor Therapy Conversion Law affects, and that she has no intention to engage in this speech based on a "credible fear" that the Minor Therapy Conversion Law will be enforced against her. *See Peck*, 43 F.4th at 1129–30. Accordingly, she has established the injury in fact requirement, and has standing to bring this pre-enforcement First Amendment action. *See id.* at 1133; *see also Spokeo*, 578 U.S. at 338.[5]

---

[5] Ms. Chiles contends that she has standing because she has satisfied *Peck*'s requirements (*See* ECF No. 29 at 10). However, *Peck* only concerned standing's injury in fact requirement—not Ms. Chiles' burden to satisfy the two remaining standing elements. *See Peck*, 43 F.4th at 1129 ("[O]nly the injury-in-fact requirement is at issue."). Nonetheless, the Court agrees with Ms. Chiles that she has met her standing burden (ECF No. 29 at 11). *See also Spokeo*, 578 U.S. at 338. As the Tenth Circuit explained in *Peck*, "the statute's alleged violation of [the plaintiff's] First Amendment rights is undisputedly traceable to the statute itself and could be redressed by [a court's] invalidation of the law." *Peck*, 43 F.4th at 1129. So too with the Minor Therapy Conversion Law's alleged chilling of Ms. Chiles'

2.  *Third-Party Standing*

Ms. Chiles argues that she has standing to "assert the free-speech rights" of her clients (ECF No. 29 at 20). Defendants contend that Ms. Chiles lacks third-party standing because she has not established that she "holds a close relationship" to a specific third-party minor, that there is no "demonstrated hinderance" to a potential client's ability to protect their own interest, and that Ms. Chiles has fundamentally failed to provide any details of how her clients are "impacted" by the Minor Therapy Conversion Law (ECF No. 45 at 33, 35). The Court agrees with Defendants that Ms. Chiles lacks third-party standing to sue on behalf of her clients.

The Ninth Circuit had recent occasion to address this issue in a nearly identical factual context. In *Tingley v. Ferguson*, the Ninth Circuit considered "whether [Washington] may prohibit health care providers operating under a state license from practicing conversion therapy on children." *Tingley*, 47 F.4th at 1063. The Ninth Circuit concluded that a licensed therapist seeking to enjoin Washington's conversion therapy statute lacked standing to "bring claims on behalf of his minor clients." *Id.* at 1066. The plaintiff lacked third-party standing, the Ninth Circuit reasoned, because he made only "generalized statements about the rights of his clients" being purportedly violated by Washington's conversion therapy statute. *Id.* at 1069. Although the plaintiff had a "sufficiently close relationship" with his clients, he failed to allege how Washington's law "specifically deprived" them of counseling information they sought, and as such his allegations that Washington's law affected his clients were "speculative." *Id.*

---

speech. Therefore, Ms. Chiles has met her burden as to the two remaining standing elements. *See Spokeo*, 578 U.S. at 338.

The Court finds *Tingley*'s reasoning persuasive. Ms. Chiles makes substantively the same arguments regarding her ability to sue on behalf of her clients as those the Ninth Circuit rejected in *Tingley*. For instance, Ms. Chiles contends that the Minor Therapy Conversion Law deprives her clients' "right to receive" counseling information regarding their sexual orientations or gender identities (ECF No. 29 at 20-21). Assuming Ms. Chiles had a close relationship with her clients, Ms. Chiles identifies nothing in her Verified Complaint or the preliminary injunction record that demonstrates how the Minor Therapy Conversion Law *specifically* deprives her clients of any information they seek. *See Tingley*, 47 F.4th at 1069. Moreover, *Tingley* explained, a therapist's minor clients seeking conversion therapy are free to bring their own lawsuits against conversion therapy laws, and may do so pseudonymously. *See id.*

Accordingly, the Court rejects Ms. Chiles' argument that she has standing to sue on behalf of her clients. "Without more detail about [her] clients, their desired information, or how the [Minor Therapy Conversion Law] has specifically deprived them of access to [conversion therapy] information," the Court refuses to "strain the limitations imposed on [it] by Article III to reach undeveloped claims brought on behalf" of Ms. Chiles' third-party minor clients. *Tingley*, 47 F.4th at 1069–70 (quotations omitted).

**B.  Preliminary Injunction & Likelihood of Success on the Merits**

Because Ms. Chiles has standing to challenge the Minor Therapy Conversion Law, the Court turns to her arguments that the Minor Therapy Conversion Law should be enjoined (*See, e.g.,* ECF No. 29 at 3). Regarding the likelihood of success on the merits of her constitutional claims, Ms. Chiles makes two essential arguments. First, that the Minor Therapy Conversion Law unconstitutionally regulates speech rather than conduct, and therefore violates her free speech

11

rights (*Id.* at 13). Second, that the Minor Therapy Conversion Law violates her free exercise and due process rights (*Id.* at 22, 25). The Court considers and rejects these arguments in turn.

### 1. First Amendment Free Speech Claim

#### a. Professional Conduct Regulation

Defendants contend that the Minor Therapy Conversion Law—contrary to Ms. Chiles' argument—regulates professional conduct rather than speech. The Court agrees with Defendants that the Minor Therapy Conversion Law regulates professional conduct.

As an initial matter, the Court agrees with Defendants that the Minor Therapy Conversion Law is not so sweeping as Ms. Chiles argues (*See* ECF No. 45 at 18). For instance, she argues that "the [Minor Therapy Conversion Law] *prohibits* [her] from uttering words if those words might assist [her clients] in aligning their desires with their beliefs or their biology" (ECF No. 29 at 14 (emphasis added); *see also* ECF No. 1 at ¶ 4). But, as Defendants contend, the Minor Therapy Conversion Law imposes no prohibition on counselors' ability to assist clients with any concerns they raise regarding their sexuality or gender identity (ECF No. 45 at 19). Under the Minor Therapy Conversion Law, "conversion therapy" does *not* include "practices or treatments" that provide "[a]cceptance, support, and understanding *for the facilitation of an individual's coping.*" § 12–245–202(3.5)(b)(I) (emphasis added). Ms. Chiles is free to facilitate conversations regarding any minor clients' distresses about their sexuality or gender that "may arise" during their counseling sessions (*See* ECF No. 1 at 28 ¶ 96). *See also* § 12–245–202(3.5)(b)(I). Indeed, several of Ms. Chiles' practices are consistent with and do not violate the Minor Therapy Conversion Law (*See* ECF No. 1 at 24-25, 31 ¶¶ 82-83, 85, 108). Ms. Chiles may engage in therapeutic practices related to any minor client's distress, under the limited condition that her therapeutic assistance to a

client's distress "does not *seek to change* sexual orientation or gender identity." § 12–245–202(3.5)(b)(I) (emphasis added); *see also id.* at § 12–245–202(3.5)(a) (defining "conversion therapy" as a practice that "attempts or purports to change" a client's sexual orientation or gender identity, including "efforts to *change* [a client's] behaviors or gender expressions" (emphasis added)). Simply put, the Court agrees with Defendants that the Minor Therapy Conversion Law narrowly prohibits therapeutic practices that promote particular sexual orientations or gender identities—not practices that support, facilitate, or assist minor clients' exploration of those orientations or identities (*See* ECF No. 45 at 18). *See* § 12–245–202(3.5)(b)(I) (excluding from the definition of "conversion therapy" practices that facilitate minor clients' "identity exploration and development" including "sexual-orientation-neutral interventions" so long as those practices do not "seek to change" a client's sexual orientation or gender identity).

But Ms. Chiles' challenges more than the scope of the Minor Therapy Conversion Law's regulations. Ms. Chiles challenges what the Minor Therapy Conversion Law fundamentally regulates. In her opinion, the Minor Therapy Conversion Law regulates "pure speech," rather than professional conduct, and is therefore subject to strict scrutiny (*See* ECF No. 29 at 13, 15). Defendants argue that the Minor Therapy Conversion Law regulates professional conduct, not speech, and therefore it survives Ms. Chiles' constitutional challenge (*See* ECF No. 45 at 21). The Court agrees with Defendants.

Regulations of professional conduct are constitutionally permissible. *See, e.g.*, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456–57 (1978). And "[s]tates may regulate professional conduct, even though that conduct incidentally involves speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (citation omitted). When a state regulates

professional conduct that "incidentally involves speech," the First Amendment "afford[s] less protection" for the incidental professional speech. *Id.* (citations omitted). Although a state cannot "ignore constitutional rights" under the "guise of prohibiting professional misconduct," the First Amendment "does not prohibit restrictions directed [at] conduct from imposing incidental burdens on speech." *Id.* (citations omitted). *See also Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1226 (11th Cir. 2022), *cert. denied sub nom. Del Castillo v. Ladapo,* No. 22-135, 2022 WL 17408180 (U.S. Dec. 5, 2022) ("Because the [statute at issue] is a professional regulation with a merely incidental effect on protected speech, it is constitutional under the First Amendment." (quotations omitted)). "[P]rofessionals are no exception to this rule." *Id.* (citations omitted). *See also Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992), *overruled on other grounds by Dobbs v. Jackson Women's Health Org*., 142 S. Ct. 2228 (2022) ("To be sure, [a] physician's First Amendment rights not to speak are implicated by [an informed consent statute] . . . but only as part of the practice of medicine, subject to reasonable licensing and regulation . . . ." (citations omitted)).

The Minor Therapy Conversion Law regulates professional conduct. It contemplates regulating a licensed professional counselor's therapeutic "practice[s] or treatment[s] . . . ." § 12–245–202(3.5)(a); *see also id.* at § 12–245–202(6) (defining "licensed professional counselor"). Under the Minor Therapy Conversion Law, specifically credentialed professionals and their practices are empowered to provide "[a]cceptance, support, and understanding for the facilitation" of clients' therapeutic needs, but prohibited from using their "practices or treatment" in order to "change sexual orientation or gender identity." *Id.* at § 12–245–202(3)(b)(I). A reading of the Minor Therapy Conversion Law's plain text confirms that, as Defendants argue, it is a professional

regulation and "prophylactic measure[] whose objective is the prevention of harm before it occurs." *Ohralik*, 436 U.S. at 464. *See also id.* ("[The] State has a strong interest in adopting and enforcing rules of conduct designed to protect the public from harmful [professional practices] by [professionals] whom it has licensed.").

To support her argument that the Minor Therapy Conversion Law is unconstitutional, Ms. Chiles' characterizes the work she performs as a licensed professional counselor as pure speech protected by the First Amendment—not regulable professional conduct (*See* ECF No. 29 at 13-14). To be sure, "what one thinks or believes, what one utters and says have the full protection of the First Amendment." *Speiser v. Randall*, 357 U.S. 513, 535–36 (1958) (Douglas, J., concurring). And Defendants do not—and cannot—dispute that Ms. Chiles speaks to her clients during counseling sessions (*See* ECF No. 45 at 23-24). But speech made in professional contexts is not always pure speech. *See EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 429 (6th Cir. 2019) ("*Casey* and [*National Institute of Family and Life Advocates*] recognize that First Amendment heightened scrutiny does not apply to incidental regulation of professional speech that is part of the [professional] practice . . . ."). As Defendants argue, speech made in a professional context—particularly in the context of licensed professional counseling—is distinguishable from, for example, political speech (ECF No. 45 at 23). Ms. Chiles admits that she is a licensed professional counselor with a graduate degree in clinical mental health, and that her speech is made in the course of her work as a professional counselor (ECF No. 1 at 29-31 ¶¶ 104, 108). "[I]t has never been deemed an abridgment of freedom of speech . . . to [regulate] a course of [professional] conduct . . .  merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Ohralik*, 436 U.S. at 456 (quotations omitted).

Ms. Chiles cites *Otto v. City of Boca Raton, Florida* for the proposition that a government cannot "relabel" pure speech as conduct to avoid heightened First Amendment scrutiny (*See* ECF No. 29 at 13-14). *See also Otto*, 981 F.3d at 865 ("The government cannot regulate speech by relabeling it as conduct."). Against a similar factual backdrop, *Otto* concluded that ordinances prohibiting "therapists from engaging in counseling . . . with a goal of changing a minor's sexual orientation" ultimately warranted strict scrutiny because the ordinances were "content-based restrictions of speech," not regulations of therapists' professional conduct. *Id.* at 859, 861. The Court finds *Otto*'s reasoning unpersuasive and therefore rejects it. Central to *Otto*'s conclusion that its conversion therapy ordinance was a content-based speech restriction was the Eleventh Circuit's prior admonishment that "the enterprise of labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation." *Id.* at 861 (citing *Wollschlaeger v. Governor, Fla*., 848 F.3d 1293, 1308 (11th Cir. 2017) (en banc)). Perhaps. But the Eleventh Circuit's conclusion that strict scrutiny applied to the ordinances in *Otto* simply because "the ordinances depend[ed] on what [was] said" ignores that "what [was] said" depends on its professional context and whether a plaintiff is licensed to say it. *Id.* at 861. *Cf. Del Castillo*, 26 F.4th at 1225–26 ("Assessing a client's . . . needs, conducting . . . research, developing a . . . care system, and integrating information from [an assessment] are not speech. They are 'occupational conduct'. . . as part of . . . professional services." (citation omitted)).

As Defendants observe, other cases run contrary to *Otto* (*See, e.g.,* ECF No. 45 at 25-26). *See, e.g., Del Castillo*, 26 F.4th at 1225 ("A statute that governs the practice of an occupation is not unconstitutional as an abridgement of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." (quotation

omitted)). *Tingley*, in fact, reached the exact opposite conclusion as *Otto*: "What licensed mental health providers do during their appointments with patients for compensation under the authority of a state license is treatment." *Tingley*, 47 F.4th at 1082. Furthermore, *Tingley* correctly characterized the nature of professional counseling practices related to minors' sexuality and gender identity. *See Tingley*, 47 F.4th at 1083 ("The work that [a therapist] does is different than a conversation about the weather, even if he claims that all he does is 'sit and talk.'"). "That the treatment technique of talk therapy is administered through words does not somehow render it any less of a healthcare treatment technique or any less subject to government regulation in the interest of protecting the public health." *Otto v. City of Boca Raton, Fla*., 41 F.4th 1271, 1294–95 (11th Cir. 2022)[6] (Rosenbaum, J., dissenting from the denial of rehearing en banc). Ms. Chiles errs in arguing otherwise (*See* ECF No. 29 at 15).[7]

### b.  Rational Basis Review

The Minor Therapy Conversion Law is viewpoint neutral and does not impose content-based speech restrictions.[8] It is a public health law that regulates professional conduct. Any speech

---

[6] After a three-judge panel of the Eleventh Circuit decided *Otto v. City of Boca Raton, Florida*, 983 F.3d 854 (11th Cir. 2020), the Eleventh Circuit voted against hearing the case en banc. *See Otto v. City of Boca Raton, Florida*, 41 F.4th 1271 (11th Cir. 2022).

[7] Ms. Chiles contends that her speech is not incidental to her professional conduct because Defendants cannot identify any separate conduct—other than her speech—that the Minor Therapy Conversion Law regulates (ECF No. 29 at 15). The Court rejects this argument because it rests on a flawed premise, presupposing "speech" in the context of a licensed professional counselor's work is wholly separate from the work of counseling itself. However, "[t]he practice of psychotherapy is not different from the practice of other forms of medicine simply because it uses words to treat ailments." *Tingley*, 47 F.4th at 1082.

[8] Ms. Chiles argues that the Minor Therapy Conversion Law "discriminates based on viewpoint" because it prohibits "counseling from the viewpoint" that sexuality and gender identity can "change to align with an individual's biology and beliefs" (ECF No. 29 at 20; *see also id.* at 18). Not so. As explained above, the Court agrees with Defendants that the Minor Therapy Conversion Law is a professional conduct regulation that affects all regulated counselors and prohibits therapeutic *practices* attempting to change a minor's sexual orientation or gender identity. *See* C.R.S. § 12–245–202(3.5)(a). To the extent it affects speech incidental to a practitioner's therapeutic practice, it does so in order to regulate outcome-determinative counseling for *all* clients—including heterosexual-identifying clients. Moreover,

affected by the Minor Therapy Conversion Law is incidental to the professional conduct it regulates. *See National Institute of Family and Life Advocates*, 138 S. Ct. at 2372. Accordingly, the Court declines Ms. Chiles' invitation to apply strict scrutiny in its analysis of her First Amendment challenge (ECF No. 29 at 25).[9]

The Court applies rational basis review to its analysis of the Minor Therapy Conversion Law. *See, e.g., Tingley*, 47 F.4th at 1077–78 (applying rational basis review to conversion therapy law); *Otto*, 41 F.4th at 1276 ("The rational basis 'reasonableness' standard applies only to regulations of conduct that incidentally burden speech." (citing *National Institute of Family and Life Advocates*, 138 S. Ct. at 2373–74)) (Grant, J., concurring in the denial of rehearing en banc); *Ohralik*, 436 U.S. at 462. To survive the "light burden" of rational basis review, the Minor Therapy Conversion Law must be "rationally related to a legitimate state interest." *Tingley*, 47 F.4th at 1078 (quotations omitted); *see also Wilson v. Wichita State Univ.*, 662 F. App'x 626, 629 (10th Cir. 2016) ("Under the rational-basis standard, we will uphold an action so long as it is rationally related to a legitimate government purpose." (citation omitted)). Public health laws "must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." *Dobbs*, 142 S. Ct. at 2284 (quotation omitted). "[H]ealth and welfare laws [are] entitled to a strong presumption of validity." *Id.* (citation omitted).

---

this professional regulation applies to all licensed counselors. *See Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 694 (2010) ("It is, after all, hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers"); *see also id.* at 699 (distinguishing "singling out" those "who hold religious beliefs" from "those who engage in discriminatory conduct based on . . . religious beliefs" and stating that "all acts of [] discrimination are equally covered [and] [t]he discriminator's beliefs are simply irrelevant") (Stevens, J., concurring).

[9] Because the Minor Therapy Conversion Law is a professional conduct regulation that does not discriminate on the basis of content or viewpoint, Ms. Chiles' argument that Defendants bears the burden to "justify" its content-based restrictions is of no moment, and the Court need not indulge it (ECF No. 25 at 12).

The Court agrees with Defendants that the Minor Therapy Conversion Law survives rational basis review (*See* ECF No. 45 at 27-29). First, Defendants have a legitimate and important state interest in the prevention of "harmful therapy known to increase suicidality in minors" (*Id.* at 29; ECF No. 45-1 at 5-6). *See also Tingley*, 47 F.4th at 1078 (describing state interest in "protecting . . . minors against exposure to serious harms caused by conversion therapy" as "without a doubt" a "legitimate state interest" (citations and alterations omitted)); *Otto*, 41 F.4th at 1285–86 (describing therapeutic practices that are "sexual-orientation change efforts" as "types of talk therapy that significantly increase the risk of suicide and have never been shown to be efficacious") (Rosenbaum, J., dissenting from the denial of rehearing en banc). The legitimacy and importance of the interest underpinning the Minor Therapy Conversion Law is undisputable. Surely, a state's interest in protecting the psychological and physical health of its minor population cannot be doubted. *Cf. Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 (1982) ("[S]afeguarding the physical and psychological well-being of a minor . . . is a *compelling one*." (emphasis added)).

Furthermore, Defendants have a legitimate interest in "regulating and maintaining the integrity of the mental-health profession," which includes regulating the efficacy and safety of its professionals' therapeutic practices—particularly the practices of mental health professionals who counsel minor clients. *Ferguson v. People*, 824 P.2d 803, 810 (Colo. 1992). *See also Tingley*, 47 F.4th at 1078 ("[The state] also has a compelling interest in the practice of professions within [its] boundaries . . . regulating mental health . . . and affirming the equal dignity and worth of LGBT people." (quotations omitted) (first alteration added)).

Second, the Minor Therapy Conversion Law rationally serves these legitimate and important interests. *See Dobbs*, 142 S. Ct. at 2284. As the Ninth Circuit explained in *Tingley* and its analysis of Washington's conversion therapy law, a state acts "rationally when it decide[s] to protect the physical and psychological well-being of its minors by preventing state-licensed health care providers from practicing conversion therapy on them." *Tingley*, 47 F.4th at 1078 (quotations omitted). The preliminary injunction record demonstrates that conversion therapy is ineffective and harms minors who identify as gay, lesbian, bisexual, transgender, or gender non-conforming (ECF No. 45 at 29-30, 39; *see also, e.g.*, ECF No. 45-1 at 22-24, 29-33). Colorado considered the body of medical evidence regarding conversion therapy and sexual orientation change efforts—and their harms—when passing the Minor Therapy Conversion Law and made the reasonable and rational decision to protect minors from ineffective and harmful therapeutic modalities (*See* ECF No. 45 at 30). *See also Tingley*, 47 F.4th at 1078–79 ("In relying on the body of evidence before it . . . [the state] rationally acted by amending its regulatory scheme for licensed health care providers to add [conversion therapy] to the list of unprofessional conduct for the health professions." (quotations omitted)).[10] Therefore—and for substantially the same reasons set forth in *Tingley*—the Minor Therapy Conversion Law survives rational basis review.

---

[10] Ms. Chiles argues that the medical evidence does not so readily support the Colorado legislature's concerns regarding conversion therapy (*See, e.g.*, ECF Nos. 25 at 5; 1 at 9-10 ¶¶ 43-44). The Court disagrees. The preliminary injunction record amply shows that the Minor Therapy Conversion Law comports with the prevailing medical consensus regarding conversion therapy and sexual orientation change efforts (*See generally* ECF No. 45-1). Moreover, even if Ms. Chiles identifies some medical evidence that runs contrary to the evidence Defendants marshal and consulted in passing the Minor Therapy Conversion Law, "the preponderating opinion in the medical community is against its use." *Tingley*, 47 F.4th at 1081 (quotations omitted). *See also id.* (affirming "the right of the government to regulate what medical treatments its licensed health care providers could practice on their patients according to the applicable standard of care and governing consensus at the time (even if not unanimous)").

Ms. Chiles argues that the Minor Therapy Conversion Law is "presumptively invalid" because—in order for it to survive her challenge—Defendants must identify "historical evidence" that a "long tradition" of similar speech restrictions exists (ECF No. 25 at 12). Again, Ms. Chiles is incorrect. As set forth above, the Minor Therapy Conversion Law is a professional conduct regulation and does not implicate legal frameworks that might otherwise apply to content-based speech restrictions under the First Amendment. *See National Institute of Family and Life Advocates*, 138 S. Ct. at 2373. On this basis, Ms. Chiles' reliance on *New York State Rifle & Pistol Association, Inc. v. Bruen* is misplaced. 142 S. Ct. 2111, 2130 (2022) ("When the government restricts *speech* [it] bears the burden of providing [the restriction's] constitutionality [by] generally point[ing] to historical evidence about the reach of the First Amendment's protections." (quotations omitted) (emphasis added)). Nonetheless, Defendants have identified a history of public health regulations with which the Minor Therapy Conversion Law is entirely consistent (*See* ECF No. 45 at 22-23). "It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, *particularly those which closely concern the public health*. There is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine." *Watson v. State of Maryland*, 218 U.S. 173, 176 (1910) (emphasis added); *see also Dent v. State of W.Va.*, 129 U.S. 114, 122 (1889) ("The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations . . . . [a]s one means to this end it has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely."); *Tingley*, 47 F.4th at 1080 ("There is a long (if

heretofore unrecognized) tradition of regulation governing the practice of those who provide health care within state border.").

Fundamentally, Ms. Chiles fails to overcome the "strong presumption of validity" the Court applies to the Minor Therapy Conversion Law. *Dobbs*, 142 S. Ct. at 2284 (citation omitted). As such, and for the reasons set forth above, she has failed to meet her burden of showing a likelihood of success on the merits of her First Amendment free speech claim. *See Beltronics*, 562 F.3d at 1070 (10th Cir. 2009).

### 2. *First Amendment Free Exercise Claim*

Ms. Chiles argues that the Minor Therapy Conversion Law violates her First Amendment free exercise rights because it is neither neutral nor generally applicable, and therefore cannot survive strict scrutiny (*See* ECF No. 29 at 22, 24). Defendants contend that the Minor Therapy Conversion law is neutral and generally applicable (*See* ECF No. 45 at 38, 40). For these reasons, Defendants argue, rational basis review applies and the Minor Therapy Conversion Law survives rational basis review (*See* ECF No. 45 at 37). For the reasons set forth below, the Court agrees with Defendants.

### a. *Legal Standard Governing First Amendment Free Exercise Claims*

The First Amendment's Free Exercise Clause, "applicable to the States under the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1876 (2021) (quotation omitted); *see also* U.S. Const. amend. I. Laws prohibiting religion's free exercise may be subject to strict scrutiny. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022). "But such strict scrutiny does not always apply to free-exercise claims." *Church v. Polis*, No. 20-

1391, 2022 WL 200661, at *8 (10th Cir. Jan. 24, 2022), *cert. denied sub nom. Cmty. Baptist Church v. Polis*, 142 S. Ct. 2753 (2022). "[N]eutral" and "generally applicable" laws are not subject to strict scrutiny, even if they "incidentally burden[] religion." *Fulton*, 141 S. Ct. at 1876 (citation omitted); *see also Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006) ("Neutral rules of general applicability normally do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief." (citation omitted)); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) ("[O]ur cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."). *Cf. Fulton*, 141 S. Ct. at 1882 ("[A] neutral and generally applicable law typically does not violate the Free Exercise Clause—no matter how severely that law burdens religious exercise." (citation omitted)) (Barrett, J., concurring).

Laws that are "both neutral and generally applicable need only be rationally related to a legitimate governmental interest to survive a constitutional challenge"—i.e., they are only subject to rational basis review. *Grace United Methodist Church*, 451 F.3d at 649 (citation omitted); *see also Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 52 (10th Cir. 2013) ("Government actions that stem from 'neutral' rules of 'general applicability' are subject to rational basis review." (citation omitted)). With this legal standard in mind, the Court proceeds in its analysis of Ms. Chiles' free exercise claim.

     *b. Minor Therapy Conversion Law & Neutrality*

Ms. Chiles argues that the Minor Therapy Conversion Law is not neutral because it is "based on religious hostility" and "targets a religious practice" (ECF No. 29 at 22). Defendants

contend that Ms. Chiles cannot meet her burden of showing that the Minor Therapy Conversion Law is not neutral because it is "directed at a therapy practice and does not restrict religious exercise" (ECF No. 45 at 38). The Court agrees with Defendants.

A state "fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877 (citation omitted). Factors "relevant to the assessment" of government neutrality include:

- The "historical background" of the challenged decision or policy;

- Specific series of events "leading to the enactment" of the challenged policy; and

- Legislative or administrative histories

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) (citation omitted).

According to Ms. Chiles, the Minor Therapy Conversion Law is not neutral because it was "well-known" at the time the Colorado General Assembly enacted the Minor Therapy Conversion Law that conversion therapy was primarily sought for religious reasons (ECF No. 29 at 22). Therefore, Ms. Chiles' argument goes, the Minor Therapy Conversion Law impermissibly burdens practitioners who hold particular religious beliefs (*See id.*). The Court disagrees. The Minor Therapy Conversion Law does not "restrict [therapeutic] practices because of their *religious* nature." *Fulton*, 141 S. Ct. at 1877 (citation omitted) (emphasis added). As Defendants argue, the Minor Therapy Conversion Law targets specific "modes of therapy" due to their *harmful* nature— regardless of the practitioner's personal religious beliefs or affiliations (ECF No. 45 at 38). As the preliminary injunction record shows, the Minor Therapy Conversion law targets these therapeutic

modalities because conversion therapy is ineffective and has the potential to "increase [minors'] isolation, self-hatred, internalized stigma, depression, anxiety, and suicidality" (ECF No. 45-1 at 36 ¶ 68; *see also id.* at 34-35 ¶ 64). Against the background of a significant body of scientific research concerning conversion therapy's historical ineffectiveness and harmfulness, the Colorado General Assembly enacted the Minor Therapy Conversion Law to eliminate the harms minor clients suffered during conversion therapy (*See, e.g.*, ECF No. 45-1 at 5-6 ¶ 13).

Fundamentally, the Minor Therapy Conversion Law neutrally regulates professional conduct and professional practices. For this reason, Ms. Chiles' arguments that the Minor Therapy Conversion Law is not neutral because its regulation of specific therapeutic practices incidentally burdens her—or any other practitioners'—religious beliefs is unavailing. *See, e.g., Fulton*, 141 S. Ct. at 1876; *Grace United Methodist*, 451 F.3d at 649. The Minor Therapy Conversion law "is [not] *specifically directed* at" religious practices, nor are religious exercises its "object." *Kennedy*, 142 S. Ct. at 2442 (quotations omitted) (emphasis added); *see also Grace United Methodist*, 451 F.3d at 649–50 ("A law is neutral so long as its object is something other than the infringement or restriction of religious practices." (citation omitted)). Simply because some religious bases for conversion therapy may have been "well-known" at the time the Minor Therapy Conversion Law was enacted does not erase its facial neutrality or the backdrop of scientific evidence considered in the Law's passage.[11] There is nothing on the Minor Therapy Conversion Law's face that "refers to a religious practice without a secular meaning discernable from the language or context."

---

[11] Ms. Chiles identifies herself as a "practicing Christian" (ECF No. 1 at 29-30 ¶ 104). She also notes that conversion therapy may include "techniques based in Christian faith-based methods" and is provided by practitioners who "believe in Christian faith-based methods" of counseling (*Id.* at 7 ¶ 37; *see also* ECF No. 29 at 22). The preliminary injunction does not indicate—and the Court expresses no opinion on—whether any non-Christian practitioners, or Christians with religious beliefs that are dissimilar to Ms. Chiles' beliefs, engage in professional conduct that implicates the Minor Therapy Conversion Law.

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). At bottom, the Minor Therapy Conversion Law is facially neutral, and nothing in the preliminary injunction record demonstrates that "suppression" of any religions or religious beliefs was the Minor Therapy Conversion Law's "central element." *Id.* at 534.

Ms. Chiles makes the additional argument that the Minor Therapy Conversion Law "attempt[s] to impose its views" on practitioners (ECF No. 29 at 23). Nonsense. As Defendants observe, the Minor Therapy Conversion Law exempts from its coverage forms of religious ministry (ECF No. 45 at 40). *See also* C.R.S. § 12-245-217(1) ("A person engaged in the practice of religious ministry is not required to comply with [the Minor Therapy Conversion Law]"); *Tingley*, 47 F.4th at 1085 ("The law's express protection for the practice of conversion therapy in a religious capacity is at odds with [the plaintiff's] assertion that the law inhibits religion."). This exemption underscores that the Minor Therapy Conversion Law intends to regulate therapeutic practices and the harms that flow from these practices, not individual practitioners' religious beliefs. *See id.* For these reasons, Ms. Chiles has not met her burden of showing the Minor Therapy Conversion law is not neutral.

### c.  *Minor Therapy Conversion Law & General Applicability*

Ms. Chiles argues that the Minor Therapy Conversion Law is not generally applicable because it contains "vague terms" that invite "individual exemptions" regarding practitioners' conduct (ECF No. 29 at 24). Defendants contend that the Minor Therapy Conversion Law is generally applicable because it "does not contain a mechanism for individualized exemptions" and prohibits conversion therapy for any reason (ECF No. 45 at 40). The Court agrees with Defendants.

"The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Lukumi*, 508 U.S. at 543. A law will fail the "general applicability requirement" if the law "prohibits religious conduct while permitting secular conduct . . . ." *Kennedy*, 142 S. Ct. at 2422 (quotations omitted). Further, "[a] law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (quotations omitted). In the case of free exercise challenges based on a law's alleged system of "individualized exceptions," the law is generally applicable "as long as [it] remains exemptionless, and [therefore] religious groups cannot claim a right to exemption; however, when a law has secular exemptions, a challenge by a religious group becomes possible." *Grace United Methodist*, 451 F.3d at 650.

Ms. Chiles argues that the Minor Therapy Conversion Law impermissibly "invites enforcement authorities" to "make individualized exemptions" for secular counselors whose therapeutic practices are approved under the Law (ECF No. 29 at 24). The Court disagrees. The Minor Therapy Conversion Law is enforced against all practitioners who engage in defined forms of conversion therapy. *See* § 12-245-202. It does not invest in any agency the "sole discretion" to decide when enforcement of the Minor Therapy Conversion Law is warranted. *See Fulton*, 141 S. Ct. at 1879. Contrary to Ms. Chiles' contention that the Minor Therapy Conversion Law uses "vague terms," it clearly describes what practices do and do not violate the Law. *See id.; see also* § 12-245-202(3.5)(a), (b). The Minor Conversion Therapy Law's facial language does not provide a "formal and discretionary mechanism" for individual, discretionary exceptions. *See Tingley*, 47 F.4th at 1088. *Cf. Fulton*, 141 S. Ct. at 1878 ("[T]inclusion of a *formal system of entirely*

27

*discretionary exceptions* in [the law] renders [its requirements] not generally applicable." (emphasis added).[12] And to the extent that Ms. Chiles argues that the Minor Therapy Conversion Law favors certain forms of therapeutic counseling over others, it does not. The Minor Therapy Conversion Law simply prohibits specific therapeutic practices (*See* ECF No. 29 at 24).[13] The Minor Therapy Conversion Law's prohibition on specific therapeutic practices constitutes a "limited-yes-or-no inquiry" into whether a counselor's practice violates the Law. *See Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298 (10th Cir. 2004) ("[T]hat kind of limited yes-or-no inquiry is qualitatively different from [a] kind of case-by-case system . . . ."); *see also id.* ("[The] 'individualized exemption' exception is limited . . . to systems that are *designed* to make *case-by-case* determinations . . . ." (emphasis added) (citation omitted). As such, Ms. Chiles has failed to meet her burden regarding the Minor Therapy Conversion Law's general applicability.

### d.   Rational Basis Review

Ms. Chiles has failed to meet her burden of showing the Minor Therapy Conversion Law is not neutral or generally applicable. Therefore, the Court applies rational basis, rather than strict scrutiny, review. *See Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 53 (10th Cir. 2013) ("[The] District's actions were based upon neutral rules of general applicability, [and are] subject to rational basis review." (citation omitted)). As discussed above, the Minor Therapy Conversion

---

[12] The Court agrees with Defendants that the Minor Therapy Conversion Law's exemption of religious ministries from its prohibitions further demonstrates that the Minor Therapy Conversion Law is generally applicable and does not treat secular activity "more favorably" than religious exercise (ECF No. 45 at 41). *See Tandon v. Newsom,* 141 S. Ct. 1294, 1297 (2021). *See also Lukumi*, 508 U.S. at 543 ("[The] government . . . cannot in a selective manner *impose* burdens only on conduct motivated by religious belief . . . ." (emphasis added)); *Kennedy*, 142 S. Ct. at 2422.

[13] At one point in her preliminary injunction motion, Ms. Chiles argues that the Minor Therapy Conversion Law is overinclusive and underinclusive (ECF No. 29 at 30-32). The Court rejects this argument. The Minor Therapy Conversion Law is a neutral and generally applicable law that regulates professional conduct—not pure speech—and clearly delineates what therapeutic practices it does and does not allow. *See* § 12-245-202(3.5)(a), (b).

Law is rationally related to a legitimate governmental interest and survives rational basis review. Ms. Chiles has failed to show a likelihood of success on the merits on her First Amendment free exercise claim.[14]

### 3. Due Process Claim

Ms. Chiles also challenges the Minor Therapy Conversion Law on due process grounds, contending that it is unconstitutionally vague and gives enforcement authorities "unfettered discretion to punish speech with which they disagree" (ECF No. 29 at 32). Defendants argue that Ms. Chiles cannot meet her burden of showing that the Minor Therapy Conversion Law violates the Fourteenth Amendment's Due Process Clause because the Law is clear and does not invite arbitrary enforcement (ECF No. 49 at 45-46). The Court agrees with Defendants.

First, the Minor Therapy Conversion Law is not unconstitutionally vague. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law is unconstitutionally vague if it does not provide "a person of ordinary intelligence [with] fair notice of what is permitted" or is so "standardless" that it permits "seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Ms. Chiles argues that the Minor Therapy Conversion Law is unconstitutionally vague because it is ambiguous and does not precisely define its key terms (*See* ECF No. 29 at 33). The Court disagrees. The Minor Therapy Conversion Law defines what is— and is not—considered "conversion therapy," and what therapeutic practices violate the Law. *See*

---

[14] Because Ms. Chiles has failed to show a likelihood of success on the merits of her free speech and free exercise claims, the Court need not address her argument that she has a "hybrid-rights" claim triggering strict scrutiny. *See Axson-Flynn*, 356 F.3d at 1295 ("[T]he hybrid-rights theory at least requires a colorable showing of infringement of a companion constitutional right." (quotations omitted)).

§ 12-245-202(3.5)(a), (b). Colorado law elsewhere defines "gender identity" and "sexual orientation." C.R.S. § 24-34-301(3.5), (7). For these reasons, the Minor Therapy Conversion Law provides a person of ordinary intelligence with sufficient information to ably determine what is and is not permitted under the Law. *See* § 12-245-202(3.5)(a), (b). *See also Williams*, 553 U.S. at 304; *Tingley*, 47 F.4th 1055, 1089–90 (rejecting argument that the phrases "sexual orientation" and "gender identity" were unconstitutionally vague); *id.* at 1090 ("[T]he terms of the statute provide a clear, dividing line: whether change [of a minor's gender identity] is the object."); *Reynolds v. Talberg*, No. 1:18-CV-69, 2020 WL 6375396, at *9 (W.D. Mich. Oct. 30, 2020) ("Phrases like 'sexual orientation' and 'gender identity' have also been held sufficiently definite to foreclose vagueness challenges . . . . If the phrase 'gender identity' is not too vague, then surely companion concepts like 'transgender' and 'gender expression' are not overly vague either." (citations omitted)).

Second, the Court rejects Ms. Chiles' argument that the Minor Therapy Conversion Law violates due process on the grounds that its enforcement is "left to the subjective judgments" of enforcement agencies (ECF No. 29 at 34). As discussed above in the Court's analysis of Ms. Chiles' free exercise claim, the Minor Therapy Conversion Law clearly delineates what is and is not permitted under the Law. *See* § 12-245-202(3.5)(a), (b). The Minor Therapy Conversion Law is "sufficiently definite such that it does not encourage arbitrary enforcement" against specified therapeutic practices. *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1180 (10th Cir. 2009). Its enforcement does not require an indeterminate, "wide-ranging inquiry" that "invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 597 (2015). As such, Ms. Chiles has not

met her burden of showing that the Minor Therapy Conversion Law is unconstitutional under the Fourteenth Amendment's Due Process Clause.

* * *

For the reasons set forth above, Ms. Chiles has failed to meet her burden of showing a likelihood of success on the merits for all of her constitutional challenges to the Minor Therapy Conversion Law. Because a preliminary injunction "can issue only if each [preliminary injunction] factor is established," and Ms. Chiles has not met her burden on the "likelihood of success on the merits" factor, the Court need not determine whether she has met her burden for the remaining preliminary injunction factors. *See Denver Homeless*, 32 F.4th at 1277 (citation omitted).

The Court makes one final observation. Throughout her preliminary injunction motion, Ms. Chiles contends that she "listens and asks questions to help" her clients (ECF No. 29 at 14). According to Ms. Chiles, "[a]ll she does is talk to her clients" (*Id.* at 13). As the preliminary injunction record shows, this is disingenuous. "What licensed mental health providers do during their appointments with patients for compensation under the authority of a state license is treatment." *Tingley*, 47 F.4th at 1082. Ms. Chiles cannot seriously compare her work as a professional counselor to "book club" discussions, given especially that she claims the relationship between "a mental health professional and her client" is based on a "deeply held trust from which a *critical* therapeutic alliance forms allowing the *professional* to provide *vital mental health care* to the client" (*Cf.* ECF No. 29 at 16; ECF No. 1 at 2 ¶ 1 (emphasis added)). The therapeutic work for which she obtained a graduate degree and professional licensure is incomparable to casual conversations about *New York Times* bestsellers. *See also Tingley*, 47 F.4th at 1082–83 ("Comparing the work that licensed mental health providers do to book club discussions or

conversations among friends minimizes the rigorous training, certification, and post-secondary education that licensed mental health providers endure to be able to treat other humans for compensation.").

"Children may identify as gay, straight, cisgender, or transgender." *Id.* at 1084. In the case of children who identify as lesbian, gay, bisexual, cisgender, transgender, or gender non-conforming, they are entitled to treatment—regardless of its outcome—that does not take a cavalier approach to their "dignity and worth." *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018). And at the bare minimum, they are also entitled to a state's protection from therapeutic modalities that have been shown to cause longstanding psychological and physical damage.

## IV. CONCLUSION

Consistent with the above analysis, Ms. Chiles' Motion for Preliminary Injunction (ECF No. 29) is DENIED.

DATED this 19th day of December 2022.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge