22-1445, 23-1002

---

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

KALEY CHILES,

*Plaintiff-Appellant/Cross-Appellee,*

v.

PATTY SALAZAR, in her official capacity as Executive Director of the
Department of Regulatory Agencies, et al.,

*Defendants-Appellees/Cross-Appellants.*

---

On Appeal from the United States District Court
for the District of Colorado
Case No. 1:22-CV-02287
Honorable Charlotte N. Sweeney

---

## BRIEF OF APPELLANT/CROSS-APPELLEE

## Oral Argument Requested

---

BARRY K. ARRINGTON
ARRINGTON LAW FIRM
4195 Wadsworth Blvd.
Wheat Ridge, CO 80033
(303) 205-7870
barry@arringtonpc.com

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

SHAUN PEARMAN
PEARMAN LAW FIRM
4195 Wadsworth Blvd.
Wheat Ridge, CO 80033
(720) 343-8534
shaun@pearmanlawfirm.com

CODY S. BARNETT
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
cbarnett@ADFlegal.org

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Table of Authorities...........................................................................iv

Statement of Related Cases ...........................................................1

Statement of Jurisdiction...............................................................1

Statement of Issues .......................................................................2

Introduction...................................................................................3

Statement of the Case ...................................................................4

I.    Plaintiff Kaley Chiles.............................................................4

II.    Colorado's Law ......................................................................8

III.   Procedural History ...............................................................10

Summary of the Argument ...........................................................13

Argument.....................................................................................15

I.    Colorado's Counseling Censorship Law targets Chiles's
speech, not her conduct. ......................................................15

    A.    In her counseling, Chiles indisputably uses nothing
more than words, and words are protected by the First
Amendment. .................................................................15

    B.    Words are not transformed from "speech" to "conduct"
simply because a licensed professional utters them. ...........16

    C.    Labeling Chiles's words a "treatment" also does not
transform them from speech into conduct. .........................20

    D.    The district court was wrong to resurrect the
discredited "professional speech" continuum. ....................22

E.    Colorado's Counseling Censorship Law suppresses
      Chiles's speech directly, not incidentally.............................27

IV.    Colorado's Law is presumptively unconstitutional because it
       censors speech based on its content and viewpoint.......................29

V.    Colorado's Law censors religious speech and violates the
      Free Exercise Clause.......................................................31

      A.    Colorado's Law is not neutral because it facially
            suppresses speech well known to be religious.......................34

      B.    Colorado's Law is not generally applicable because it
            uses terms that invite individualized exemptions
            allowing secular speech that equally undermines the
            government's asserted interest.............................................38

VI.    Colorado's Law cannot survive scrutiny because it advances
       no legitimate governmental interest, is not narrowly
       tailored, and is a historical anomaly. ............................................39

      A.    As enforced against pure speech, Colorado's Law serves
            no legitimate governmental interest. ...................................40

      B.    The Law is not narrowly tailored because it is not
            necessary, is overbroad, is underinclusive, and could
            achieve Colorado's objectives through less restrictive
            avenues. ...................................................................44

      C.    The Censorship Law is a historical anomaly. ......................47

VII.    The other factors weigh in favor of preliminarily enjoining
        Colorado's Law. ...........................................................50

Conclusion ...........................................................................53

Statement in Support of Oral Argument...............................................53

Certificate of Compliance..........................................................55

Certificate of Digital Submission............................................................56

Certificate of Service ................................................................................57

District Court Order Denying Motion for Preliminary Injunction

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Anderson v. City of Hermosa Beach*,
    621 F.3d 1051 (9th Cir. 2010) ....................................................... 15

*Animal Legal Defense Fund v. Kelly*,
    9 F.4th 1219 (10th Cir. 2021)..................................... 17, 18, 29, 30

*Barr v. American Association of Political Consultants, Inc.*,
    140 S. Ct. 2335 (2020) .................................................................... 30

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001) ........................................................................ 16

*Bennett v. Metropolitan Government of Nashville & Davidson County*,
    977 F.3d 530 (6th Cir. 2020) .......................................................... 40

*Billups v. City of Charleston*,
    961 F.3d 673 (4th Cir. 2020) .......................................................... 19

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969) ........................................................................ 42

*Brokamp v. District of Columbia*,
    No. 20-3574, 2022 WL 681205 (D.D.C. Mar. 7, 2022) ............. 19, 21

*Brown v. Entertainment Merchants Association*,
    564 U.S. 786 (2011) ................................................................. 44, 45

*Capital Associated Industries, Inc. v. Stein*,
    922 F.3d 198 (4th Cir. 2019) ..................................................... 19, 24

*Capitol Square Review & Advisory Board v. Pinette*,
    515 U.S. 753 (1995) ........................................................................ 32

*Central Rabbinical Congress of United States & Canada v. New York City Department of Health & Mental Hygiene*,
    763 F.3d 183 (2d Cir. 2014)........................................................... 37

*Chelsey Nelson Photography, LLC v. Louisville/Jefferson County Metro Government*,
    No. 19-CV-851, 2022 WL 3972873 (W.D. Ky. Aug. 30, 2022) ........ 25

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ........................................................... 34, 36, 37

*Cohen v. California*,
    403 U.S. 15 (1971) ........................................................................ 16

*Conant v. Walters*,
    309 F.3d 629 (9th Cir. 2002) ............................................. 13, 20, 21

*Courthouse News Service v. New Mexico Administrative Office of Courts*,
    53 F.4th 1245 (10th Cir. 2022) ..................................................... 50

*Eisenstadt v. Baird*,
    405 U.S. 438 (1972) ..................................................................... 41

*Employment Division, Department of Human Resources of Oregon v. Smith*,
    494 U.S. 872 (1990) ..................................................................... 33

*EMW Women's Surgical Center, P.S.C. v. Beshear*,
    920 F.3d 421 (6th Cir. 2019) .................................................. 24, 27

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975) ..................................................................... 44

*Florida Bar v. Went for It, Inc.*,
    515 U.S. 618 (1995) ..................................................................... 13

*Florida Star v. B.J.F.*,
    491 U.S. 524 (1989) ..................................................................... 47

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021) ..................................... 33, 39, 45, 46, 47

*Hines v. Quillivan*,
    No. 18-CV-155, 2021 WL 5833886 (S.D. Tex. Dec. 9, 2021) .......... 19

*Høeg v. Newsom*,
  No. 22-cv-01980, 2023 WL 414258 (E.D. Cal. Jan. 25, 2023)........25

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) .................................................... 17, 18, 21, 24, 49

*Homans v. City of Albuquerque*,
  264 F.3d 1240 (10th Cir. 2001) ...............................................50, 52

*Honeyfund.com, Inc. v. DeSantis*,
  No. 22-CV-227, 2022 WL 3486962 (N.D. Fla. Aug. 18, 2022) .......16

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
  515 U.S. 557 (1995) ..................................................... 15, 26, 40, 41

*Janus v. American Federation of State, County, & Municipal Employees, Council 31*,
  138 S. Ct. 2448 (2018) ....................................................................31

*Kennedy v. Bremerton School District*,
  142 S. Ct. 2407 (2022) ......................................................32, 33, 34

*King v. Governor of New Jersey*,
  767 F.3d 216 (3d Cir. 2014)................................................ 19, 20, 23

*Landmark Communications, Inc. v. Virginia*,
  435 U.S. 829 (1978) ........................................................................42

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
  138 S. Ct. 1719 (2018) ....................................................................34

*McCraw v. City of Oklahoma City*,
  973 F.3d 1057 (10th Cir. 2020) ......................................................28

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ................................................................30, 38

*Members of the City Council v. Taxpayers for Vincent*,
  466 U.S. 789 (1984) ...................................................................3, 29

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ....................................................31, 38

*NAACP v. Button*,
    371 U.S. 415 (1963) ..................................................................... 18

*National Institute of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ................3, 18, 23, 24, 25, 26, 27, 38, 46, 47

*New Hope Family Services, Inc. v. Poole*,
    966 F.3d 145 (2d Cir. 2020).......................................................... 36

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) .................................................. 47, 48, 49, 50

*New York v. Ferber*,
    458 U.S. 747 (1982) ..................................................................... 43

*Otto v. City of Boca Raton*,
    41 F.4th 1271 (11th Cir. 2022).................................................21, 48

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ..11, 13, 14, 16, 20, 23, 24, 26, 27, 29,
    31, 41

*Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*,
    961 F.3d 1062 (9th Cir. 2020) ........................................................ 24

*Pickup v. Brown*,
    740 F.3d 1208 (9th Cir. 2014) ........................................... 21, 22, 23

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ........................................................... 29, 39, 41

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ........................................................... 29, 30, 31

*Republican Party of Minnesota v. White*,
    416 F.3d 738 (8th Cir. 2005) ........................................................ 45

*Republican Party of New Mexico v. King*,
    741 F.3d 1089 (10th Cir. 2013) ..................................................... 51

*Rosenberger v. Rector & Visitors of University of Virginia*,
    515 U.S. 819 (1995) ..................................................................... 29

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2006) .......................................................................... 18

*Stonewater Roofing, Ltd. v. Texas Department of Insurance*,
    641 S.W.3d 794 (Tex. Ct. App. 2022) ............................................ 19

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ................................................................... 37

*Telescope Media Group v. Lucero*,
    936 F.3d 740 (8th Cir. 2019) ........................................................ 21

*Texas v. Johnson*,
    491 U.S. 397 (1989) ....................................................................... 40

*Thompson v. Western States Medical Center*,
    535 U.S. 357 (2002) ................................................................. 42, 43

*Tingley v. Ferguson*,
    47 F.4th 1055 (9th Cir. 2022)................................................. 11, 22

*Tingley v. Ferguson*,
    57 F.4th 1072 (9th Cir. 2023)..........14, 18, 23, 24, 28, 32, 33, 36, 40

*Turner Broadcasting System, Inc. v. FCC*,
    520 U.S. 180 (1997) ....................................................................... 43

*United States v. Alvarez*,
    567 U.S. 709 (2012) ....................................................................... 48

*United States v. Playboy Entertainment Group, Inc.*,
    529 U.S. 803 (2000) ....................................................................... 45

*United States v. Stevens*,
    559 U.S. 460 (2010) ....................................................................... 22

*Upsolve, Inc. v. James*,
    604 F. Supp. 3d 97 (S.D.N.Y. 2022) ....................................... 18, 47

*Verlo v. Martinez*,
    820 F.3d 1113 (10th Cir. 2016) ..................................................... 51

*Video Software Dealers Association v. Schwarzenegger*,
    556 F.3d 950 (9th Cir. 2009) .......................................................... 44

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer
    Council, Inc.*,
    425 U.S. 748 (1976) ......................................................................... 43

*Vizaline, LLC v. Tracy*,
    949 F.3d 927 (5th Cir. 2020) .................................................... 18, 24

*Volokh v. James*,
    No. 22-CV-10195, 2023 WL 1991435 (S.D.N.Y. Feb. 14, 2023).....25

*Wollschlaeger v. Governor of Florida*,
    848 F.3d 1293 (11th Cir. 2017) ........................ 21, 23, 24, 26, 38, 40

## **Statutes**

28 U.S.C. § 1291 ......................................................................................1

28 U.S.C. § 1331 ......................................................................................1

28 U.S.C. § 1343 ......................................................................................1

28 U.S.C. § 2107(a) ..................................................................................1

42 U.S.C. § 1983 ......................................................................................1

COLO. REV. STAT. § 12-245-202.................................... 3, 9, 27, 30, 31, 39

COLO. REV. STAT. § 12-245-217 ...............................................................36

COLO. REV. STAT. § 12-245-224 ...............................................................36

COLO. REV. STAT. § 12-245-225 ...............................................................10

## **Other Authorities**

4 Annals of Cong. 936 (1794) .................................................................32

A Memorial and Remonstrance Against Religious Assessments, *in*
    SELECTED WRITINGS OF JAMES MADISON (R. Ketcham ed. 2006)...32

Akhil Reed Amar, *How America's Constitution Affirmed Freedom of Speech Even Before the First Amendment*, 38 CAP. U. L. REV. 503 (2010) .......................................................................... 32

Christina Buttons, *Finland's Leading Gender Dysphoria Expert Says 4 Out of 5 Children Grow Out of Gender Confusion*, DAILY WIRE (Feb. 6, 2023) ........................................................................ 5

Colorado House Committee on Public Health Care & Human Services, February 13, 2019 .......................................................... 47

Colorado Senate Second Reading Debate, March 21, 2019 .................... 46

D. Paul Sullins, *Sexual Orientation Change Efforts Do Not Increase Suicide: Correcting a False Research Narrative,* 51 ARCHIVES OF SEXUAL BEHAVIOR 3377 (Sept. 2022) .............................. 7, 12, 42, 43

Elena Kagan, *Regulation of Hate Speech and Pornography after R.A.V.,* 60 U. CHI. L. REV. 873 (1993) .............................................. 26

Elliott A. Krause, DEATH OF THE GUILDS (1996) ...................................... 48

Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones*, 90 CORNELL L. REV. 1277 (2005) ... 15, 20

Lisa M. Diamond & Clifford J. Rosky, *Scrutinizing Immutability: Research on Sexual Orientation & U.S. Legal Advocacy for Sexual Minorities*, 53 J. OF SEX RESEARCH 1 (2016) ........................ 6

Paula Berg, *Toward a First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. REV. 201 (1994) ................................................................ 3

Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 SEATTLE U. L. REV. 885 (2000) .............. 50

S. David Young, THE RULE OF EXPERTS: OCCUPATIONAL LICENSING IN AMERICA (1987) ................................................................................ 48

The Cass Review, *Independent Review of Gender Identity Services for Children and Young People* (Feb. 2022) .......................... 6, 9, 44, 53

*Watered Down Anti-Conversion Therapy Bill Passes Utah House Committee; Original Sponsors Vote Against It*, Q Salt Lake Magazine (Mar. 5, 2019) ........................................................ 35, 46

## <u>Constitutional Provisions</u>

U.S. Const. amend. I ................................................................. 15

## STATEMENT OF RELATED CASES

Kaley Chiles has not filed any previous appeal in this matter and is aware of no other related cases pending before this Court.

## STATEMENT OF JURISDICTION

Kaley Chiles sued Colorado officials Patty Salazar, Reina Sbarbaro-Gordon, Jennifer Luttman, Amy Skinner, Karen Van Zuiden, MaryKay Jimenez, Kalli Likness, Sue Noffsinger, Richard Glover, Erika Hoy, Kristina Daniel, Halcyon Driskell, Crystal Kisselburgh, Anjali Jones, Theresa Lopez, and Jonathan Culwell in the United States District Court for the District of Colorado under 42 U.S.C. § 1983, alleging violations of her rights under the First and Fourteenth Amendments to the United States Constitution. The district court properly exercised federal-question jurisdiction under 28 U.S.C. § 1331 and 1343.

On December 19, 2022, the district court denied Chiles's motion for a preliminary injunction. Chiles timely filed her notice of appeal on January 3, 2023, within the 30-day period established in 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether a law that prohibits pure speech—and only speech—in a counseling session between counselor and client, based both on that speech's content and viewpoint, violates the First Amendment.

2. Whether a law that intentionally suppresses speech that is overwhelmingly—if not exclusively—religious unconstitutionally targets religious exercise in violation of the First Amendment.

3. Whether a law that suppresses pure speech and burdens religious exercise, with no historical analogue, serves a compelling interest, or, whether the government could have achieved its interest without burdening either.

## INTRODUCTION

Counselors "help [clients] make deeply personal decisions." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2374 (2018) (*NIFLA*). For those decisions to be "best for" the client, the client needs "an unconstrained flow of information from" a counselor who speaks candidly. Paula Berg, *Toward a First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. REV. 201, 235–36 (1994).

The government has no business forcing itself into these private conversations. Yet Colorado has done just that. It enacted a counseling censorship law that prohibits counselors from helping clients who voluntarily want to "change [their] sexual orientation or gender identity." COLO. REV. STAT. § 12-245-202(3.5)(a). And Colorado did so because it disagrees with that counsel's viewpoint.

Such heavy-handed censorship threatens First Amendment liberties. When experts disagree, the State cannot "favor some viewpoints or ideas at the expense of others." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984). In doing so here, Colorado violated the Constitution. Its law should be enjoined.

3

## STATEMENT OF THE CASE

### I.    Plaintiff Kaley Chiles

Kaley Chiles works as a licensed professional counselor in Colorado. She began her career focused on trauma. App. 036. From there she branched out into "adjacent and co-occurring clinical issues such as addictions, attachment, and then personality disorders." *Id.*

Chiles sees her work as an outgrowth of her faith. As a committed Christian, Chiles wants to help her clients achieve spiritual well-being. App. 042. Chiles is not a pastor and does not seek to impose her faith on anyone. *Id.* But because it is impossible to "practice counseling in a philosophical vacuum," Chiles's Christian views inform how she sees human nature and healthy relationships. *Id.*

Many clients share these viewpoints. Some are referred by local churches. Others hear through word of mouth about Chiles and seek out her "Christian counseling." App. 042–43. These clients come to her precisely because she shares their faith-based convictions and worldview. They want counseling that respects and is informed by that worldview.

These clients bring a wide variety of issues, including struggles with "sexual attraction[s], behaviors, or identity." App. 037. Some want to grow comfortable with their biological sex. Others want Chiles's help to direct their focus to opposite-sex relationships. And others want freedom from what they see as harmful sexual behaviors, such as

pornography use. These clients believe that life will be more fulfilling if aligned with the teachings of their faith. "Clients who identify as Christians holding to a biblical worldview believe their faith and their relationships with God supersede romantic attractions and that God determines their identity according to what He has revealed in the Bible rather than their attractions or perceptions determining their identity." App. 044. Though Chiles never promises that she can solve these issues, she, like her Christian clients, believes that sexuality and gender identity issues can, with God's help, be brought into alignment with the teachings of one's faith.

Faith and science are aligned when it comes to the possibility of change in gender identity or sexual orientation. Many young people who experience gender dysphoria end up identifying with their biological sex. In 2023, Finland's "leading expert on pediatric gender medicine" concluded that "four out of five children will grow out of their gender confusion," Christina Buttons, *Finland's Leading Gender Dysphoria Expert Says 4 Out of 5 Children Grow Out of Gender Confusion*, DAILY WIRE (Feb. 6, 2023)[1]; some studies have concluded that up to 98% will. And though it was once asserted that change in sexual orientation was rare or impossible, research shows that change is "indisputable."

---

[1] https://perma.cc/G6NB-VEV8.

Respected researchers Lisa Diamond and Clifford Rosky, who consider themselves advocates for LGBT issues, reviewed the scientific literature and concluded that "arguments based on the immutability of sexual orientation are unscientific, given that scientific research does not indicate that sexual orientation is uniformly biologically determined at birth or that patterns of same-sex and other-sex attractions remain fixed over the life course." Lisa M. Diamond & Clifford J. Rosky, *Scrutinizing Immutability: Research on Sexual Orientation & U.S. Legal Advocacy for Sexual Minorities*, 53 J. OF SEX RESEARCH 1, 2 (2016). And Dr. Nicholas Cummings, former president of the American Psychological Association, oversaw hundreds of clients who successfully changed from an unwanted sexual orientation, gender identity, or sexual behavior. The proposition that sexual orientation and gender identity are immutable and change is impossible is, Dr. Cummings concluded, "a distortion of reality." App. 034.

A report from the independent review of science and policy relating to treatment of gender dysphoria in minors commissioned by the English National Health Service confirmed the existence of those who regret gender transition and seek to "detransition," and noted an urgent and unmet "need for services" for those who desire to make that change to realign their gender identity with their biology. The Cass Review, *Independent Review of Gender Identity Services for Children and Young People*, at 49 (Feb. 2022). Studies also show that those who desire change

and seek counseling to help reach that goal "are placed at a much lower suicidal risk." D. Paul Sullins, *Sexual Orientation Change Efforts Do Not Increase Suicide: Correcting a False Research Narrative*, 51 ARCHIVES OF SEXUAL BEHAVIOR 3377 (Sept. 2022). Those who claim the opposite do so based on "presumpt[ion] and speculat[ion]." *Id.* Consistent with this science, Chiles wants to give her clients counsel that aligns with their faith and hers.

To provide counsel on these deeply intimate matters, Chiles must build a relationship with her clients. She wants to "formulate methods of counseling that will most benefit" each client. App. 037. To start, she builds a "critical therapeutic alliance" by "sit[ting] down with her clients and talk[ing] to them about their goals, objectives, religious or spiritual beliefs, values, desires, and identity." App. 014, 037. Chiles and her clients "freely" discuss "gender roles, identity, sexual attractions, root causes of desires, behavior and values." App. 014, 037. Together, they "fully explore" the issues; the client "communicates their goals, desires and objectives to" Chiles, and she subsequently "provides counseling that aligns with the client's self-determined choices." App. 014, 037. Her counseling consists, entirely, of speech; she does not use "aversive techniques," nor is she even aware of any practitioner who does. App. 036.

At every step, Chiles, in accordance with "clients' fundamental right of self-determination," acts only according to the client's self-defined goals. App. 037. She "does not begin counseling with any

predetermined goals other than those that the clients themselves identify and set." *Id*. And she certainly "does not seek to 'cure' clients of same-sex attraction." App. 038. She "seeks only to assist clients with their stated desires and objectives." *Id*. And she works only "with voluntary clients who determine the goals that they have for themselves." App. 043. If, for instance, a client is "happy identifying as gay, lesbian, bi-sexual, or gender non-conforming," then Chiles does not "try to help [them] change their attractions, behavior, or identity" but instead helps them develop other "therapeutic goal[s]." *Id*.

But some clients *do* express a desire "to reduce or eliminate unwanted sexual attractions, change sexual behaviors, or grow in the experience of harmony with [their] physical bod[ies]." App. 038. In Chiles's professional opinion, "challenge and confrontation" are critical tools for a counselor to help clients who desire to change their sexual orientation or gender identity, just as they are with any other unwanted attitude or behavior. *Id*. If a client is experiencing anxiety or distress over an unwanted sexual attraction or gender identity and wants to eliminate that anxiety or stress, then Chiles, as with "all forms of mental health counseling," wants to help "the client in building their own sense of self." *Id*.

## II.  **Colorado's Law**

Colorado now forbids the counseling Chiles provides. Though independent studies have confirmed a "lack of an agreed consensus" on

how to treat those struggling with gender identity and sexual orientation issues, Colorado dictated an ideological approach. The Cass Review, *supra*, at 47; *accord* App. 025. In 2019, Colorado enacted the Counseling Censorship Law, which censors certain conversations a counselor may have with her clients under age 18—condemning these conversations as akin to "conversion therapy." COLO. REV. STAT. § 12-245-202(3.5)(a). The Law defines "conversion therapy" broadly to include "any practice or treatment … that attempts or purports to change an individual's sexual orientation or gender identity"—which specifically includes any effort to "change behaviors or gender expressions or to eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex." *Id.* Yet the Law exempts counseling that provides "[a]cceptance, support, and understanding for the facilitation of an individual's coping, social support, and identity exploration and development, including sexual-orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices," or "[a]ssistance to a person undergoing gender transition." *Id.* § 12-245-202(3.5)(b)(I)–(II). But under no circumstances can a counselor help a client "change [his or her] sexual orientation or gender identity." *Id.* § 12-245-202(3.5)(a).

Colorado does not define the line between "explor[ing] and develop[ing]" one's "sexual orientation or gender identity" on the one hand versus "chang[ing]" it on the other. Yet anyone who crosses the line, even inadvertently, faces steep penalties—up to $5,000 for each violation,

9

possible suspension from practice, and even revocation of the counselor's license. *Id.* § 12-245-225.

Faced with such draconian penalties, Chiles's conversations with clients about gender, gender identity, gender expression, sexual orientation, and sexual behaviors have become more guarded and cautious. She "has intentionally avoided conversations with clients that may be perceived as violating the Law." App. 037. That fear is compounded by the hostile political climate, both nationally and in Colorado. As a result, Chiles has not been "able to fully explore the topic of sexuality with minor[ clients]," and those clients "are prevented from being able to fully explore the topic with her." *Id.*

## III. Procedural History

Chiles sued to vindicate her constitutional rights, arguing that the Counseling Censorship Law unconstitutionally abridges her free speech and free exercise rights. Concomitant with her complaint, Chiles moved the district court for a preliminary injunction that would protect her rights.

But the district court denied Chiles's motion. Even though Chiles uses nothing but words in her conversations with clients—a fact the district court found indisputable—the court nonetheless suggested that these words, when used in the "professional context," are not constitutionally equivalent to the exact same words used elsewhere and therefore receive different First Amendment protection. Convinced that

the "professional context" makes all the difference, the district court snubbed the contrary (and common sense) holding in *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020) (*Otto I*), that a nearly identical counseling censorship law targets speech because it targets what a counselor says. To the district court, the Eleventh Circuit "ignore[d] that what [is] said depends on its professional context and whether a plaintiff is licensed." App. 074.

Instead, the district court followed the Ninth Circuit's lead in *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) (*Tingley I*). There, the court suggested that "[w]hat licensed mental health providers do during their appointments with patients for compensation under the authority of a state license is treatment," and "treatment," even if it consists of words, is always conduct that a State can freely regulate. *Id.* at 1082. The district court therefore considered the Counseling Censorship Law a regulation of professional conduct. And even if the Law censored speech—which it does—the district court suggested that this practice was historically consistent with Colorado's ability to regulate medicine.

Treating the Law as a regulation of professional conduct, the district court subjected it to rational-basis review. The court accepted as "undisputable" Colorado's overgeneralized interest in preventing "harmful therapy known to increase suicidality in minors"—despite evidence, documented in Chiles's complaint, that the conversations she wants to have with her clients do *not*, in fact, increase suicidality but in

11

reality are more likely to reduce it. App. 077; *contra* Sullins, *supra*, at 3377–93. The court also agreed that Colorado's decision to censor speech was a rational means to achieve its objective.

Again the court turned to this faulty evidence to brush aside Chiles's free-exercise challenge. Even though the Counseling Censorship Law falls almost exclusively on counselors and clients with particular religious viewpoints—a fact "well[ ]known" to Colorado legislators when they enacted the Law—the district court suggested the law targeted not a "religious" practice but a "harmful" one. App. 082. To the district court, the Law thus burdened religion only incidentally. And even though the Law silences conversations in the counseling room, it cannot violate the Free Exercise Clause, the district court suggested, because it does not likewise silence conversations in churches and synagogues.

This upside-down world—where pure speech is now conduct and an exclusive ban on a religious viewpoint is suddenly neutral and generally applicable—is made more confusing by the fact that the Counseling Censorship Laws fails to define the line between impermissible speech that encourages "change" and permissible speech that instead encourages "exploration and development," leaving the question to an enforcement official's discretion. The district court compounded this problem of discretionary enforcement by essentially ignoring it.

Facing severe penalties for the exercise of her constitutional rights, Chiles timely filed a notice of appeal.

## SUMMARY OF THE ARGUMENT

Kaley Chiles did not "surrender [her] First Amendment rights" when she became a counselor. *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002). In fact, Chiles's speech—which must candidly explore her clients' intimate concerns and personal goals—is "entitled to 'the strongest protection our Constitution has to offer.'" *Id.* (quoting *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 634 (1995)).

Colorado's Counseling Censorship Law would turn that "strong[ ] protection" into an easily evaded Maginot Line. Colorado wants to tiptoe around the Constitution by relabeling Chiles's speech as conduct—or, more foggily, as a "treatment." But when counseling clients on sexuality and gender identity issues, *all* Chiles does is talk with her clients. No amount of legerdemain can turn that speech into conduct. The Supreme Court and other circuits have rejected government attempts to "rescue … [unconstitutional laws] by calling the plaintiffs' speech conduct" as "unprincipled and susceptible to manipulation." *Otto I*, 981 F.3d at 861 (cleaned up). So should this Court. Colorado's Law plainly targets speech.

Indeed, the Law indisputably suppresses speech in content- and viewpoint-based ways. The Law "limit[s] a category of people—therapists—from communicating a particular message," a message "grounded in a particular viewpoint about sex, gender, and sexual ethics." *Id.* at 863–84. And the Law forces those counselors to adopt the State's

13

approved viewpoint: that "sexual orientation is immutable, but gender is not," that "exploration and discovery" is beneficent but "change" is harmful. *Id.* at 864. Colorado does not have a compelling interest that justifies this biased censorship.

The Law also violates Chiles's free-exercise rights. Chiles practices as an overtly Christian counselor. Most of her clients seek her counsel precisely *because* they share her faith and want counseling consistent with their worldview. But the Law declares that worldview off-limits. And Colorado legislators knew that they were censoring a viewpoint that is "overwhelmingly—if not exclusively—religious." *Tingley v. Ferguson*, 57 F.4th 1072, 1084 (9th Cir. 2023) (*Tingley II*) (Bumatay, J., dissenting from the denial of rehearing). In doing so, Colorado abandoned its duty to remain neutral and violated the Free Exercise Clause.

Not only is Chiles likely to succeed on the merits of her claims, but other equitable factors favor enjoining Colorado's Censorship Law. The district court erred when it failed to do so. This Court should reverse and remand with instructions to enjoin the Law.

14

# ARGUMENT

I. **Colorado's Counseling Censorship Law targets Chiles's speech, not her conduct.**

A. **In her counseling, Chiles indisputably uses nothing more than words, and words are protected by the First Amendment.**

The First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I. Speech can come in wide varieties, for the Constitution protects expression beyond the spoken word. The First Amendment guards everything from "topless dancing" to "movies" to "parades." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th Cir. 2010) (collecting cases).

But no one doubts that, *at minimum*, the Constitution shields "written or spoken words." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995). "Under nearly every theory of free speech, the right to free speech is at its core the right to communicate— to persuade and to inform people through the content of one's message." Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones*, 90 Cornell L. Rev. 1277, 1304 (2005). Thus, "words … are forms of pure expression … entitled to full First Amendment protection." *Anderson*, 621 F.3d at 1061.

The conversations Chiles has with her clients are just that: words entitled to full First Amendment protection. When counseling clients on gender identity and sexuality, "[s]peech is the *only* tool" she uses. App.

15

037 (emphasis added). In any other context, Chiles's speech would be recognized uncontroversially as an information exchange. She talks to clients about "their stated desires and objectives," and then "formulate[s] methods of counseling that will" help them achieve those goals. App. 037–038. If "the[se] acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (cleaned up).

## B.    Words are not transformed from "speech" to "conduct" simply because a licensed professional utters them.

Colorado cannot end-run the First Amendment and "regulate [Chiles's] speech by relabeling it as conduct." *Otto I*, 981 F.3d at 865. When evaluating whether a law targets a professional's speech, courts draw the line between speech and conduct the same way they do outside the professional setting: by looking at what the regulation prohibits. As the Eleventh Circuit held in a factually indistinguishable case, if "the only conduct which the State [seeks] to punish [is] the fact of communication," then the State punishes speech, not conduct. *Id.* at 866 (cleaned up). "And the telltale sign" that the State punishes "communication is that statutory violations are not based on conduct that is 'separately identifiable' from speech." *Honeyfund.com, Inc. v. DeSantis*, No. 22-CV-227, 2022 WL 3486962, at *8 (N.D. Fla. Aug. 18, 2022) (quoting *Cohen v. California*, 403 U.S. 15, 18 (1971)).

That is exactly how the Supreme Court draws the line. In *Holder v. Humanitarian Law Project*, the challenged statute prohibited anyone from providing "material support" to certain organizations. 561 U.S. 1, 7 (2010). On its face, the prohibition targeted only conduct. But even a law that "*generally* functions as a regulation of conduct" can nonetheless target speech in certain circumstances. *Id.* at 27. In *Holder*, the plaintiffs wanted to provide certain organizations with "expert advice." *Id.* at 21–22. When the government tried to characterize this advice as conduct, the Supreme Court rejected its contention: the only "conduct triggering coverage under the statute consist[ed] of communicating a message," and that was speech. *Id.* at 28.

This Court draws the line the same way. In *Animal Legal Defense Fund v. Kelly*, a Kansas law prohibited "certain actions directed at an animal facility without effective consent of the owner of the facility and with intent to damage the enterprise of such facility." 9 F.4th 1219, 1223 (10th Cir. 2021). The Animal Legal Defense Fund wanted to plant investigators at animal facilities to secretly document animal abuse but worried that investigators' willingness "to lie about their association with ALDF" to gain access would "run afoul of the Act." *Id.* at 1223–24. Among other things, Kansas argued that its law targeted conduct—namely, entering private property—and not speech. Even though the Act *generally* regulated conduct, this Court held that it specifically targeted "not only what ALDF investigators may or may not do, but what they

17

'may or may not *say*.'" *Id.* at 1233 (quoting *Rumsfeld v. FAIR*, 547 U.S. 47, 60 (2006)). And that made it subject to traditional First Amendment scrutiny.

That "the First Amendment cannot be evaded by regulating speech 'under the guise' of regulating conduct" applies equally to the professional context. *Tingley II,* 57 F.4th at 1075 (O'Scannlain, J., dissenting from the denial of rehearing) (quoting *NAACP v. Button*, 371 U.S. 415, 439 (1963)). "Speech is not unprotected merely because it is uttered by 'professionals.'" *NIFLA*, 138 S. Ct. at 2371–72. After all, *Holder* involved licensed professionals who wanted to give "expert advice." 561 U.S. at 21. And in *NIFLA*, the Court emphasized that the First Amendment fully protects "specialized advice." 138 S. Ct. at 2374. It even "stressed the danger of content-based regulations in the fields of medicine and public health, where information can save lives." *Id.* (cleaned up). In doing so, *NIFLA* "reoriented courts toward the traditional taxonomy that draws the line between speech and conduct." *Vizaline, LLC v. Tracy*, 949 F.3d 927, 933 (5th Cir. 2020) (cleaned up).

In a host of "professional" settings since, other courts have followed the Supreme Court's lead. Regulations targeting a lawyers' communications "indisputably [target] speech," *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 114 (S.D.N.Y. 2022), while those that "focus more broadly on the question of who may conduct themselves as a lawyer" target conduct, *Capital Associated Industries, Inc. v. Stein*, 922 F.3d 198,

208 (4th Cir. 2019). Laws that stop a retired veterinarian from giving advice to pet owners without first physically examining the pet target "speech, and not conduct" because "all of [the veterinarian's] interactions with pet owners took the form of verbal and written communications." *Hines v. Quillivan*, No. 18-CV-155, 2021 WL 5833886, at *3 (S.D. Tex. Dec. 9, 2021). And laws that "prohibit[ ] unlicensed tour guides from leading visitors on paid tours" are not simply "restriction[s] on economic activity" but prohibitions on "an activity which, by its very nature, depends upon speech or expressive conduct." *Billups v. City of Charleston*, 961 F.3d 673, 683 (4th Cir. 2020).[2]

Several courts have examined censorship laws like Colorado's and concluded that they target not conduct but speech.[3] When, for instance, New Jersey defended its nearly identical counseling censorship law as regulating conduct, the Third Circuit held that "the argument that verbal communications become 'conduct' when they are used to deliver professional services was rejected by [*Holder*]." *King v. Governor of N.J.*, 767 F.3d 216, 228 (3d Cir. 2014). "That the counselor is speaking as a

---

[2] Even adjusting public insurance "necessarily and inextricably involves speech" and cannot be regulated when the government "points to nothing that a public insurance adjuster does that is simply conduct." *Stonewater Roofing, Ltd. v. Tex. Dep't of Ins.*, 641 S.W.3d 794, 802 (Tex. Ct. App. 2022).

[3] In a different context, one district court has also held that "counseling" "is speech, not conduct." *Brokamp v. District of Columbia*, No. 20-3574, 2022 WL 681205, at *1 (D.D.C. Mar. 7, 2022).

licensed professional," the court explained, "does not transmogrify her words into 'conduct.'" *Id.*

Similarly, the Eleventh Circuit flatly "rejected the practice of relabeling controversial speech as conduct." *Otto I*, 981 F.3d at 861. It denounced such attempts as "unprincipled and susceptible to manipulation." *Id.* (cleaned up). Whether as a regulation on "medical practice" or on a "client-directed conversation," Boca Raton's virtually identical counseling ban targeted "entirely speech." *Id.* at 865, 866 n.3.

If these identical counseling censorship laws targeted speech, not conduct, so does Colorado's. It prohibits Chiles from using words that might encourage a client to "change" his or her sexual orientation or gender identity. It triggers based not on any "separately identifiable conduct" that Chiles does but on the very words she uses. *Otto I*, 981 F.3d at 865. In short, "[w]hen [Colorado] restricts professionals" like Chiles "from speaking to [her] clients, it's restricting speech, not conduct." Volokh, *supra*, at 1346.

### C. Labeling Chiles's words a "treatment" also does not transform them from speech into conduct.

Branding Chiles's words a treatment does not remove them from the First Amendment's ambit. The First Amendment looks at whether a law targets speech or conduct, and a "treatment" can refer to either. For instance, to "treat" a patient by recommending marijuana is to engage in "the dispensing of information"—protected speech. *Conant*, 309 F.3d at

635. But to "treat" a patient by prescribing marijuana is to engage in "the dispensing of controlled substances"—unprotected conduct. *Id.* at 636. In either instance, the word "treatment," by itself, says nothing about whether the government regulates speech or conduct.

Indeed, to alchemize Chiles's speech into conduct by calling it a "treatment" is to engage in nothing more than a "labeling game." *Pickup v. Brown*, 740 F.3d 1208, 1218 (9th Cir. 2014) (O'Scannlain, J., dissenting from the denial of rehearing). "Speech is the *only* tool" Chiles uses in her "treatments." App. 037; *accord Brokamp v. District of Columbia*, No. 20-3574, 2022 WL 681205, at *1 (D.D.C. Mar. 7, 2022) (holding that "counseling" "is speech, not conduct"). And "speech is speech," *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1307 (11th Cir. 2017) (en banc) (cleaned up); it does not become "conduct just because the government says it is," *Telescope Media Group v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019).

In *Holder*, speech did not become conduct just because the government labeled it "material support." 561 U.S. at 28. So too here: Chiles's speech does not become conduct just because Colorado labels it a "treatment." "Talk therapy [may be] … a form of treatment," but it "consists—entirely—of words." *Otto v. City of Boca Raton*, 41 F.4th 1271, 1274 (11th Cir. 2022) (*Otto II*) (Grant, J., concurring in the denial of rehearing). And outside a narrow band of "historic and traditional categories long familiar to the bar," words are constitutionally protected

21

speech. *United States v. Stevens*, 559 U.S. 460, 468 (2010) (cleaned up). No one—neither Colorado nor the district court—has identified any "separately identifiable conduct" that Chiles engages in apart from the words she uses. Her pure speech cannot be regulated by labeling it "treatment."

### D. The district court was wrong to resurrect the discredited "professional speech" continuum.

To reach the "oxymoronic" conclusion that Chiles's words are a conduct-based "treatment," *Tingley II*, 57 F.4th at 1075 (O'Scannlain, J., dissenting), the district court relied on the Ninth Circuit's decision in *Tingley I*, 47 F.4th 1055. *Tingley* involved Washington State's counseling censorship law—which was "nearly identical" to California's, previously upheld by the Ninth Circuit in *Pickup* as a regulation of professional conduct. *Id.* at 1063 (citing *Pickup*, 740 F.3d at 1208). The court in *Tingley* concluded that it was bound by *Pickup*.

This Court is not bound by *Pickup* or *Tingley*, and both were wrongly decided. In *Pickup*, the Ninth Circuit posited that "the First Amendment rights of professionals" exist on a "continuum," where only "public dialogue" garners full protection, so-called "professional speech" earns diminished protection, and anything labeled conduct has no protection at all. *Pickup*, 740 F.3d at 1226–28. Bans on counseling conversations were "conduct" because, to the panel, they were bans on "treatment." *Id.* at 1229. The panel admitted that this so-called

22

treatment "require[s] speech," but "the fact that speech may be used to carry out those therapies does not turn the regulation of conduct into a regulation of speech."[4] *Id.*

There is no "continuum." There is simply speech and nonspeech. *Wollschlaeger*, 848 F.3d at 1307. And anything that qualifies as speech gets the same protection as "public dialogue." *Pickup*, 740 F.3d at 1227. In constructing its flawed continuum, *Pickup* ignored everything the Supreme Court held in *Holder* about the First Amendment protecting "expert instruction and advice by licensed professionals" and "wrongly claimed that [*Holder*] involved only 'political speech' by 'ordinary citizens.'" *Tingley II*, 57 F.4th at 1076 (O'Scannlain, J., dissenting) (quoting *Pickup*, 740 F.3d at 1230, and cataloging its numerous "flaws in … reasoning" and "misreading of relevant precedents").

To make clear the Ninth Circuit's error, the Supreme Court in *NIFLA* unequivocally held that "[s]peech is not unprotected merely because it is uttered by 'professionals.'" 138 S. Ct. at 2371–72. The Court

---

[4] Chiles contests the conflation of her speech with "medical treatment." The conversations she has with clients are "not medical at all" but are "a client-directed conversation consisting entirely of speech." *Otto* v. *City of Boca Raton*, 981 F.3d 854, 866 n.3 (11th Cir. 2020) (*Otto I*). A "sophomore psychology major" could converse with a fellow student in a way that looks identical to conversations Chiles has with her clients. *King* v. *Governor of N.J.*, 767 F.3d 216, 228 (3d Cir. 2014). No one would label the sophomore's speech as "conduct"; yet Colorado labels Chiles' conversations that way *only* because she is a "licensed counselor," *id.*—despite the Supreme Court's admonitions that governments lack "unfettered power to reduce a group's First Amendment rights simply by imposing a licensing requirement," *Nat'l Inst. of Fam. & Life Advocs.* v. *Becerra*, 138 S. Ct. 2361, 2375 (2018) (*NIFLA*).

has never recognized a separate "category called 'professional speech.'" *Id.* at 2372. Instead it has consistently recognized that the First Amendment protects professionals the same as it protects "ordinary citizens." As *NIFLA* clarified, if a law targets the conduct of a citizen *or* a professional and happens to sweep in speech at the margins, the law does not trigger First Amendment scrutiny. *Id.* at 2373. But if a law *directly* targets "communicating a message," whether the communicator be an "ordinary citizen" or a licensed professional, full First Amendment scrutiny applies. *Holder*, 561 U.S. at 28. The Court even went so far as to "directly criticize[ ]" *Pickup* by name. *Otto I*, 981 F.3d at 867; *NIFLA*, 138 S. Ct. at 2371–72 (citing—and rejecting—*Pickup*).

Since *NIFLA*, virtually every circuit has "uniformly rejected" *Pickup* and its continuum. *Tingley II*, 57 F.4th at 1078 (O'Scannlain, J., dissenting). From the start, there were "serious doubts about whether *Pickup* was correctly decided," *Wollschlaeger*, 848 F.3d at 1309, and *NIFLA* put those doubts to rest, for it "did *not* adopt any of the 'different rules' applied in *Pickup*," including its "sliding scale," *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 436 (6th Cir. 2019); *accord Vizaline*, 949 F.3d at 931–32; *Stein*, 922 F.3d at 207 (noting *Pickup*'s abrogation); *see also Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068–69 (9th Cir. 2020) (recognizing *Pickup* as "abrogated"). The Ninth Circuit should not have doubled down on its errors in *Tingley*.

Neither should have the district court here. Like the Ninth Circuit in *Pickup*, the district court put decisive weight on the "professional context" in which Chiles's speech occurs. App. 073. It ignored the Supreme Court's careful differentiation between speech and conduct and relied exclusively on the fact that Colorado grants Chiles a "license." *Id.* But neither the "professional context" nor Chiles's "license" determines the level of constitutional protection; whether her words are speech—which they are—does. The district court was wrong to rely on the Ninth Circuit's discredited "professional speech" doctrine.

To recast words used in counseling sessions "as mere conduct (or speech incidental to conduct) would undermine core First Amendment protections and subject wide swaths of protected speech to regulation by the government." *Chelsey Nelson Photography, LLC v. Louisville/Jefferson Cnty. Metro Gov't*, No. 19-CV-851, 2022 WL 3972873, at *13 (W.D. Ky. Aug. 30, 2022) (cleaned up). It would give the "States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement." *NIFLA*, 138 S. Ct. at 2375. If a counselor's speech can be transformed into conduct, so too can a doctor's speech about the best COVID treatments, *Høeg v. Newsom*, No. 22-cv-01980, 2023 WL 414258, at *1 (E.D. Cal. Jan. 25, 2023), or a social media blogpost about a controversial political issue, *Volokh v. James*, No. 22-CV-10195, 2023 WL 1991435, at *2, 7 (S.D.N.Y. Feb. 14, 2023). For that

matter, so too could "teaching or protesting," "[d]ebating," and "[b]ook clubs." *Otto I*, 981 F.3d at 865.

The district court suggested these comparisons are "disingenuous" because a professional counselor like Chiles has a "graduate degree and a professional licensure," which "is incomparable to casual conversations about *New York Times* bestsellers." App. 089. But to the First Amendment, that's a distinction without a difference. Whether words come from a professional counselor or a casual observer, they are speech and "must be analyzed as such." *Wollschlaeger*, 848 F.3d at 1307. To classify one as speech and the other as conduct based solely on training does exactly what *NIFLA* forbade: giving "States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement." 138 S. Ct. at 2375.

Though "[t]he speech/conduct line" can be "hard to draw," it is not here. Elena Kagan, *Regulation of Hate Speech and Pornography after R.A.V.*, 60 U. CHI. L. REV. 873, 884 (1993). Under any definition of speech, "spoken words" qualify. *Hurley*, 515 U.S. at 569. The district court failed to honor this common-sense understanding. By relying exclusively on the "professional context" and Chiles's "license" to hold that her speech was conduct, the court committed reversible error.

### E.　Colorado's Counseling Censorship Law suppresses Chiles's speech directly, not incidentally.

In *NIFLA*, the Supreme Court clarified that professionals' speech gets "less protection" in only two limited circumstances—first, when laws require "professionals to disclose factual, noncontroversial information in their 'commercial speech,'" and, second, when "regulations of professional conduct" only "incidentally burden speech." 138 S. Ct. at 2372–73. Laws burden speech incidentally only when they target "separately identifiable conduct" and, in so doing, "sweep up some speech at the[ ] margins," *Otto I*, 981 F.3d at 865.

That's not what the Counseling Censorship Law does. It regulates speech at its core. Colorado censors licensed counselors from saying anything that might "attempt[ ] or purport[ ] to change an individual's sexual orientation or gender identity." COLO. REV. STAT. § 12-245-202(3.5)(a). Even the district court agreed that Colorado cannot "dispute that Ms. Chiles speaks to her clients during counseling sessions," and that speech is exactly what the Law forbids. App. 073 (cleaned up).

That differentiates Colorado's Law from regulations that directly target conduct. For instance, in *EMW Women's Surgical Center, P.S.C. v. Beshear*—a case cited by the district court—the law at issue "regulate[d] doctors' conduct: performing abortions." 920 F.3d at 426. Unlike Ms. Chiles's counseling, performing an abortion is "separately identifiable conduct," *Otto I*, 981 F.3d at 865, involving a concrete and invasive "medical procedure," *EMW*, 920 F.3d at 429. And "the First Amendment

27

recognizes the obvious difference, and protects therapeutic speech in a way it does not protect physical medical procedures." *Tingley II*, 57 F.4th at 1075 (O'Scannlain, J., dissenting) (emphasis omitted).

Inexplicably, the district court held that the Counseling Censorship Law targeted Chiles's speech incidentally at best. But that conclusion "minimize[s] [her] protected speech to such a degree that it is extinguished." *McCraw v. City of Okla. City*, 973 F.3d 1057, 1067 (10th Cir. 2020). No doubt Chiles's practice involves some activity. But those activities are not what Colorado's Law targets. Instead it takes aim directly at her *speech*; she cannot talk to clients in a way that might encourage them to "change" their "sexual orientation or gender identity." COLO. REV. STAT. § 12-245-202(3.5)(a). If the government can regulate this speech by connecting it to incidental conduct, then, as the Eleventh Circuit concluded, it could also regulate "teaching or protesting," "[d]ebating," and "[b]ook clubs." *Otto I*, 981 F.3d at 865. After all, most speech is accompanied by some conduct; "[p]icketing is accompanied by the conduct of holding a placard; leafleting is accompanied by the conduct of standing on a sidewalk." *Green v. Miss United States of Am.*, 52 F.4th 773, 780 (9th Cir. 2022). Yet a law banning picketing or leafleting would undeniably target speech. To hold otherwise "is like saying that limitations on walking and running are merely incidental to ambulation." *Wollschlaeger*, 848 F.3d at 1308.

28

## IV.  Colorado's Law is presumptively unconstitutional because it censors speech based on its content and viewpoint.

A law regulates speech based on content when it "target[s] speech based on its communicative content." *Animal Legal Defense Fund*, 9 F.4th at 1228 (cleaned up). If a law goes further and suppresses speech based "not [only on] subject matter, but [also on] particular views taken by speakers on a subject," then that law discriminates based on viewpoint, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), which is a particularly "egregious form of content discrimination," *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015).

Laws that censor based on content and viewpoint are "presumptively invalid," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), and so "blatant[ly]" violate the First Amendment that they rarely survive review, *Rosenberger*, 515 U.S. at 829.[5]

As the Eleventh Circuit observed when confronted with a virtually identical censorship law, here "[t]he answer to the content-based-or-not question turns out to be … easy." *Otto I*, 981 F.3d at 861. Colorado's Law singles out disapproved speech based on both content and viewpoint.

A simple test to determine whether a speech restriction is content-based is to ask whether the law "requires enforcement authorities to

---

[5] Arguably, viewpoint-discriminatory laws are more than presumptively unconstitutional; they might even be "unconstitutional per se." *Otto I*, 981 F.3d at 870 n.12 (citing *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804–05 (1984)).

examine the content of the message that is conveyed to determine whether a violation has occurred." *Animal Legal Defense Fund*, 9 F.4th at 1228 (quoting *McCullen v. Coakley*, 573 U.S. 464, 479 (2014)). Here, to enforce its Counseling Censorship Law, Colorado must examine what a counselor says. The Law is implicated only if the counselor discusses certain content: "sexual orientation or gender identity." COLO. REV. STAT. § 12-245-202(3.5)(a). The Law does not apply to counseling about other struggles like anxiety or addiction. Further, enforcement authorities must determine if the counselor's speech somehow "attempts or purports to change an individual's sexual orientation or gender identity"; if so, then the Law punishes that speech as "unprofessional conduct." *Id.* But if enforcement authorities determine that the counselor instead provided "[a]cceptance, support, and understanding" of the client's "identity exploration and development," then the counselor does not violate the Law. *Id.* § 12-245-202(3.5)(b)(I). Either way, the Law's triggers depend on "the topic discussed," *Reed*, 576 U.S. at 163, and enforcement authorities must examine the content of a counselor's speech "to determine whether a violation has occurred," *Animal Legal Defense Fund*, 9 F.4th at 1228 (cleaned up). "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020).

A law goes further and suppresses speech based on viewpoint when it targets "the specific motivating ideology or the opinion or perspective

of the speaker." *Reed*, 576 U.S. at 168–69. Colorado's Law does that, too. It completely prohibits speech by counselors from one "ideology" or "perspective"—even if that perspective is shared by both counselor and client. It does so on topics that are deeply private and personal, and at the same time the center of a "hotly contested" "political topic[ ]." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018); *Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021).

The Law does not ban all conversations about gender identity and sexual orientation. Rather, it allows counselors to talk about these topics in a way that Colorado believes provides "[a]cceptance, support, and understanding" of "identity exploration and development," while prohibiting any speech that might assist or support a client in "chang[ing]" his or her gender identity or sexual orientation. COLO. REV. STAT. § 12-245-202(3.5)(b)(I). In so doing, the Law "codif[ies] a particular viewpoint"—namely, that changing ones' gender identity or sexual orientation is either impossible or undesirable—while prohibiting counseling that can help some clients align their identity with their biology and beliefs. *Otto I*, 981 F.3d at 864. And that discriminates based on viewpoint.

## V.    Colorado's Law censors religious speech and violates the Free Exercise Clause.

"While there is no longstanding tradition of regulating therapeutic speech, there *is* a constitutional tradition relevant here—namely, that of

protecting religious speech." *Tingley II*, 57 F.4th at 1082 (O'Scannlain, J., dissenting). At its core, the First Amendment most vigorously protects religious speech. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (noting that the First Amendment "doubly protects religious speech"). The Free Speech and Free Exercise "Clauses work in tandem" to "provide[ ] overlapping protection." *Id.* In fact, "a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995).

That is "no accident." *Kennedy*, 142 S. Ct. at 2421. "In Anglo-American history, government suppression of speech has so commonly been directed *precisely* at religious speech." *Id.* (cleaned up). Free speech has its intellectual origins in free *religious* speech. Given the English government's centuries-long wrangling over religious opinions, the Framers had a natural "distrust of government attempts to regulate religion and suppress dissent." *Id.* (citing A Memorial and Remonstrance Against Religious Assessments, *in* SELECTED WRITINGS OF JAMES MADISON 21, 25 (R. Ketcham ed. 2006)). They enshrined this distrust in the First Amendment, giving "censorial power" to "the people over the Government, and not in the Government over the people." Akhil Reed Amar, *How America's Constitution Affirmed Freedom of Speech Even Before the First Amendment*, 38 CAP. U. L. REV. 503, 506 (2010) (quoting 4 Annals of Cong. 936 (1794)).

Colorado's Law seeks to wrest this "censorial power" back into the hands of government. Chiles is a practicing Christian and "take[s] seriously the origins of 'psychotherapy' in the religious 'cure of souls.'" *Tingley II*, 57 F.4th at 1082 (O'Scannlain, J., dissenting) (cleaned up). Many of her clients seek out counseling because they want to bring their sexual attractions or identities in line with the teachings of their faiths. For these clients, her "faith-based counseling … offer[s] a unique path to healing and inner peace." *Id.* at 1084 (Bumatay, J., dissenting).

And her ability to counsel these clients consistent with their shared Christian values "does not lose its constitutional protection simply because [s]he is subject to a licensing requirement." *Id.* at 1082 (O'Scannlain, J., dissenting) (citing *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1884 (2021) (Alito, J., concurring)). The Constitution protects "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life." *Kennedy*, 142 S. Ct. at 2421. That includes those who do not prescribe to Colorado's orthodoxy on matters of sexuality and gender identity.

By intentionally targeting speech that is "overwhelmingly—if not exclusively—religious," Colorado violated the Free Exercise Clause. *Tingley II*, 57 F.4th at 1084 (Bumatay, J., dissenting). When a government enacts a law that targets religious beliefs or practices, such a law "doubtless[ly]" violates the First Amendment's core protection. *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990).

33

A law targets religion if it lacks either neutrality or general applicability. Colorado's Law lacks both.

### A.     Colorado's Law is not neutral because it facially suppresses speech well known to be religious.

"[T]he Constitution requires" the government to commit itself to "religious neutrality." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1724 (2018). At minimum that means that government officials cannot enact laws that on their face "refer[ ] to a religious practice without a secular meaning discernable from the language or context." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533–34 (1993). But "even slight suspicion that" government officials acted out of "animosity to religion or distrust of its practices" is "inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion." *Masterpiece Cakeshop*, 138 S. Ct. at 1731–32. And when such hostility accompanies the enactment of a law, the law must be "set aside," "without further inquiry." *Kennedy*, 142 S. Ct. at 2422 n.1 (quoting *Masterpiece Cakeshop*, 138 S. Ct. at 1732).

Here, Colorado's departure was far from subtle. Colorado labeled any speech that seeks to "change" someone's sexuality or gender identity as "conversion therapy"—a loaded term meant to evoke aversive practices that haven't been used "in decades." *Watered Down Anti-Conversion Therapy Bill Passes Utah House Committee; Original*

34

*Sponsors Vote Against It*, Q Salt Lake Magazine (Mar. 5, 2019).[6] The Alliance for Therapeutic Choice and Scientific Integrity has noted that using the term "conversion therapy" to refer to speech that encourages voluntary change is "no longer scientifically or politically tenable." App. 036. Yet Colorado used it anyway.

And it used this negative association to censor speech it knew was overwhelmingly religious. As Chiles has alleged, citing multiple authorities, it was "well[ ]known" that counseling from the viewpoint and with the goals prohibited by the Law is primarily a "religious … practice." App. 019. Researchers Diamond and Rosky noted that "the majority of individuals seeking to change their sexual orientation report doing so *for religious reasons* rather than to escape discrimination." App. 020–021 (emphasis added). The American Psychological Association similarly reported that "*most* [efforts to change sexual orientation or gender identity] currently seem directed to those holding conservative religious … beliefs, and recent research … includes *almost exclusively* individuals who have strong religious beliefs." App. 020. And the American Counseling Association asserted that "[c]onversion therapy … is a religious … practice." App. 019.

Thus, Chiles has reasonably alleged that the Law's ban falls "almost exclusively on" counselors and clients who hold "particular

---

[6] https://perma.cc/864F-LMST.

religious beliefs." *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 169 (2d Cir. 2020). The Law prevents clients who "*almost exclusively* [are] individuals who have strong religious beliefs" from seeking counsel that aligns with and respects their beliefs. App. 020 (emphasis added). It is reasonable to infer animus from these facts; "the effect of a law in its real operation is strong evidence of its object." *Lukumi*, 508 U.S. at 534–35.

Colorado's anti-religious targeting and gerrymandering is made more obvious by its enactment of an entirely illusory "religious exemption." That provision exempts no conversation that would otherwise be prohibited by the Law's core provisions. Specifically, this so-called "exemption" claims to exempt "religious ministr[ies]" from the Law's ambit. COLO. REV. STAT. § 12-245-217(1). But the Law regulates only "[a] person licensed, registered, or certified"—it does not apply to "religious ministries" at all. *Id.* § 12-245-224(1). The supposed exemption has no operation but to mislead the public. And it shows that even Colorado "implicitly acknowledge[d] the constitutional issue." *Tingley II*, 57 F.4th at 1082 (O'Scannlain, J., dissenting).

When a law targets a religious practice or religious speech, it is no cure that the law also applies to some hypothetical secular conduct. A law can implicate "multiple concerns unrelated to religious animosity" that "mask" its real target: religion. *Lukumi*, 508 U.S. at 535; *New Hope*, 966 F.3d at 163. To the extent that the district court thought that Colorado's law did not violate the Constitution because it also prohibited counseling

based on secular reasons, that misses the point. Even if states treat "some comparable secular" conduct "as poorly as or even less favorably than the religious exercise at issue," that does not answer the question. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam). When faced with a Free Exercise issue, courts must dig beneath the surface to guard against even "subtle" departures from neutrality that can be cleverly masked by so-called "facial neutrality." *Lukumi*, 508 U.S. at 534.

Nor can Colorado excuse or disguise its targeting of a primarily religiously motivated practice or viewpoint by claiming that the State is exercising its police powers. The district court thought the Law was designed not to target religion but to protect minors from so-called harmful therapies, but that overgeneralizes the issue. "[G]overnment[s], in pursuit of [even] legitimate interests, cannot in a selective manner impose burdens only on conduct [or speech] motivated by religious belief." *Lukumi*, 508 U.S. at 543. So too here. Whatever valid interest Colorado has in protecting minors, it cannot pursue that interest in a manner that targets a particular religious viewpoint or practice. *Cent. Rabbinical Congress of U.S. & Canada v. N.Y. City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014) (invalidating a regulation that targeted a religious practice even though the government "may have [had] legitimate reasons for addressing HSV infection risk among infants").

Most fundamentally, Colorado's attempt to impose its views in an area of profound religious, philosophical, and scientific

debate is itself a violation of neutrality. As several courts have recognized, issues of gender identity and sexuality are "hotly contested matter[s] of public concern." *Meriwether*, 992 F.3d at 506. On one side of that debate are major historic faiths, including Judaism, Christianity, and Islam, which have long taught (among other tenets) that the only moral context for sexual relationships is within a heterosexual marriage. Colorado now forces counselors and clients with these religious convictions to advocate only the contrary viewpoint, one that insists on "exploration and development" rather than working to bring one's heart, desires, and conduct into line with the teachings of one's faith.

It is not the government's role to decide this religious debate, but rather "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *McCullen*, 573 U.S. at 476. And "[t]he need to prevent the government from picking ideological winners and losers is as important" here "as it is in any other context." *Wollschlaeger*, 848 F.3d at 1328 (W. Pryor, J., concurring). When the government abandons its duty—when it "is the one deciding which ideas should prevail"—"the people lose." *NIFLA*, 138 S. Ct. at 2375.

**B.    Colorado's Law is not generally applicable because it uses terms that invite individualized exemptions allowing secular speech that equally undermines the government's asserted interest.**

"A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a

mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (cleaned up). And the Counseling Censorship Law is framed in terms that invite enforcement authorities to pass judgment and make individualized exemptions for secular counselors of whose attitudes they approve. The Law favors speech that provides "[a]cceptance, support, and understanding for the facilitation of … identity exploration and development." COLO. REV. STAT. § 12-245-202(3.5)(b)(I). The Law prohibits speech that "seek[s] to change sexual orientation or gender identity." *Id.* But "exploration and development" can result in "change." The line between the allowed and the prohibited rests in the enforcement official's "sole discretion." *Fulton*, 141 S. Ct. at 1879. And given the history and context reviewed above, it is no reach to expect that "change" resulting from secular counseling will be treated as exempt and lawful, while "change" that results from counseling informed by faith-based convictions about identity and sexual morality will be treated as unlawful.

## VI. Colorado's Law cannot survive scrutiny because it advances no legitimate governmental interest, is not narrowly tailored, and is a historical anomaly.

The Counseling Censorship Law violates Chiles's free-speech and free-exercise rights and is therefore presumptively unconstitutional. *R.A.V.*, 505 U.S. at 382. A "content-discriminatory law has two ways to survive a First Amendment challenge: it must either pass 'rigorous' means-end scrutiny, or fit within a carefully 'delimit[ed]' long-standing

tradition." *Tingley II*, 57 F.4th at 1079 (O'Scannlain, J., dissenting) (quoting *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 553 (6th Cir. 2020) (Murphy, J., concurring in the judgment)). Colorado's censorship law cannot meet either test.

### A.    As enforced against pure speech, Colorado's Law serves no legitimate governmental interest.

The Law's text and history confirm that, in enacting it, Colorado's primary interest was suppressing a viewpoint with which the State disagrees. But "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "While the law is free to promote all sorts of conduct," "it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579.

Colorado has no business "picking ideological winners and losers." *Wollschlaeger*, 848 F.3d at 1328 (W. Pryor, J., concurring). No matter how much Colorado dislikes the ethics, goals, and religious beliefs that motivate clients to seek counseling for unwanted gender identity and sexual attraction issues, "the [client's] freedom to learn about them, fully to comprehend their scope and portent, and to weigh them against the tenets of the 'conventional wisdom,' may not be abridged." *Eisenstadt v.*

*Baird*, 405 U.S. 438, 457 (1972) (Douglas, J., concurring) (citation omitted).

And no matter how many "professionals" agree with Colorado's viewpoint, that does not give the State an interest in silencing the other side of the debate. After all, "[i]t is not uncommon for professional organizations to do an about-face in response to new evidence or new attitudes." *Otto I*, 981 F.3d at 869. "[O]ne example stands out." *Id.* For many years, "the American Psychiatric Association considered homosexuality a paraphilia, disorder, or disturbance." *Id.* Today that position is, "to put it mildly, broadly disfavored." *Id.* This example demonstrates why "[n]eutral principles," rather than the ever-shifting tides of "professional consensus," must govern. *Id.* at 869–70. "Professional opinions and cultural attitudes may have changed, but the First Amendment has not." *Id.* at 870. "[M]ajority preferences must be expressed in some fashion other than silencing speech on the basis of its content." *R.A.V.*, 505 U.S. at 392. So "[s]trict scrutiny cannot be satisfied by professional societies' opposition to speech." *Otto I*, 981 F.3d at 869.

Nor does Colorado have a legitimate interest in suppressing ideas it considers "harmful." Indeed, "the point of all speech protection … is to shield just those choices of content that in someone's eyes are misguided, or *even hurtful*." *Hurley*, 515 U.S. at 574 (emphasis added). Ideas may have consequences, but those consequences cannot support censorship unless they present a high and immediate risk of physical harm. *See*

*Brandenburg v. Ohio*, 395 U.S. 444, 447–49 (1969) (per curiam). Even then, the "degree of imminence" that physical harm will occur must be "extremely high before" speech can "be punished." *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 845 (1978). And Colorado would need "actual facts" that show that consensual counseling conversations cause physical harm. *Id.* at 843. Instead, Colorado has produced "presumpt[ion] and speculat[ion]." Sullins, *supra*, at 3377–93. Neither gives the State an interest in suppressing an idea it considers harmful.

Similarly, Colorado does not have an interest in protecting its citizens from pursuing emotional or identity goals that the government deems "bad." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002). Colorado might believe that volitional change in sexuality or gender identity is impossible or undesirable. And it might believe that those who pursue volitional change are making a mistake that may harm them. But Colorado cannot stop those clients from voluntarily seeking emotional changes that the *clients* believe will increase well-being solely because, in the government's eyes, such change is a "bad decision[ ]." *Id.* The Supreme Court has consistently rejected such an approach as illegitimately "paternalistic." *Id.* at 375. "It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for

us." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976).

Moreover, Colorado's paternalism rests on "questionable assumption[s]" that counselors will, through words that encourage "change" over "exploration and development," harm clients who voluntarily want to talk about ideas that Colorado disfavors. *Thompson*, 535 U.S. at 374. In "formulating its judgments," the legislature was required to "draw[ ] *reasonable* inferences based on *substantial* evidence." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (cleaned up) (emphasis added). Yet Colorado did the opposite. As Chiles pled, scientific studies show that counselors can increase well-being in individuals who pursue change in obedience to their religious convictions. App. 035; *accord* Sullins, *supra*, at 3377–93. Such conversations have, in fact, greatly reduced suicidality rates among those individuals. Sullins, *supra*, at 3377–93. Conversely, studies show that some clients are harmed by counseling that only encourages them to "explore and develop" gender identity, including greatly increased rates of mental health problems ranging from depression and anxiety to suicidal ideation and suicide attempts. App. 025–26. If Colorado wants its citizens to flourish, it should leave decisions as to which counseling to pursue to counselor and client.

That Colorado has a general interest in "safeguarding the physical and psychological well-being of a minor" does not give it a freer hand in suppressing speech. *New York v. Ferber*, 458 U.S. 747, 756–57 (1982)

43

(citation omitted). Colorado does not have "a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794–95 (2011). Speech "cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975).

When the government invokes this "abstract" interest, it "must demonstrate," at the very least, "that the recited harms are real, not merely conjectural, and that the [censorship] will in fact alleviate these harms in a direct and material way." *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 962 (9th Cir. 2009) (cleaned up). Colorado has done nothing more than express a preference in protecting minors from "words" that the legislators found "harmful"—without any evidence that words themselves cause harm, particularly to religiously motivated individuals pursuing self-chosen goals. In fact, consensus does not exist regarding best practice with children who struggle with gender identity. *See* The Cass Review, *supra*, at 47; App. 025, 035–36. Colorado's general interest in protecting minors does not justify its censorship.

**B.    The Law is not narrowly tailored because it is not necessary, is overbroad, is underinclusive, and could achieve Colorado's objectives through less restrictive avenues.**

"A narrowly tailored regulation … actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive),

does not leave significant influences bearing on the interest unregulated (is not underinclusive), and" cannot "be replaced" by a regulation "that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005). "[S]o long as the government can achieve its interests in a manner that does not burden religion"—or that does not burden speech—"it *must* do so," *Fulton*, 141 S. Ct. at 1881 (emphasis added) (religion); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (speech). Colorado's Counseling Censorship Law fails on all fronts.

First, Colorado has not identified a need to suppress the consensual conversations between Chiles and her clients. To satisfy strict scrutiny, Colorado must "specifically identify an actual problem" and show that suppressing "speech [is] actually necessary to the solution." *Brown*, 564 U.S. at 799 (cleaned up). The Law's legislative history notes concern about unscrupulous counselors psychologically abusing minors by forcing them to convert to a different sexuality or gender identity against their will. But Colorado has not documented any specific instances where counselors used these practices, much less where a single individual has been harmed. "Licensed therapists haven't been doing electric shock therapy and adversant practices *in decades*." *Watered Down Anti-Conversion Therapy Bill Passes Utah House Committee; Original Sponsors Vote Against It*, Q Salt Lake Magazine

(Mar. 5, 2019) (emphasis added).[7] Colorado needs more than anecdote and supposition for its Law to survive strict scrutiny; it needs evidence of an actual problem. It has none.

Moreover, Colorado cannot satisfy strict scrutiny as applied to Chiles. For "[t]he question … is not whether [Colorado] has a compelling interest in enforcing its" Law "generally, but whether it has such an interest in" enforcing it against Chiles specifically. *Fulton*, 141 S. Ct. at 1881. The concerns noted in the legislative history have nothing to do with Chiles. She does not use aversive techniques. When counseling clients on sexuality and gender identity issues, all she does is listen and talk with clients.

Second, the Law sweeps more broadly than necessary. "Precision must be the touchstone when it comes to regulations of speech," but Colorado's Law widely misses this mark. *NIFLA*, 138 S. Ct. at 2376 (cleaned up). If the State wanted to stop coercive therapy, it could have done so without suppressing consensual speech. There is no evidence that the consensual conversations Chiles's clients want to have with her will amount to the harms legislators noted. In fact, other legislators offered one amendment that would have limited the Law to "things that are not consensual." Colorado Senate Second Reading Debate, March 21, 2019.[8]

---

[7] https://perma.cc/864F-LMST.

[8] https://perma.cc/727U-APWL.

The legislature rejected this and, by doing so, made clear that it desired to suppress *all* speech related to the disfavored viewpoint.

Finally, if Colorado's goal is to protect minors, its Law is so underinclusive that it fails to capture other closely related speech that could harm them, "rais[ing] serious doubts about whether [the government] is, in fact, serving, with this statute, the significant interests which [it] invokes" to justify its Law. *Fla. Star v. B.J.F.*, 491 U.S. 524, 540 (1989). At a legislative hearing on the Law, Colorado's own witness noted that the State was leaving out "unlicensed professionals" from the Law's ambit. Colorado House Committee on Public Health Care & Human Services, February 13, 2019.[9] Unlicensed counselors can have the same psychological effect (whatever that disputed effect may be) as licensed counselors. This further undermines any contention that Colorado's Law "can brook no departures." *Fulton*, 141 S. Ct. at 1882.

### C.   The Censorship Law is a historical anomaly.

States can regulate speech based on content *only* if such regulation is "historically rooted in a tradition of regulation going back to the Founding." *Upsolve*, 604 F. Supp. 3d at 116; *accord NIFLA*, 138 S. Ct. at 2373; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022). Traditionally, the list has been "tightly limited in number" to "defamation, incitement, fraud, and obscenity." *Upsolve*, 604 F. Supp. 3d

---

[9] https://perma.cc/EX6M-ZH6F.

at 116. Colorado has not even attempted to meet its burden to show that "therapeutic speech" or "the speech of licensed professionals" historically belongs. *See Bruen*, 142 S. Ct. at 2130 (putting the burden on the State to provide some "historical evidence about the reach of the First Amendment's protections" (cleaned up)). Yet the district court nonetheless exerted a "freewheeling authority" and allowed the State to impose a content-based regulation on this speech anyway. *United States v. Alvarez*, 567 U.S. 709, 722 (2012).

"[T]here is *no* tradition of regulating professional speech"—not even speech related to medicine or therapy. *Otto II*, 41 F.4th at 1274 (Grant, J., concurring). There's not even a consistent history of regulating these *practices*. Though some states enacted professional regulations after the Revolution, most were repealed shortly thereafter as "inconsistent with the … democratic political ideology." Elliott A. Krause, DEATH OF THE GUILDS 30 (1996). That included medicine: "almost anyone could practice 'medicine,' and many did." *Id.*; *accord* S. David Young, THE RULE OF EXPERTS: OCCUPATIONAL LICENSING IN AMERICA 12 (1987) ("[B]y the mid-1800s the medical profession was open to almost anyone who chose to hang out a shingle."). Various "theories and approaches warred with one another" without any government interference. Krause, *supra*, at 30. Only in the 1880–1920s—well after the First and Fourteenth Amendments were ratified—did states consistently impose licensing laws.

48

Anyway, a history of regulating medical practices is not the constitutional equivalent of a history of regulating medical *speech*. To justify its content-based Law, Colorado must point to historical evidence that its censorship law "is consistent with the Nation's historical tradition of" speech regulation. *Bruen*, 142 S. Ct. at 2130. To say that a State regulated medicine generally and can therefore regulate speech specifically is another way of saying that a statute generally regulates conduct and therefore can specifically regulate speech. The Supreme Court has rejected that proposition. *Holder*, 561 U.S. at 28.

The district court erroneously concluded otherwise because Colorado could point to a broad history of regulating public health. But that's the exact historiography the Supreme Court rejected in *Bruen*. There, New York pointed to *some* historical regulations on firearms to argue that it could now ban *all* firearm ownership. But New York needed to do more than point to some historical firearm regulations; it bore the burden to provide "comparable" historical examples of regulations that burdened firearm ownership as much as New York's challenged law. *Bruen*, 142 S. Ct. at 2133. That New York could find no historical analogue doomed its modern-day regulation.

As in *Bruen*, the historical silence here is decisive. Though New York could at least point to three colonial regulations, that was not enough to show a long-standing tradition. If three regulations did not carry the day in *Bruen*, then *zero* examples cannot win the day here. *Id.*

49

at 2142. Whatever history there is of regulating medical practices, there's *no* "historical evidence" that these laws allowed States to regulate pure speech. *Id.* at 2130. "Simply put, the historical practices at the time of the ratification of the First and Fourteenth Amendments show that the rendering of personalized advice to specific clients was not one of the 'well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any constitutional problem.'" Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 SEATTLE U. L. REV. 885, 957 (2000) (cleaned up).

## VII. The other factors weigh in favor of preliminarily enjoining Colorado's Law.

This Court reviews the denial of a preliminary injunction for an abuse of discretion. *Courthouse News Serv. v. N.M. Admin. Off. of Cts.*, 53 F.4th 1245, 1254 (10th Cir. 2022). "A district court's decision crosses the abuse-of-discretion line if it rests on an erroneous legal conclusion or lacks a rational basis in the record." *Id.* (cleaned up). This Court therefore "examine[s] the court's factual findings for clear error and its legal conclusions de novo." *Id.* at 1255 (cleaned up). Given the important First Amendment interests at stake in this case, this Court must also "make[ ] an independent examination of the record to protect against the diminution of First Amendment rights." *Homans v. City of Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001) (per curiam).

To obtain a preliminary injunction, Chiles needed to show "(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest." *Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013). "In the First Amendment context, the likelihood of success on the merits will often be the determinative factor because of the seminal importance of the interests at stake." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (cleaned up).

Those important interests are at stake in this case. Without a preliminary injunction, the Censorship Law will chill Chiles's speech. And "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* (cleaned up). Moreover, with the Law censoring Chiles's speech, clients already underserved will not receive the counsel that they need. Those struggling with gender identity and sexuality issues may find themselves pushed down a "too-hasty" path that "fail[s] to challenge [their] oversimplified desires," resulting in tragic and irreversible consequences. App. 027–29 (cleaned up).

A preliminary injunction also favors the public interest by preserving First Amendment freedoms. As this Court has held, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Verlo*, 820 F.3d at 1127. Here as in other First

Amendment cases, the "public interest is better served by following binding Supreme Court precedent and protecting the core First Amendment right[s]." *Homans*, 264 F.3d at 1244.

Chiles has demonstrated a strong likelihood to succeed on the merits of her claims. Without a preliminary injunction, she cannot give clients the counsel they seek. The public interest weighs heavily in favor of allowing Chiles to speak the counsel these clients both need and want. This Court should remand with instructions to enter a preliminary injunction against the Counseling Censorship Law.

**CONCLUSION**

Kaley Chiles began her career focused on helping "underserved populations," and those who voluntary seek to change their sexuality or gender identity have an urgent and unmet "need for services." The Cass Review, *supra*, at 49; App. 044. Chiles wants to help these clients achieve the lives and the personal goals that they have set out for themselves based on their own beliefs and wishes. She can no longer do so under Colorado's unconstitutional Counseling Censorship Law. That law forces Chiles to make a choice. She must either forego discussing sexual identity issues with a minor (even if a particular minor urgently wants to do so) lest she somehow violate the law. Her only alternative would be to counsel those clients according to the government's approved orthodoxy, regardless of what she or the client want. The Constitution does not countenance the invasion of these deeply intimate discussions. This Court should reverse the district court and remand with instructions to enjoin the Law from applying to Chiles.

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Kaley Chiles requests oral argument because argument will assist the Court in addressing complex constitutional issues that have currently split the federal circuit courts of appeal.

Dated: March 8, 2023

Respectfully submitted,

s/John J. Bursch

BARRY K. ARRINGTON
ARRINGTON LAW FIRM
4195 Wadsworth Blvd.
Wheat Ridge, CO 80033
(303) 205-7870
barry@arringtonpc.com


SHAUN PEARMAN
PEARMAN LAW FIRM
4195 Wadsworth Blvd.
Wheat Ridge, CO 80033
(720) 343-8534
shaun@pearmanlawfirm.com

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org


CODY S. BARNETT
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
cbarnett@ADFlegal.org

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,944 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: March 8, 2023

*s/John J. Bursch*
John J. Bursch

*Attorney for Plaintiffs-Appellants*

55

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Cortex XDR, Agent version 7.8.1, and according to the program are free of viruses.

*s/John J. Bursch*
John J. Bursch
*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/John J. Bursch*
John J. Bursch

*Attorney for Plaintiffs-Appellant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:22-cv-02287-CNS-STV

KALEY CHILES,

      Plaintiff,

v.

PATTY SALAZAR, in her official capacity as Executive Director of the Department of
Regulatory Agencies; *et al.*,

      Defendants.

---

## ORDER

---

Before the Court is Plaintiff Kaley Chiles' Motion for Preliminary Injunction (ECF No. 29). Ms. Chiles is a licensed professional counselor (ECF No. 1 at 29-30 ¶ 104). Her clients include minors who identify as gay, lesbian, bisexual, transgender, or gender non-conforming (*Id.* at 31 ¶ 109). Ms. Chiles argues that Colorado's regulation of specific therapeutic practices unlawfully abridges what she can say to her minor clients (*See* ECF No. 29 at 2). It does not. As such, and for the reasons set forth below, Ms. Chiles' Motion for Preliminary Injunction (ECF No. 29) is DENIED.

# I. BACKGROUND[1]

Plaintiff Kaley Chiles is a licensed professional counselor in the state of Colorado, as well as a practicing Christian (ECF No. 1 at 6, 29-30 ¶¶ 28-29, 104). Ms. Chiles' client base includes minors seeking counseling related to same-sex attraction and gender identity (*Id.* at 31 ¶ 109). As a counselor, she does not engage in "aversive techniques," and she alleges that she previously "helped clients freely discuss" sexual attractions, gender identity, gender roles, and "root causes of [their] desires [and] behavior" (*Id.* at 24-25 ¶¶ 82-83).[2] Ms. Chiles only pursues the "goals" that her clients "themselves identify and set," rather than "any predetermined goals" for clients' counseling (*Id.* at 25, 31 ¶¶ 85, 108). According to Ms. Chiles, Colorado law prohibits her from "fully explor[ing]" certain clients' "bodily experiences around sexuality and gender," including any client's discussion of their own "unwanted sexual attraction, behaviors, or identity" (*Id.* at 25-26, 32 ¶¶ 86, 88, 113). Many of Ms. Chiles' clients do not initially request counseling to eliminate their attractions or identities (*Id.* at 28 ¶ 96). Instead, discussion of clients' unwanted attractions or identities "may arise" during their counseling with Ms. Chiles (*Id.*)

Colorado enacted its Minor Therapy Conversion Law in 2019. *See, e.g.,* C.R.S. §§ 12–245–202, 12–245–101. Under the Minor Therapy Conversion Law, mental health professionals may not engage in what is commonly known as "conversion therapy" for minors who identify as gay, lesbian, bisexual, transgender, or gender non-conforming (*See* ECF Nos. 1 at 5, 45 at 15). *See*

---

[1] The background facts are taken predominantly from Ms. Chiles' Verified Complaint, the parties' briefs, and the briefs' supporting exhibits. *See Denver Homeless Out Loud v. Denver, Colorado*, 514 F. Supp. 3d 1278, 1285 (D. Colo. 2021), *vacated and remanded on other grounds*, 32 F.4th 1259 (10th Cir. 2022).

[2] "Aversion techniques" include treatments that "induc[e] nausea, vomiting, or paralysis; providing electric shocks; or having the individual snap an elastic band around the wrist when the individual bec[omes] aroused to same-sex erotic images or thoughts" (ECF No. 45-3 at 31).

*also, e.g.,* C.R.S. § 12–245–202(3.5)(a). Ms. Chiles alleges that the Minor Therapy Conversion Law prohibits her ability to assist minor clients "seeking to reduce or eliminate unwanted sexual attractions, change sexual behaviors, or grow in the experience of harmony with [their] physical bod[ies]" (ECF No. 1 at 26-27 ¶¶ 87, 91-92). Consequently, she has "intentionally avoided" certain conversations with her clients that she fears may violate the Minor Therapy Conversion Law (*Id.* at 25 ¶ 83).

Ms. Chiles sued Defendants, alleging the Minor Therapy Conversion Law violates her constitutional rights and bringing claims under the First and Fourteenth Amendments (*See generally* ECF No. 1). She filed her Motion for Preliminary Injunction in September 2022 (ECF No. 29). The Motion is fully briefed (*See* ECF Nos. 45, 49).

## II. LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019) (quotation omitted). To prevail on a preliminary injunction motion, the movant bears the burden of showing that four factors weigh in their favor: (1) they are likely to succeed on the merits; (2) they will suffer irreparable injury if the injunction is denied; (3) the threatened injury outweighs the injury the injunction would cause the opposing party; and (4) the injunction would not adversely affect the public interest. *See Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (citation omitted). "An injunction can issue only if each factor is established." *Denver Homeless Out Loud v. Denver, Colorado*, 32 F.4th 1259, 1277 (10th Cir. 2022) (citation omitted). Where the government is the non-moving party, the last two preliminary injunction factors merge. *See Denver Homeless*, 32 F.4th at 1278 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Preliminary

injunctions changing the status quo are "disfavored," and in these instances, the moving party's burden of establishing that they are likely to succeed on the merits is heightened. *See Free the Nipple*, 916 F.3d at 797 (quotation omitted).

## III. ANALYSIS

Having considered Ms. Chiles' Motion for Preliminary Injunction, the related briefing, and relevant legal authority, the Court denies Ms. Chiles' Motion.

### A.  Standing

Ms. Chiles argues that she has standing to pursue her claims, even though Defendants have "not yet threatened" to revoke her professional licenses (ECF No. 29 at 10). She also argues that she has third-party standing to sue on behalf of her clients (*See id.* at 20). The Defendants contend that Ms. Chiles lacks standing to bring this pre-enforcement action, and that she lacks third-party standing (*See* ECF No. 45 at 33, 48). The Court considers Ms. Chiles' standing to bring this suit herself and whether she has third-party standing to sue on behalf of her clients in turn.

#### 1.  *Ms. Chiles' Standing*

Ms. Chiles argues that she has standing to sue, given the gravamen of her First Amendment claims, even though Defendants have not yet enforced the Minor Therapy Conversion Law against her (ECF No. 29 at 10-11). Defendants contend that Ms. Chiles has failed to demonstrate that she intends to engage in conduct that violates the Minor Therapy Conversion Law (ECF No. 45 at 48). The Court agrees with Ms. Chiles that she has standing to sue.

For a federal court to exercise jurisdiction over a suit, the plaintiff must have standing to sue. *See, e.g., Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing consists of three elements, and a plaintiff—as the party invoking federal jurisdiction—bears the burden of satisfying

them. *See, e.g. Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff must have suffered an "injury in fact" that is "fairly traceable" to the defendant's challenged conduct and that is "likely to be redressed by a favorable judicial decision." *Id.* (citation omitted). If the plaintiff fails to meet this burden, "there is no case or controversy for the federal court to resolve," and the federal court cannot exercise jurisdiction over the plaintiff's claims. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (quotation omitted); *see also* U.S. Const. art. III, § 2.

The analysis changes, however, in the First Amendment context. The First Amendment "creates unique interests that lead [courts] to apply the [constitutional] standing requirements somewhat more leniently, facilitating pre-enforcement suits." *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (citation omitted). One way a plaintiff may establish standing for their First Amendment claim is by "alleging a credible threat of future prosecution plus an ongoing injury resulting" from the statute's "chilling effect" on the plaintiff's desire to exercise their First Amendment rights. *Id.* (quotations omitted). To determine whether a plaintiff's pre-enforcement First Amendment claim has alleged a "chilling effect" that sufficiently demonstrates the plaintiff has suffered an injury in fact, courts consider the following:

> (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that the statute will be enforced.

*Id.* at 1129–30.

Ms. Chiles alleges that the threat of the Minor Therapy Conversion Law's enforcement has created an ongoing injury resulting from the Law's "chilling effect" (*See, e.g.*, ECF No. 1 at 35 ¶ 134). In her preliminary injunction motion, Ms. Chiles argues that—given the nature of her First

5

Amendment claim—she has satisfied *Peck*'s factors to show that she has suffered an injury in fact (ECF No. 29 at 10). Therefore, the Court considers whether Ms. Chiles has satisfied these three *Peck* factors. For the reasons set forth below, she has.

### a. Past Engagement

Ms. Chiles has engaged in the type of speech affected by the Minor Therapy Conversion Law.[3] The Minor Therapy Conversion Law implicates speech that purports to "eliminate or reduce sexual or romantic attraction or feelings toward individuals of the same sex." § 12–245–202(3.5)(a). Further, the Minor Therapy Conversion law contemplates practices that provide "understanding for the facilitation of an individual's coping." *Id.* at § 12–245–202(3)(b)(I). Ms. Chiles alleges her therapeutic practices have concerned these forms of speech. For instance, she alleges that she seeks to help clients "explore certain . . . bodily experiences," including any "unwanted sexual attraction[s]" that "may arise" during her counseling sessions (ECF No. 1 at 25-26, 28, 32 ¶¶ 86, 96, 112). Therefore, she has met her burden of showing that she has in the past engaged in the type of speech "affected" by the Minor Therapy Conversion Law. *Peck*, 43 F.4th at 1129–30.

### b. Present Desire

Ms. Chiles has shown that she has a present desire to engage in speech affected by the Minor Therapy Conversion Law.[4] For instance, she states in the Verified Complaint that she has

---

[3] As discussed later, the Minor Therapy Conversion Law is a professional conduct regulation that imposes an incidental burden on speech. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018).

[4] Ms. Chiles did not submit an affidavit in support of her preliminary injunction motion. However, the Court construes Ms. Chiles Verified Complaint, submitted under "penalties of perjury," as an affidavit for purposes of its analysis of *Peck*'s second factor (ECF No. 1 at 45-46). *See also, e.g.*, *Controltec, LLC v. Anthony Doors, Inc*., No. 06-CV-00295-MSK, 2006 WL 8460951, at *1 (D. Colo. Feb. 22, 2006) (concluding that the moving party for a preliminary injunction "must show by Verified Complaint or Affidavit" facts to establish four preliminary injunction factors).

"intentionally avoided conversations with clients" that may be perceived as violating the Minor

Therapy Conversion Law, including conversations related to her practice—counseling clients on

their "sexual attractions, behaviors, and [gender] identity" (ECF No. 1 at 24-25 ¶ 83). Ms. Chiles

wishes to "assist clients with their stated desires," including discussions with certain clients

"seeking to reduce or eliminate unwanted sexual attractions" (*Id.* at 26 ¶ 87). Accordingly, she has

established the specific content of her desired speech for future client interactions, and satisfied

*Peck*'s second factor. *Cf. Peck*, 43 F.4th at 1131 (holding that "First Amendment plaintiffs

generally need not state that they 'have specific plans to engage in XYZ speech next Tuesday' in

order to show standing" (citation omitted)).

### c.   Credible Threat

In determining whether a First Amendment plaintiff has satisfied *Peck*'s third "credible

threat" factor, courts consider the following:

> (1) whether the plaintiff showed past enforcement against the
> same conduct; (2) whether authority to initiate charges was not
> limited to a prosecutor or an agency and, instead, any person
> could file a complaint against the plaintiffs; and (3) whether the
> state disavowed future enforcement.

*Peck*, 43 F.4th at 1132 (quotations omitted). No one "credible threat" factor is dispositive. *See id.*

*See also Scott v. Hiller*, No. 21-CV-02011-NYW-KLM, 2022 WL 4726038, at *6 (D. Colo. Oct.

3, 2022) ("The fact that a prosecutor had never enforced the statute at issue is not dispositive."

(citing *Peck*, 43 F.4th at 1133)). In short, the plaintiff must demonstrate "an objectively justified

fear of real consequences." *Peck*, 43 F.4th at 1132 (quotations omitted).

Regarding the "past enforcement" factor, Ms. Chiles has failed to identify any past

enforcement against the same conduct presented in her Verified Complaint. She argues only that

the Minor Therapy Conversion Law may impose "severe" sanctions if counselors violate it in the future (ECF No. 29 at 11). The "past enforcement" factor weighs against her for this reason.

Under the "prosecution" factor, Ms. Chiles admits that Defendants "are the persons empowered by Colorado to enforce" the Minor Therapy Conversion Law against her as a licensed professional counselor (ECF No. 1 at 40 ¶ 165; *see also id.* at 6-7 ¶¶ 31, 35). Therefore, the second element weighs against her. *See Peck*, 43 F.4th at 1132 (concluding second factor weighed against plaintiff where only "prosecutors c[ould] bring charges" under a statute).

Turning to whether the state has "disavowed" enforcement of the Minor Therapy Conversion Law, there is nothing in the preliminary injunction record to demonstrate that the Defendants "do not disavow an intent to prosecute" Ms. Chiles. *Peck*, 41 F.4th at 1132. Defendants' refusal to explicitly disavow enforcement of the Minor Therapy Conversion Law has "heavy weight" in the Court's assessment of Ms. Chiles' First Amendment claims. *Id.* at 1133. There is "nothing . . . to prevent [Defendants] or another [state entity] from" bringing charges in the future against Ms. Chiles under the Minor Therapy Conversion Law for statements that mirror those she has previously made to clients. *Id.*; *see also id.* at 1133 (concluding that a state's "refusal to provide such an assurance [that it will not enforce] undercu[t]" an argument that the plaintiff's "perception of a threat of prosecution is not objectively justifiable"). Therefore, the "disavowal" factor weighs in Ms. Chiles' favor.

Weighing the "credible threat" factors, Ms. Chiles has met her burden of showing that there is a credible threat that Defendants will enforce the Minor Therapy Conversion Law against her. *Peck*, 43 F.4th at 1129–30. Although only the third factor weighs in favor of Ms. Chiles, demonstrating that she suffers a credible threat of enforcement "is not supposed to be a difficult

bar to clear in the First Amendment pre-enforcement context." *Id.* at 1133. *See also Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003) ("As to whether a First Amendment plaintiff faces a credible threat of prosecution, the evidentiary bar that must be met is extremely low."); *Tingley v. Ferguson*, 47 F.4th 1055, 1066–67 (9th Cir. 2022) ("The unique standing considerations in the First Amendment context tilt dramatically toward a finding of standing when a plaintiff brings a pre-enforcement challenge" (quotations omitted)). Therefore, given the absence of Defendants' explicit disavowal to enforce the Minor Therapy Conversion Law and the "heavy weight" it places on the Court's assessment of whether Ms. Chiles' fears are credible, her fear of enforcement is "objectively justifiable" and therefore satisfies *Peck*'s "credible fear" factor. *See Peck*, 43 F.4th at 1133.

\* \* \*

For the reasons set forth above, Ms. Chiles has satisfied *Peck*'s three factors. She has in the past engaged in the type of speech affected by the Minor Therapy Conversion Law, demonstrated that she has a present desire to engage in speech the Minor Therapy Conversion Law affects, and that she has no intention to engage in this speech based on a "credible fear" that the Minor Therapy Conversion Law will be enforced against her. *See Peck*, 43 F.4th at 1129–30. Accordingly, she has established the injury in fact requirement, and has standing to bring this pre-enforcement First Amendment action. *See id.* at 1133; *see also Spokeo*, 578 U.S. at 338.[5]

---

[5] Ms. Chiles contends that she has standing because she has satisfied *Peck*'s requirements (*See* ECF No. 29 at 10). However, *Peck* only concerned standing's injury in fact requirement—not Ms. Chiles' burden to satisfy the two remaining standing elements. *See Peck*, 43 F.4th at 1129 ("[O]nly the injury-in-fact requirement is at issue."). Nonetheless, the Court agrees with Ms. Chiles that she has met her standing burden (ECF No. 29 at 11). *See also Spokeo*, 578 U.S. at 338. As the Tenth Circuit explained in *Peck*, "the statute's alleged violation of [the plaintiff's] First Amendment rights is undisputedly traceable to the statute itself and could be redressed by [a court's] invalidation of the law." *Peck*, 43 F.4th at 1129. So too with the Minor Therapy Conversion Law's alleged chilling of Ms. Chiles'

### 2. Third-Party Standing

Ms. Chiles argues that she has standing to "assert the free-speech rights" of her clients (ECF No. 29 at 20). Defendants contend that Ms. Chiles lacks third-party standing because she has not established that she "holds a close relationship" to a specific third-party minor, that there is no "demonstrated hinderance" to a potential client's ability to protect their own interest, and that Ms. Chiles has fundamentally failed to provide any details of how her clients are "impacted" by the Minor Therapy Conversion Law (ECF No. 45 at 33, 35). The Court agrees with Defendants that Ms. Chiles lacks third-party standing to sue on behalf of her clients.

The Ninth Circuit had recent occasion to address this issue in a nearly identical factual context. In *Tingley v. Ferguson*, the Ninth Circuit considered "whether [Washington] may prohibit health care providers operating under a state license from practicing conversion therapy on children." *Tingley*, 47 F.4th at 1063. The Ninth Circuit concluded that a licensed therapist seeking to enjoin Washington's conversion therapy statute lacked standing to "bring claims on behalf of his minor clients." *Id.* at 1066. The plaintiff lacked third-party standing, the Ninth Circuit reasoned, because he made only "generalized statements about the rights of his clients" being purportedly violated by Washington's conversion therapy statute. *Id.* at 1069. Although the plaintiff had a "sufficiently close relationship" with his clients, he failed to allege how Washington's law "specifically deprived" them of counseling information they sought, and as such his allegations that Washington's law affected his clients were "speculative." *Id.*

---

speech. Therefore, Ms. Chiles has met her burden as to the two remaining standing elements. *See Spokeo*, 578 U.S. at 338.

The Court finds *Tingley*'s reasoning persuasive. Ms. Chiles makes substantively the same arguments regarding her ability to sue on behalf of her clients as those the Ninth Circuit rejected in *Tingley*. For instance, Ms. Chiles contends that the Minor Therapy Conversion Law deprives her clients' "right to receive" counseling information regarding their sexual orientations or gender identities (ECF No. 29 at 20-21). Assuming Ms. Chiles had a close relationship with her clients, Ms. Chiles identifies nothing in her Verified Complaint or the preliminary injunction record that demonstrates how the Minor Therapy Conversion Law *specifically* deprives her clients of any information they seek. *See Tingley*, 47 F.4th at 1069. Moreover, *Tingley* explained, a therapist's minor clients seeking conversion therapy are free to bring their own lawsuits against conversion therapy laws, and may do so pseudonymously. *See id.*

Accordingly, the Court rejects Ms. Chiles' argument that she has standing to sue on behalf of her clients. "Without more detail about [her] clients, their desired information, or how the [Minor Therapy Conversion Law] has specifically deprived them of access to [conversion therapy] information," the Court refuses to "strain the limitations imposed on [it] by Article III to reach undeveloped claims brought on behalf" of Ms. Chiles' third-party minor clients. *Tingley*, 47 F.4th at 1069–70 (quotations omitted).

**B.  Preliminary Injunction & Likelihood of Success on the Merits**

Because Ms. Chiles has standing to challenge the Minor Therapy Conversion Law, the Court turns to her arguments that the Minor Therapy Conversion Law should be enjoined (*See, e.g.,* ECF No. 29 at 3). Regarding the likelihood of success on the merits of her constitutional claims, Ms. Chiles makes two essential arguments. First, that the Minor Therapy Conversion Law unconstitutionally regulates speech rather than conduct, and therefore violates her free speech

rights (*Id.* at 13). Second, that the Minor Therapy Conversion Law violates her free exercise and due process rights (*Id.* at 22, 25). The Court considers and rejects these arguments in turn.

### 1. *First Amendment Free Speech Claim*

#### a. *Professional Conduct Regulation*

Defendants contend that the Minor Therapy Conversion Law—contrary to Ms. Chiles' argument—regulates professional conduct rather than speech. The Court agrees with Defendants that the Minor Therapy Conversion Law regulates professional conduct.

As an initial matter, the Court agrees with Defendants that the Minor Therapy Conversion Law is not so sweeping as Ms. Chiles argues (*See* ECF No. 45 at 18). For instance, she argues that "the [Minor Therapy Conversion Law] *prohibits* [her] from uttering words if those words might assist [her clients] in aligning their desires with their beliefs or their biology" (ECF No. 29 at 14 (emphasis added); *see also* ECF No. 1 at ¶ 4). But, as Defendants contend, the Minor Therapy Conversion Law imposes no prohibition on counselors' ability to assist clients with any concerns they raise regarding their sexuality or gender identity (ECF No. 45 at 19). Under the Minor Therapy Conversion Law, "conversion therapy" does *not* include "practices or treatments" that provide "[a]cceptance, support, and understanding *for the facilitation of an individual's coping*." § 12–245–202(3.5)(b)(I) (emphasis added). Ms. Chiles is free to facilitate conversations regarding any minor clients' distresses about their sexuality or gender that "may arise" during their counseling sessions (*See* ECF No. 1 at 28 ¶ 96). *See also* § 12–245–202(3.5)(b)(I). Indeed, several of Ms. Chiles' practices are consistent with and do not violate the Minor Therapy Conversion Law (*See* ECF No. 1 at 24-25, 31 ¶¶ 82-83, 85, 108). Ms. Chiles may engage in therapeutic practices related to any minor client's distress, under the limited condition that her therapeutic assistance to a

client's distress "does not *seek to change* sexual orientation or gender identity." § 12–245–202(3.5)(b)(I) (emphasis added); *see also id.* at § 12–245–202(3.5)(a) (defining "conversion therapy" as a practice that "attempts or purports to change" a client's sexual orientation or gender identity, including "efforts to *change* [a client's] behaviors or gender expressions" (emphasis added)). Simply put, the Court agrees with Defendants that the Minor Therapy Conversion Law narrowly prohibits therapeutic practices that promote particular sexual orientations or gender identities—not practices that support, facilitate, or assist minor clients' exploration of those orientations or identities (*See* ECF No. 45 at 18). *See* § 12–245–202(3.5)(b)(I) (excluding from the definition of "conversion therapy" practices that facilitate minor clients' "identity exploration and development" including "sexual-orientation-neutral interventions" so long as those practices do not "seek to change" a client's sexual orientation or gender identity).

But Ms. Chiles' challenges more than the scope of the Minor Therapy Conversion Law's regulations. Ms. Chiles challenges what the Minor Therapy Conversion Law fundamentally regulates. In her opinion, the Minor Therapy Conversion Law regulates "pure speech," rather than professional conduct, and is therefore subject to strict scrutiny (*See* ECF No. 29 at 13, 15). Defendants argue that the Minor Therapy Conversion Law regulates professional conduct, not speech, and therefore it survives Ms. Chiles' constitutional challenge (*See* ECF No. 45 at 21). The Court agrees with Defendants.

Regulations of professional conduct are constitutionally permissible. *See, e.g.*, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456–57 (1978). And "[s]tates may regulate professional conduct, even though that conduct incidentally involves speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (citation omitted). When a state regulates

professional conduct that "incidentally involves speech," the First Amendment "afford[s] less protection" for the incidental professional speech. *Id.* (citations omitted). Although a state cannot "ignore constitutional rights" under the "guise of prohibiting professional misconduct," the First Amendment "does not prohibit restrictions directed [at] conduct from imposing incidental burdens on speech." *Id.* (citations omitted). *See also Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1226 (11th Cir. 2022), *cert. denied sub nom. Del Castillo v. Ladapo,* No. 22-135, 2022 WL 17408180 (U.S. Dec. 5, 2022) ("Because the [statute at issue] is a professional regulation with a merely incidental effect on protected speech, it is constitutional under the First Amendment." (quotations omitted)). "[P]rofessionals are no exception to this rule." *Id.* (citations omitted). *See also Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ("To be sure, [a] physician's First Amendment rights not to speak are implicated by [an informed consent statute] . . . but only as part of the practice of medicine, subject to reasonable licensing and regulation . . . ." (citations omitted)).

The Minor Therapy Conversion Law regulates professional conduct. It contemplates regulating a licensed professional counselor's therapeutic "practice[s] or treatment[s] . . . ." § 12–245–202(3.5)(a); *see also id.* at § 12–245–202(6) (defining "licensed professional counselor"). Under the Minor Therapy Conversion Law, specifically credentialed professionals and their practices are empowered to provide "[a]cceptance, support, and understanding for the facilitation" of clients' therapeutic needs, but prohibited from using their "practices or treatment" in order to "change sexual orientation or gender identity." *Id.* at § 12–245–202(3)(b)(I). A reading of the Minor Therapy Conversion Law's plain text confirms that, as Defendants argue, it is a professional

14

regulation and "prophylactic measure[] whose objective is the prevention of harm before it occurs." *Ohralik*, 436 U.S. at 464. *See also id.* ("[The] State has a strong interest in adopting and enforcing rules of conduct designed to protect the public from harmful [professional practices] by [professionals] whom it has licensed.").

To support her argument that the Minor Therapy Conversion Law is unconstitutional, Ms. Chiles' characterizes the work she performs as a licensed professional counselor as pure speech protected by the First Amendment—not regulable professional conduct (*See* ECF No. 29 at 13-14). To be sure, "what one thinks or believes, what one utters and says have the full protection of the First Amendment." *Speiser v. Randall*, 357 U.S. 513, 535–36 (1958) (Douglas, J., concurring). And Defendants do not—and cannot—dispute that Ms. Chiles speaks to her clients during counseling sessions (*See* ECF No. 45 at 23-24). But speech made in professional contexts is not always pure speech. *See EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 429 (6th Cir. 2019) ("*Casey* and [*National Institute of Family and Life Advocates*] recognize that First Amendment heightened scrutiny does not apply to incidental regulation of professional speech that is part of the [professional] practice . . . ."). As Defendants argue, speech made in a professional context—particularly in the context of licensed professional counseling—is distinguishable from, for example, political speech (ECF No. 45 at 23). Ms. Chiles admits that she is a licensed professional counselor with a graduate degree in clinical mental health, and that her speech is made in the course of her work as a professional counselor (ECF No. 1 at 29-31 ¶¶ 104, 108). "[I]t has never been deemed an abridgment of freedom of speech . . . to [regulate] a course of [professional] conduct . . . merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Ohralik*, 436 U.S. at 456 (quotations omitted).

Ms. Chiles cites *Otto v. City of Boca Raton, Florida* for the proposition that a government cannot "relabel" pure speech as conduct to avoid heightened First Amendment scrutiny (*See* ECF No. 29 at 13-14). *See also Otto*, 981 F.3d at 865 ("The government cannot regulate speech by relabeling it as conduct."). Against a similar factual backdrop, *Otto* concluded that ordinances prohibiting "therapists from engaging in counseling . . . with a goal of changing a minor's sexual orientation" ultimately warranted strict scrutiny because the ordinances were "content-based restrictions of speech," not regulations of therapists' professional conduct. *Id.* at 859, 861. The Court finds *Otto*'s reasoning unpersuasive and therefore rejects it. Central to *Otto*'s conclusion that its conversion therapy ordinance was a content-based speech restriction was the Eleventh Circuit's prior admonishment that "the enterprise of labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation." *Id.* at 861 (citing *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1308 (11th Cir. 2017) (en banc)). Perhaps. But the Eleventh Circuit's conclusion that strict scrutiny applied to the ordinances in *Otto* simply because "the ordinances depend[ed] on what [was] said" ignores that "what [was] said" depends on its professional context and whether a plaintiff is licensed to say it. *Id.* at 861. *Cf. Del Castillo*, 26 F.4th at 1225–26 ("Assessing a client's . . . needs, conducting . . . research, developing a . . . care system, and integrating information from [an assessment] are not speech. They are 'occupational conduct'. . . as part of . . . professional services." (citation omitted)).

As Defendants observe, other cases run contrary to *Otto* (*See, e.g.,* ECF No. 45 at 25-26). *See, e.g., Del Castillo*, 26 F.4th at 1225 ("A statute that governs the practice of an occupation is not unconstitutional as an abridgment of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." (quotation

omitted)). *Tingley*, in fact, reached the exact opposite conclusion as *Otto*: "What licensed mental health providers do during their appointments with patients for compensation under the authority of a state license is treatment." *Tingley*, 47 F.4th at 1082. Furthermore, *Tingley* correctly characterized the nature of professional counseling practices related to minors' sexuality and gender identity. *See Tingley*, 47 F.4th at 1083 ("The work that [a therapist] does is different than a conversation about the weather, even if he claims that all he does is 'sit and talk.'"). "That the treatment technique of talk therapy is administered through words does not somehow render it any less of a healthcare treatment technique or any less subject to government regulation in the interest of protecting the public health." *Otto v. City of Boca Raton, Fla.*, 41 F.4th 1271, 1294–95 (11th Cir. 2022)[6] (Rosenbaum, J., dissenting from the denial of rehearing en banc). Ms. Chiles errs in arguing otherwise (*See* ECF No. 29 at 15).[7]

### b. Rational Basis Review

The Minor Therapy Conversion Law is viewpoint neutral and does not impose content-based speech restrictions.[8] It is a public health law that regulates professional conduct. Any speech

---

[6] After a three-judge panel of the Eleventh Circuit decided *Otto v. City of Boca Raton, Florida*, 983 F.3d 854 (11th Cir. 2020), the Eleventh Circuit voted against hearing the case en banc. *See Otto v. City of Boca Raton, Florida*, 41 F.4th 1271 (11th Cir. 2022).

[7] Ms. Chiles contends that her speech is not incidental to her professional conduct because Defendants cannot identify any separate conduct—other than her speech—that the Minor Therapy Conversion Law regulates (ECF No. 29 at 15). The Court rejects this argument because it rests on a flawed premise, presupposing "speech" in the context of a licensed professional counselor's work is wholly separate from the work of counseling itself. However, "[t]he practice of psychotherapy is not different from the practice of other forms of medicine simply because it uses words to treat ailments." *Tingley*, 47 F.4th at 1082.

[8] Ms. Chiles argues that the Minor Therapy Conversion Law "discriminates based on viewpoint" because it prohibits "counseling from the viewpoint" that sexuality and gender identity can "change to align with an individual's biology and beliefs" (ECF No. 29 at 20; *see also id.* at 18). Not so. As explained above, the Court agrees with Defendants that the Minor Therapy Conversion Law is a professional conduct regulation that affects all regulated counselors and prohibits therapeutic *practices* attempting to change a minor's sexual orientation or gender identity. *See* C.R.S. § 12–245–202(3.5)(a). To the extent it affects speech incidental to a practitioner's therapeutic practice, it does so in order to regulate outcome-determinative counseling for *all* clients—including heterosexual-identifying clients. Moreover,

affected by the Minor Therapy Conversion Law is incidental to the professional conduct it regulates. *See National Institute of Family and Life Advocates*, 138 S. Ct. at 2372. Accordingly, the Court declines Ms. Chiles' invitation to apply strict scrutiny in its analysis of her First Amendment challenge (ECF No. 29 at 25).[9]

The Court applies rational basis review to its analysis of the Minor Therapy Conversion Law. *See, e.g., Tingley*, 47 F.4th at 1077–78 (applying rational basis review to conversion therapy law); *Otto*, 41 F.4th at 1276 ("The rational basis 'reasonableness' standard applies only to regulations of conduct that incidentally burden speech." (citing *National Institute of Family and Life Advocates*, 138 S. Ct. at 2373–74)) (Grant, J., concurring in the denial of rehearing en banc); *Ohralik*, 436 U.S. at 462. To survive the "light burden" of rational basis review, the Minor Therapy Conversion Law must be "rationally related to a legitimate state interest." *Tingley*, 47 F.4th at 1078 (quotations omitted); *see also Wilson v. Wichita State Univ.*, 662 F. App'x 626, 629 (10th Cir. 2016) ("Under the rational-basis standard, we will uphold an action so long as it is rationally related to a legitimate government purpose." (citation omitted)). Public health laws "must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." *Dobbs*, 142 S. Ct. at 2284 (quotation omitted). "[H]ealth and welfare laws [are] entitled to a strong presumption of validity." *Id.* (citation omitted).

---

this professional regulation applies to all licensed counselors. *See Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 694 (2010) ("It is, after all, hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers"); *see also id.* at 699 (distinguishing "singling out" those "who hold religious beliefs" from "those who engage in discriminatory conduct based on . . . religious beliefs" and stating that "all acts of [] discrimination are equally covered [and] [t]he discriminator's beliefs are simply irrelevant") (Stevens, J., concurring).

[9] Because the Minor Therapy Conversion Law is a professional conduct regulation that does not discriminate on the basis of content or viewpoint, Ms. Chiles' argument that Defendants bears the burden to "justify" its content-based restrictions is of no moment, and the Court need not indulge it (ECF No. 25 at 12).

The Court agrees with Defendants that the Minor Therapy Conversion Law survives rational basis review (*See* ECF No. 45 at 27-29). First, Defendants have a legitimate and important state interest in the prevention of "harmful therapy known to increase suicidality in minors" (*Id.* at 29; ECF No. 45-1 at 5-6). *See also Tingley*, 47 F.4th at 1078 (describing state interest in "protecting . . . minors against exposure to serious harms caused by conversion therapy" as "without a doubt" a "legitimate state interest" (citations and alterations omitted)); *Otto*, 41 F.4th at 1285–86 (describing therapeutic practices that are "sexual-orientation change efforts" as "types of talk therapy that significantly increase the risk of suicide and have never been shown to be efficacious") (Rosenbaum, J., dissenting from the denial of rehearing en banc). The legitimacy and importance of the interest underpinning the Minor Therapy Conversion Law is undisputable. Surely, a state's interest in protecting the psychological and physical health of its minor population cannot be doubted. *Cf. Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 (1982) ("[S]afeguarding the physical and psychological well-being of a minor . . . is a *compelling one*." (emphasis added)).

Furthermore, Defendants have a legitimate interest in "regulating and maintaining the integrity of the mental-health profession," which includes regulating the efficacy and safety of its professionals' therapeutic practices—particularly the practices of mental health professionals who counsel minor clients. *Ferguson v. People*, 824 P.2d 803, 810 (Colo. 1992). *See also Tingley*, 47 F.4th at 1078 ("[The state] also has a compelling interest in the practice of professions within [its] boundaries . . . regulating mental health . . . and affirming the equal dignity and worth of LGBT people." (quotations omitted) (first alteration added)).

19

Second, the Minor Therapy Conversion Law rationally serves these legitimate and important interests. *See Dobbs*, 142 S. Ct. at 2284. As the Ninth Circuit explained in *Tingley* and its analysis of Washington's conversion therapy law, a state acts "rationally when it decide[s] to protect the physical and psychological well-being of its minors by preventing state-licensed health care providers from practicing conversion therapy on them." *Tingley*, 47 F.4th at 1078 (quotations omitted). The preliminary injunction record demonstrates that conversion therapy is ineffective and harms minors who identify as gay, lesbian, bisexual, transgender, or gender non-conforming (ECF No. 45 at 29-30, 39; *see also, e.g.*, ECF No. 45-1 at 22-24, 29-33). Colorado considered the body of medical evidence regarding conversion therapy and sexual orientation change efforts—and their harms—when passing the Minor Therapy Conversion Law and made the reasonable and rational decision to protect minors from ineffective and harmful therapeutic modalities (*See* ECF No. 45 at 30). *See also Tingley*, 47 F.4th at 1078–79 ("In relying on the body of evidence before it . . . [the state] rationally acted by amending its regulatory scheme for licensed health care providers to add [conversion therapy] to the list of unprofessional conduct for the health professions." (quotations omitted)).[10] Therefore—and for substantially the same reasons set forth in *Tingley*—the Minor Therapy Conversion Law survives rational basis review.

---

[10] Ms. Chiles argues that the medical evidence does not so readily support the Colorado legislature's concerns regarding conversion therapy (*See, e.g.*, ECF Nos. 25 at 5; 1 at 9-10 ¶¶ 43-44). The Court disagrees. The preliminary injunction record amply shows that the Minor Therapy Conversion Law comports with the prevailing medical consensus regarding conversion therapy and sexual orientation change efforts (*See generally* ECF No. 45-1). Moreover, even if Ms. Chiles identifies some medical evidence that runs contrary to the evidence Defendants marshal and consulted in passing the Minor Therapy Conversion Law, "the preponderating opinion in the medical community is against its use." *Tingley*, 47 F.4th at 1081 (quotations omitted). *See also id.* (affirming "the right of the government to regulate what medical treatments its licensed health care providers could practice on their patients according to the applicable standard of care and governing consensus at the time (even if not unanimous)").

Ms. Chiles argues that the Minor Therapy Conversion Law is "presumptively invalid" because—in order for it to survive her challenge—Defendants must identify "historical evidence" that a "long tradition" of similar speech restrictions exists (ECF No. 25 at 12). Again, Ms. Chiles is incorrect. As set forth above, the Minor Therapy Conversion Law is a professional conduct regulation and does not implicate legal frameworks that might otherwise apply to content-based speech restrictions under the First Amendment. *See National Institute of Family and Life Advocates*, 138 S. Ct. at 2373. On this basis, Ms. Chiles' reliance on *New York State Rifle & Pistol Association, Inc. v. Bruen* is misplaced. 142 S. Ct. 2111, 2130 (2022) ("When the government restricts *speech* [it] bears the burden of providing [the restriction's] constitutionality [by] generally point[ing] to historical evidence about the reach of the First Amendment's protections." (quotations omitted) (emphasis added)). Nonetheless, Defendants have identified a history of public health regulations with which the Minor Therapy Conversion Law is entirely consistent (*See* ECF No. 45 at 22-23). "It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, *particularly those which closely concern the public health*. There is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine." *Watson v. State of Maryland*, 218 U.S. 173, 176 (1910) (emphasis added); *see also Dent v. State of W.Va.*, 129 U.S. 114, 122 (1889) ("The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations . . . . [a]s one means to this end it has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely."); *Tingley*, 47 F.4th at 1080 ("There is a long (if

heretofore unrecognized) tradition of regulation governing the practice of those who provide health care within state border.").

Fundamentally, Ms. Chiles fails to overcome the "strong presumption of validity" the Court applies to the Minor Therapy Conversion Law. *Dobbs*, 142 S. Ct. at 2284 (citation omitted). As such, and for the reasons set forth above, she has failed to meet her burden of showing a likelihood of success on the merits of her First Amendment free speech claim. *See Beltronics*, 562 F.3d at 1070 (10th Cir. 2009).

### 2. First Amendment Free Exercise Claim

Ms. Chiles argues that the Minor Therapy Conversion Law violates her First Amendment free exercise rights because it is neither neutral nor generally applicable, and therefore cannot survive strict scrutiny (*See* ECF No. 29 at 22, 24). Defendants contend that the Minor Therapy Conversion law is neutral and generally applicable (*See* ECF No. 45 at 38, 40). For these reasons, Defendants argue, rational basis review applies and the Minor Therapy Conversion Law survives rational basis review (*See* ECF No. 45 at 37). For the reasons set forth below, the Court agrees with Defendants.

### a. Legal Standard Governing First Amendment Free Exercise Claims

The First Amendment's Free Exercise Clause, "applicable to the States under the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1876 (2021) (quotation omitted); *see also* U.S. Const. amend. I. Laws prohibiting religion's free exercise may be subject to strict scrutiny. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022). "But such strict scrutiny does not always apply to free-exercise claims." *Church v. Polis*, No. 20-

1391, 2022 WL 200661, at *8 (10th Cir. Jan. 24, 2022), *cert. denied sub nom. Cmty. Baptist Church v. Polis*, 142 S. Ct. 2753 (2022). "[N]eutral" and "generally applicable" laws are not subject to strict scrutiny, even if they "incidentally burden[] religion." *Fulton*, 141 S. Ct. at 1876 (citation omitted); *see also Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006) ("Neutral rules of general applicability normally do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief." (citation omitted)); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) ("[O]ur cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."). *Cf. Fulton*, 141 S. Ct. at 1882 ("[A] neutral and generally applicable law typically does not violate the Free Exercise Clause—no matter how severely that law burdens religious exercise." (citation omitted)) (Barrett, J., concurring).

Laws that are "both neutral and generally applicable need only be rationally related to a legitimate governmental interest to survive a constitutional challenge"—i.e., they are only subject to rational basis review. *Grace United Methodist Church*, 451 F.3d at 649 (citation omitted); *see also Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 52 (10th Cir. 2013) ("Government actions that stem from 'neutral' rules of 'general applicability' are subject to rational basis review." (citation omitted)). With this legal standard in mind, the Court proceeds in its analysis of Ms. Chiles' free exercise claim.

      *b.  Minor Therapy Conversion Law & Neutrality*

Ms. Chiles argues that the Minor Therapy Conversion Law is not neutral because it is "based on religious hostility" and "targets a religious practice" (ECF No. 29 at 22). Defendants

contend that Ms. Chiles cannot meet her burden of showing that the Minor Therapy Conversion Law is not neutral because it is "directed at a therapy practice and does not restrict religious exercise" (ECF No. 45 at 38). The Court agrees with Defendants.

A state "fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877 (citation omitted). Factors "relevant to the assessment" of government neutrality include:

- The "historical background" of the challenged decision or policy;

- Specific series of events "leading to the enactment" of the challenged policy; and

- Legislative or administrative histories

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) (citation omitted).

According to Ms. Chiles, the Minor Therapy Conversion Law is not neutral because it was "well-known" at the time the Colorado General Assembly enacted the Minor Therapy Conversion Law that conversion therapy was primarily sought for religious reasons (ECF No. 29 at 22). Therefore, Ms. Chiles' argument goes, the Minor Therapy Conversion Law impermissibly burdens practitioners who hold particular religious beliefs (*See id.*). The Court disagrees. The Minor Therapy Conversion Law does not "restrict [therapeutic] practices because of their *religious* nature." *Fulton*, 141 S. Ct. at 1877 (citation omitted) (emphasis added). As Defendants argue, the Minor Therapy Conversion Law targets specific "modes of therapy" due to their *harmful* nature— regardless of the practitioner's personal religious beliefs or affiliations (ECF No. 45 at 38). As the preliminary injunction record shows, the Minor Therapy Conversion law targets these therapeutic

24

modalities because conversion therapy is ineffective and has the potential to "increase [minors'] isolation, self-hatred, internalized stigma, depression, anxiety, and suicidality" (ECF No. 45-1 at 36 ¶ 68; *see also id.* at 34-35 ¶ 64). Against the background of a significant body of scientific research concerning conversion therapy's historical ineffectiveness and harmfulness, the Colorado General Assembly enacted the Minor Therapy Conversion Law to eliminate the harms minor clients suffered during conversion therapy (*See, e.g.*, ECF No. 45-1 at 5-6 ¶ 13).

Fundamentally, the Minor Therapy Conversion Law neutrally regulates professional conduct and professional practices. For this reason, Ms. Chiles' arguments that the Minor Therapy Conversion Law is not neutral because its regulation of specific therapeutic practices incidentally burdens her—or any other practitioners'—religious beliefs is unavailing. *See, e.g., Fulton*, 141 S. Ct. at 1876; *Grace United Methodist*, 451 F.3d at 649. The Minor Therapy Conversion law "is [not] *specifically directed* at" religious practices, nor are religious exercises its "object." *Kennedy*, 142 S. Ct. at 2442 (quotations omitted) (emphasis added); *see also Grace United Methodist*, 451 F.3d at 649–50 ("A law is neutral so long as its object is something other than the infringement or restriction of religious practices." (citation omitted)). Simply because some religious bases for conversion therapy may have been "well-known" at the time the Minor Therapy Conversion Law was enacted does not erase its facial neutrality or the backdrop of scientific evidence considered in the Law's passage.[11] There is nothing on the Minor Therapy Conversion Law's face that "refers to a religious practice without a secular meaning discernable from the language or context."

---

[11] Ms. Chiles identifies herself as a "practicing Christian" (ECF No. 1 at 29-30 ¶ 104). She also notes that conversion therapy may include "techniques based in Christian faith-based methods" and is provided by practitioners who "believe in Christian faith-based methods" of counseling (*Id.* at 7 ¶ 37; *see also* ECF No. 29 at 22). The preliminary injunction does not indicate—and the Court expresses no opinion on—whether any non-Christian practitioners, or Christians with religious beliefs that are dissimilar to Ms. Chiles' beliefs, engage in professional conduct that implicates the Minor Therapy Conversion Law.

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). At bottom, the Minor Therapy Conversion Law is facially neutral, and nothing in the preliminary injunction record demonstrates that "suppression" of any religions or religious beliefs was the Minor Therapy Conversion Law's "central element." *Id.* at 534.

Ms. Chiles makes the additional argument that the Minor Therapy Conversion Law "attempt[s] to impose its views" on practitioners (ECF No. 29 at 23). Nonsense. As Defendants observe, the Minor Therapy Conversion Law exempts from its coverage forms of religious ministry (ECF No. 45 at 40). *See also* C.R.S. § 12-245-217(1) ("A person engaged in the practice of religious ministry is not required to comply with [the Minor Therapy Conversion Law]"); *Tingley*, 47 F.4th at 1085 ("The law's express protection for the practice of conversion therapy in a religious capacity is at odds with [the plaintiff's] assertion that the law inhibits religion."). This exemption underscores that the Minor Therapy Conversion Law intends to regulate therapeutic practices and the harms that flow from these practices, not individual practitioners' religious beliefs. *See id.* For these reasons, Ms. Chiles has not met her burden of showing the Minor Therapy Conversion law is not neutral.

### c.   *Minor Therapy Conversion Law & General Applicability*

Ms. Chiles argues that the Minor Therapy Conversion Law is not generally applicable because it contains "vague terms" that invite "individual exemptions" regarding practitioners' conduct (ECF No. 29 at 24). Defendants contend that the Minor Therapy Conversion Law is generally applicable because it "does not contain a mechanism for individualized exemptions" and prohibits conversion therapy for any reason (ECF No. 45 at 40). The Court agrees with Defendants.

"The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Lukumi*, 508 U.S. at 543. A law will fail the "general applicability requirement" if the law "prohibits religious conduct while permitting secular conduct . . . ." *Kennedy*, 142 S. Ct. at 2422 (quotations omitted). Further, "[a] law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (quotations omitted). In the case of free exercise challenges based on a law's alleged system of "individualized exceptions," the law is generally applicable "as long as [it] remains exemptionless, and [therefore] religious groups cannot claim a right to exemption; however, when a law has secular exemptions, a challenge by a religious group becomes possible." *Grace United Methodist*, 451 F.3d at 650.

Ms. Chiles argues that the Minor Therapy Conversion Law impermissibly "invites enforcement authorities" to "make individualized exemptions" for secular counselors whose therapeutic practices are approved under the Law (ECF No. 29 at 24). The Court disagrees. The Minor Therapy Conversion Law is enforced against all practitioners who engage in defined forms of conversion therapy. *See* § 12-245-202. It does not invest in any agency the "sole discretion" to decide when enforcement of the Minor Therapy Conversion Law is warranted. *See Fulton*, 141 S. Ct. at 1879. Contrary to Ms. Chiles' contention that the Minor Therapy Conversion Law uses "vague terms," it clearly describes what practices do and do not violate the Law. *See id.; see also* § 12-245-202(3.5)(a), (b). The Minor Conversion Therapy Law's facial language does not provide a "formal and discretionary mechanism" for individual, discretionary exceptions. *See Tingley*, 47 F.4th at 1088. *Cf. Fulton*, 141 S. Ct. at 1878 ("[T]inclusion of a *formal system of entirely*

*discretionary exceptions* in [the law] renders [its requirements] not generally applicable." (emphasis added).[12] And to the extent that Ms. Chiles argues that the Minor Therapy Conversion Law favors certain forms of therapeutic counseling over others, it does not. The Minor Therapy Conversion Law simply prohibits specific therapeutic practices (*See* ECF No. 29 at 24).[13] The Minor Therapy Conversion Law's prohibition on specific therapeutic practices constitutes a "limited-yes-or-no inquiry" into whether a counselor's practice violates the Law. *See Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298 (10th Cir. 2004) ("[T]hat kind of limited yes-or-no inquiry is qualitatively different from [a] kind of case-by-case system . . . ."); *see also id.* ("[The] 'individualized exemption' exception is limited . . . to systems that are *designed* to make *case-by-case* determinations . . . ." (emphasis added) (citation omitted). As such, Ms. Chiles has failed to meet her burden regarding the Minor Therapy Conversion Law's general applicability.

### d.  Rational Basis Review

Ms. Chiles has failed to meet her burden of showing the Minor Therapy Conversion Law is not neutral or generally applicable. Therefore, the Court applies rational basis, rather than strict scrutiny, review. *See Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 53 (10th Cir. 2013) ("[The] District's actions were based upon neutral rules of general applicability, [and are] subject to rational basis review." (citation omitted)). As discussed above, the Minor Therapy Conversion

---

[12] The Court agrees with Defendants that the Minor Therapy Conversion Law's exemption of religious ministries from its prohibitions further demonstrates that the Minor Therapy Conversion Law is generally applicable and does not treat secular activity "more favorably" than religious exercise (ECF No. 45 at 41). *See Tandon v. Newsom,* 141 S. Ct. 1294, 1297 (2021). *See also Lukumi*, 508 U.S. at 543 ("[The] government . . . cannot in a selective manner *impose* burdens only on conduct motivated by religious belief . . . ." (emphasis added)); *Kennedy*, 142 S. Ct. at 2422.

[13] At one point in her preliminary injunction motion, Ms. Chiles argues that the Minor Therapy Conversion Law is overinclusive and underinclusive (ECF No. 29 at 30-32). The Court rejects this argument. The Minor Therapy Conversion Law is a neutral and generally applicable law that regulates professional conduct—not pure speech—and clearly delineates what therapeutic practices it does and does not allow. *See* § 12-245-202(3.5)(a), (b).

Law is rationally related to a legitimate governmental interest and survives rational basis review. Ms. Chiles has failed to show a likelihood of success on the merits on her First Amendment free exercise claim.[14]

### 3. Due Process Claim

Ms. Chiles also challenges the Minor Therapy Conversion Law on due process grounds, contending that it is unconstitutionally vague and gives enforcement authorities "unfettered discretion to punish speech with which they disagree" (ECF No. 29 at 32). Defendants argue that Ms. Chiles cannot meet her burden of showing that the Minor Therapy Conversion Law violates the Fourteenth Amendment's Due Process Clause because the Law is clear and does not invite arbitrary enforcement (ECF No. 49 at 45-46). The Court agrees with Defendants.

First, the Minor Therapy Conversion Law is not unconstitutionally vague. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law is unconstitutionally vague if it does not provide "a person of ordinary intelligence [with] fair notice of what is permitted" or is so "standardless" that it permits "seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Ms. Chiles argues that the Minor Therapy Conversion Law is unconstitutionally vague because it is ambiguous and does not precisely define its key terms (*See* ECF No. 29 at 33). The Court disagrees. The Minor Therapy Conversion Law defines what is— and is not—considered "conversion therapy," and what therapeutic practices violate the Law. *See*

---

[14] Because Ms. Chiles has failed to show a likelihood of success on the merits of her free speech and free exercise claims, the Court need not address her argument that she has a "hybrid-rights" claim triggering strict scrutiny. *See Axson-Flynn*, 356 F.3d at 1295 ("[T]he hybrid-rights theory at least requires a colorable showing of infringement of a companion constitutional right." (quotations omitted)).

§ 12-245-202(3.5)(a), (b). Colorado law elsewhere defines "gender identity" and "sexual orientation." C.R.S. § 24-34-301(3.5), (7). For these reasons, the Minor Therapy Conversion Law provides a person of ordinary intelligence with sufficient information to ably determine what is and is not permitted under the Law. *See* § 12-245-202(3.5)(a), (b). *See also Williams*, 553 U.S. at 304; *Tingley*, 47 F.4th 1055, 1089–90 (rejecting argument that the phrases "sexual orientation" and "gender identity" were unconstitutionally vague); *id.* at 1090 ("[T]he terms of the statute provide a clear, dividing line: whether change [of a minor's gender identity] is the object."); *Reynolds v. Talberg*, No. 1:18-CV-69, 2020 WL 6375396, at *9 (W.D. Mich. Oct. 30, 2020) ("Phrases like 'sexual orientation' and 'gender identity' have also been held sufficiently definite to foreclose vagueness challenges . . . . If the phrase 'gender identity' is not too vague, then surely companion concepts like 'transgender' and 'gender expression' are not overly vague either." (citations omitted)).

Second, the Court rejects Ms. Chiles' argument that the Minor Therapy Conversion Law violates due process on the grounds that its enforcement is "left to the subjective judgments" of enforcement agencies (ECF No. 29 at 34). As discussed above in the Court's analysis of Ms. Chiles' free exercise claim, the Minor Therapy Conversion Law clearly delineates what is and is not permitted under the Law. *See* § 12-245-202(3.5)(a), (b). The Minor Therapy Conversion Law is "sufficiently definite such that it does not encourage arbitrary enforcement" against specified therapeutic practices. *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1180 (10th Cir. 2009). Its enforcement does not require an indeterminate, "wide-ranging inquiry" that "invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 597 (2015). As such, Ms. Chiles has not

met her burden of showing that the Minor Therapy Conversion Law is unconstitutional under the Fourteenth Amendment's Due Process Clause.

* * *

For the reasons set forth above, Ms. Chiles has failed to meet her burden of showing a likelihood of success on the merits for all of her constitutional challenges to the Minor Therapy Conversion Law. Because a preliminary injunction "can issue only if each [preliminary injunction] factor is established," and Ms. Chiles has not met her burden on the "likelihood of success on the merits" factor, the Court need not determine whether she has met her burden for the remaining preliminary injunction factors. *See Denver Homeless*, 32 F.4th at 1277 (citation omitted).

The Court makes one final observation. Throughout her preliminary injunction motion, Ms. Chiles contends that she "listens and asks questions to help" her clients (ECF No. 29 at 14). According to Ms. Chiles, "[a]ll she does is talk to her clients" (*Id.* at 13). As the preliminary injunction record shows, this is disingenuous. "What licensed mental health providers do during their appointments with patients for compensation under the authority of a state license is treatment." *Tingley*, 47 F.4th at 1082. Ms. Chiles cannot seriously compare her work as a professional counselor to "book club" discussions, given especially that she claims the relationship between "a mental health professional and her client" is based on a "deeply held trust from which a *critical* therapeutic alliance forms allowing the *professional* to provide *vital mental health care* to the client" (*Cf.* ECF No. 29 at 16; ECF No. 1 at 2 ¶ 1 (emphasis added)). The therapeutic work for which she obtained a graduate degree and professional licensure is incomparable to casual conversations about *New York Times* bestsellers. *See also Tingley*, 47 F.4th at 1082–83 ("Comparing the work that licensed mental health providers do to book club discussions or

conversations among friends minimizes the rigorous training, certification, and post-secondary education that licensed mental health providers endure to be able to treat other humans for compensation.").

"Children may identify as gay, straight, cisgender, or transgender." *Id.* at 1084. In the case of children who identify as lesbian, gay, bisexual, cisgender, transgender, or gender non-conforming, they are entitled to treatment—regardless of its outcome—that does not take a cavalier approach to their "dignity and worth." *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018). And at the bare minimum, they are also entitled to a state's protection from therapeutic modalities that have been shown to cause longstanding psychological and physical damage.

## IV. CONCLUSION

Consistent with the above analysis, Ms. Chiles' Motion for Preliminary Injunction (ECF No. 29) is DENIED.

DATED this 19th day of December 2022.

BY THE COURT:

_____

Charlotte N. Sweeney
United States District Judge