**CASE NO. 22-1445**

IN THE UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

| | |
|---|---|
| KALEY CHILES, | ) |
| | ) |
| Plaintiff – Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| PATTY SALAZAR, in her official | ) |
| | ) |
| capacity as Executive Director of the | ) |
| | ) |
| Department of Regulatory Agencies; | ) |
| | ) |
| et al., | ) |
| | ) |
| Defendants – Appellee. | ) |
| | ) |

---

On Appeal from the United States District Court
For the District of Colorado
The Honorable Judge Charlotte N. Sweeney
D.C. No.1:22-cv-02287-CNS-STV

---

**BRIEF OF AMICUS CURIAE OF ASSOCIATIONS OF
CERTIFIED BIBLICAL COUNSELORS
IN SUPPORT OF PLAINTIFF – APPELLANT KALEY CHILES**

---

Respectfully submitted,

EDWARD C. WILDE, ESQ.
MICHAEL S. OVERING, ESQ.
LAW OFFICES OF MICHAEL S. OVERING, APC
790 E. Colorado Blvd., Ste. 320
Pasadena, CA 91101
(626) 564-8600
ewilde@digitalmedialaw.com
movering@digitalmedialaw.com

i

# TABLE OF CONTENTS

Page

**TABLE OF AUTHORITIES** ..................................................................... iii

**RULE 29 STATEMENT** ..........................................................................1

**I.   INTRODUCTION** ..........................................................................1

**II.   THE LOWER COURT GIVES AND TAKES AWAY** .............................2

**III.   THE LOWER COURT ERRS BY MISAPPLYING PRECEDENT** .......3

**IV.   THE LOWER COURT ERRED BY BANNING SPEECH ON THE
BASIS OF "HARM"** ...................................................................................7

**V.   MINORS HAVE FIRST AMENDMENTS TO SPEAK AND HEAR** .........9

**VI.   NEITHER THE POPULARITY OF THE CENSORSHIP NOR THE
JUDGE'S OWN MORAL CALCULATION ARE GROUNDS TO BAN
SPEECH** ....................................................................................................15

**VII.   CONCLUSION** ...........................................................................19

# TABLE OF AUTHORITIES
## CASES

*American Amusement Machine Ass'n v. Kendrick,* 244 F.3d 572 ..........................10

*American Booksellers Assn. v. Superior Court*, 129 Cal.App.3d 197 ....................13

*Barr v. American Assn. of Political Consultants, Inc.*, 140 S. Ct. 2335.................18

*Billups v. City of Charleston* 961 F.3d 673.................................................................18

*Brown v. Entertainment Merchants Assn.,* 564 U.S. 786 .........................................9

*Chiles v. Salazar* (D. Colo., Dec. 19, 2022) ...............................................................3

*Cobell v. Norton* 212 F.R.D. 14 .................................................................................17

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421 ..........................3, 4

*Entertainment Software Ass'n v. Blagojevich*, 469 F.3d 641...................................12

*Entertainment Software Ass'n v. Granholm*, 426 F. Supp. 2d 646 .........................12

*Entertainment Software Ass'n. v. Blagojevich*, 404 F. Supp. 2d 1051 ...................11

*Erznoznik v. City of Jacksonville,* 422 U.S. 205 ........................................................9

*Harris v. Reed*, 489 U.S. 255 ....................................................................................17

*Holloman ex Rel. Holloman v. Harland* (11th Cir. 2004) 370 F.3d 1252..............18

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31* (2018) 138 S. Ct.
2448 ........................................................................................................................18

*Jones v. North Carolina Prisoners' Union*, 433 U.S. 119 .......................................15

*Mainstream Loudoun v. Board of Trustees of Loudoun* 2 F. Supp. 2d 783 ............17

*Matal v. Tam*,137 S. Ct. 1744 ...................................................................18

*National Socialist Party v. Skokie* (1977) 432 U.S. 43 ............................................17

*Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361.......................18

*Nat'l Review, Inc. v. Mann* 140 S. Ct. 344 ...............................................16

*Obergefell v. Hodges*, 135 S. Ct. 2584 ........................................... 17, 18

*Ohralik v. Ohio State Bar Assn* (1978) 436 U.S. 447................................................5

*Thonen v. Jenkins*  491 F.2d 722...........................................................17

*United States v. United Foods, Inc.*,533 U.S. 405 ...................................................18

*Wooley v. Maynard* 430 U.S. 705 ................................................... 17, 18

## RULES

Federal Rule of Appellate Procedure 29(a)(2).............................................................1

## SECONDARY SOURCES

Colorado Rules of Professional Conduct, Rule 1.5(b) .............................................4

**RULE 29 STATEMENT**

Under Federal Rule of Appellate Procedure 29(a)(2), the Associations of Certified Biblical Counselors ("ACBC") files this amicus curiae brief with the consent of all parties. No counsel for any party authored this brief in whole or in part, and no person or entity, other than ACBC and its counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

## I.    INTRODUCTION

The Association of Certified Biblical Counselors represents a group of Christian counselors who provide counsel and training in and consistent with the traditional practice of the Christian religion. Admittedly, the instant regulation is not directly applicable to ACBC's members and their work. However, due to the similarities in appearance between instruction in the practice of the Christian religion in a one-on-one setting and the practice of psychotherapy, that is, one person speaking to another about a circumstance and seeking help based upon the knowledge of a counselor, there is a concern that the rules which are imposed upon Christian therapists through licensing regulation may eventually be imposed upon Christians who are providing training in the practice of the Christian religion outside of the professional licensed relationship. Further, ACBC's counselors are chilled in their speech for fear of similar prosecution for practicing their faith-

based instruction. These concerns are heightened on the basis of the novel theory advanced by the State of Colorado and approved by the lower court that speech may be censored in the name of "harm."

The Christian religion entails doctrines of self-denial in many areas of life, including sexual conduct. This counsel of self-denial is the sort of counsel which the State of Colorado has determined is "harmful." Christians are given responsibility to encourage one-another in efforts at chastity, which is what the State of Colorado has forbidden to Christian therapists under the guise of regulation of a profession.

Accordingly, ACBC has an interest in this law being struck down in its current form.

## II.     THE LOWER COURT GIVES AND TAKES AWAY

The lower court provides a rehearsal of the well-known rules respecting the protection of speech, of the wrongs of content-based restrictions on speech, and the related rules applicable. Since those rules are well-known to this court and have been adequately presented by Ms. Chiles' attorneys, amicus will assume such rules for purpose of this argument and move its attention to the manner in which the lower court creates a sweeping new power of the government to censor speech while at the same time giving the appearance of merely applying current law.

The lower court in reaching its unsupported conclusion first affirmed the rules protecting speech but then eviscerated those rules by means of a logical misstep and a fundamental misreading of existing law. This is then bolstered by the creation of a new basis for censorship made appealing on the ground that it favors the current opinion of the political majority.

Here, the lower court has structured a new legal theory which creates a power in the political majority to censor speech of a minority on the ground that it is "harmful."[1] "Harmful" speech has never been approved as a touchstone for constitutional jurisprudence. Since what constitutes "harmful" speech will always be speech the majority disapproves; were the lower court's approach accepted, the political majority can lay waste to any subject it deems "harmful," thereby banning all utterance it disapproves. That is simply not the law.

## III.    THE LOWER COURT ERRS BY MISAPPLYING PRECEDENT

The crux of the lower court's decision is found in this paragraph:

And Defendants do not—and cannot—dispute that Ms. Chiles speaks to her clients during counseling sessions (*See* ECF No. 45 at 23-24). But speech made in professional contexts is not always pure speech. *See EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 429 (6th Cir. 2019) ("*Casey* and [*National Institute of Family and Life Advocates*] recognize that First Amendment heightened scrutiny does not apply to incidental regulation of professional speech that is part of the [professional] practice . . ..")

---

[1] The passage of a law through a legislature by definition makes that position, the position of majority.

(*Chiles v. Salazar* (D. Colo., Dec. 19, 2022, Civil Action 1:22-cv-02287-CNS-STV [pp. 12-13])

The key word in this analysis is "incidental". That word becomes a rhetorical pivot which is turned to eradicate First Amendment protections. The lower court attacks the problem as one of regulation of a profession and then decides the regulation is incidental. This is wrong on two distinct grounds: First, the regulation of the profession is not where this rule is being applied – it is being applied to true speech between a patient and a therapist. Second, it is not incidental.

First, the court must consider what was actually upheld in *EMW.* In *EMW*, the government defined certain minimal disclosures to be made by a health care provider **before obtaining informed consent** for a medical procedure: "The Ultrasound Informed Consent Act—is an informed-consent statute." (*EMW Women's Surgical Ctr. v. Beshear* (6th Cir. 2019) 920 F.3d 421, 446)

This is similar to a lawyer being required to make certain disclosures about billing rates and reimbursement for costs prior to offering a client a retainer agreement. Yes, the decisions have different stakes, but defining the minimal *precontract disclosures* is a regulation of the profession. For instance, Colorado Rules of Professional Conduct, Rule 1.5(b), requires the attorney to make a series of disclosures for a contingent fee agreement to be enforceable.

The second case cited by the lower court in support of the power of "incidental regulation of professional speech" (*Ohralik v. Ohio State Bar Assn* (1978) 436 U.S. 447) actually concerned *precontractual communications* between a lawyer and a potential client:

> In *Bates* v. *State Bar of Arizona*, 433 U.S. 350 (1977), this Court held that truthful advertising of "routine" legal services is protected by the First and Fourteenth Amendments against blanket prohibition by a State. The Court expressly reserved the question of the permissible scope of regulation of "in-person solicitation of clients — at the hospital room or the accident site, or in any other situation that breeds undue influence — by attorneys or their agents or 'runners.'" *Id.*, at 366. Today we answer part of the question so reserved, and hold that the State — or the Bar acting with state authorization — constitutionally may discipline a lawyer for soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the State has a right to prevent.

(*Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 448-49 (1978)) The *Ohralik* Court did not uphold a law which regulated the content of the lawyer's counsel given *during* the professional relationship as the lower court did. Thus, *Ohralik* concerned solely *precontract*-speech.

*Ohralik* then gave as support a citation to a series of cases which permitted regulation of speech. Each of the cases cited by the *Ohralik* court concerned either *precontract speech* (such as a misleading securities' report) or speech soliciting behavior which was illegal independent of the speech:

> Moreover, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney* v. *Empire Storage Ice*

5

*Co.*, 336 U.S. 490, 502 (1949). Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities, *SEC* v. *Texas Gulf Sulphur Co.*, 401 F.2d 833  (CA2 1968), cert. denied, 394 U.S. 976 (1969), corporate proxy statements, *Mills* v. *Electric Auto-Lite Co.*, 396 U.S. 375 (1970), the exchange of price and production information among competitors, *American Column Lumber Co*. v. *United States*, 257 U.S. 377 (1921), and employers' threats of retaliation for the labor activities of employees, *NLRB* v. *Gissel Packing Co.*, 395 U.S. 575, 618  (1969). See *Paris Adult Theatre I* v. *Slaton,* 413 U.S. 49, 61-62 (1973).

(*Ohralik,* at p. 456)

When one understands what *Ohralik* actually permits and curtails, one can

see that the lower court's use of *Ohralik* goes well beyond what that Court actually

held:

As Defendants argue, speech made in a professional context—particularly in the context of licensed professional counseling—is distinguishable from, for example, political speech (ECF No. 45 at 23). Ms. Chiles admits that she is a licensed professional counselor with a graduate degree in clinical mental health, and that her speech is made in the course of her work as a professional counselor (ECF No. 1 at 29-31 ¶¶ 104, 108). "[I]t has never been deemed an abridgment of freedom of speech . . . to [regulate] a course of [professional] conduct . . . merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Ohralik*, 436 U.S. at 456 (quotations omitted).

(*Chiles* [at p. 14])

The lower court's misuse of *Ohralik* flows from its failure to provide a full

citation to and analysis of what the Court actually held. When one compares the

language from *Ohralik* and the abridgement provided by the lower court here, the

distinction is obvious. Neither *EMW* nor *Ohralik*, nor even the cases cited by

*Ohralik*, stand for the proposition that the government has the power to ban pure speech given during the course of a professional relationship after the contract has been formed. The cases stand for the a quite different proposition -- that a professional must make certain disclosure *prior to entering into a contract.*

That distinction between regulating precontract disclosure concerning the nature of services which could or would be rendered, and regulating the content of a therapeutic relationship are fundamentally different concerns. If Colorado required a therapist to disclose to a potential client that the therapist held to the Alderian or Freudian or Jungian school or used Client Centered Therapy or CBT or (any number of other models and techniques) prior to entering a contractual relationship, that regulation may be similar to *EMW* or *Ohralik.* If Colorado required Ms. Chiles to disclose she was a Christian who holds certain positions on human sexuality, that may be permissible. But when Colorado moves to a law prohibiting Ms. Chiles from relying upon her Christian commitments during the therapeutic relationship it undoubtedly violates the First Amendment.

## IV.    THE LOWER COURT ERRED BY BANNING SPEECH ON THE BASIS OF "HARM"

The Supreme Court has already explained this issue in a thorough and incontrovertible manner:

The most basic of those principles is this: "[A]s a general matter, ... government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union,* 535 U.S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) (internal quotation marks omitted). There are of course exceptions." 'From 1791 to the present,' ... the First Amendment has 'permitted restrictions upon the content of speech in a few limited areas,' and has never 'include[d] a freedom to disregard these traditional limitations.'" *United States v. Stevens,* 559 U.S. ——, ——, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010) (quoting *R.A.V. v. St. Paul,* 505 U.S. 377, 382–383, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ). These limited areas—such as obscenity, *Roth v. United States,* 354 U.S. 476, 483, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), incitement, *Brandenburg v. Ohio,* 395 U.S. 444, 447–449, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) *(per curiam),* and fighting words, *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031  (1942) — represent "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem," *id.,* at 571–572, 62 S.Ct. 766. Last Term, in *Stevens,* we held that new categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated. *Stevens* concerned a federal statute purporting to criminalize the creation, sale, or possession of certain depictions of animal cruelty. See 18 U.S.C. § 48 (amended 2010). The statute covered depictions "in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed" if that harm to the animal was illegal where the "the creation, sale, or possession t[ook] place," § 48(c)(1).   A saving clause largely borrowed from our obscenity jurisprudence, see *Miller v. California ,* 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), exempted depictions with "serious religious, political, scientific, educational, journalistic, historical, or artistic value," § 48(b).  We held that statute to be an impermissible content-based restriction on speech. There was no American tradition of forbidding the *depiction of* animal cruelty—though States have long had laws against *committing* it. The Government argued in *Stevens* that lack of a historical warrant did not matter; that it could create new categories of unprotected speech by applying a "simple balancing test" that weighs the value of a particular category of speech against its social costs and then punishes that category of speech if it fails the test. *Stevens,* 559 U.S., at ——, 130 S.Ct., at 1585. We emphatically rejected that "startling and dangerous" proposition. *Ibid.* "Maybe there are some categories of speech that have been historically unprotected, but have not yet

8

been specifically identified or discussed as such in our case law." *Id.,* at ——
–, 130 S.Ct., at 1586. But without persuasive evidence that a novel
restriction on content is part of a long (if heretofore unrecognized) tradition
of proscription, a legislature may not revise the "judgment [of] the American
people," embodied in the First Amendment, "that the benefits of its
restrictions on the Government outweigh the costs." *Id.,* at ——, 130 S.Ct.,
at 1585.

(*Brown v. Entertainment Merchants Assn.,* 564 U.S. 786, 790-92 (2011))

A supposed rationale that speech is "harmful" as a justification for banning

it, in any context, simply has been repudiated by our highest court and does not

receive traction except in the lower court.

## V.    MINORS HAVE FIRST AMENDMENTS TO SPEAK AND HEAR

Colorado may then argue, we are not merely banning "harmful" speech, but

we are banning speech which is "harmful" specifically to *minors*. Apparently, this

claim is based on the minor being too delicate to hear about chastity. But adding

the word "minors" to the equation does not move the constitutional analysis in

favor of censorship. The basic principle at issue here was affirmed by the United

States Supreme Court 48 years ago:

It is well settled that a State or municipality can adopt more stringent
controls on communicative materials available to youths than on those
available to adults. See, *e.g., Ginsberg* v. *New York*, 390 U.S. 629 (1968).
Nevertheless, minors are entitled to a significant measure of First
Amendment protection, see *Tinker* v. *Des Moines School Dist.*, 393 U.S. 503
(1969), and only in relatively narrow and well-defined circumstances may
government bar public dissemination of protected materials to
them. See, *e.g., Interstate Circuit, Inc.* v. *City of Dallas*, 390 U.S. 676,
1968); *Rabeck* v. *New York*, 391 U.S. 462 (1968).

9

(*Erznoznik v. City of Jacksonville,* 422 U.S. 205, 212-13 (1975)) Since that time, a number of courts have developed and clarified the principle that minors are entitled to First Amendment protection for the information they receive. Those cases affirm that minors have robust First Amendment rights.

In 2000, the city of Indianapolis sought to forbid minors from access to video games which the city council deemed "harmful". The Seventh Circuit rejected that statute. In one part the Court explained:

> The grounds must be compelling and not merely plausible. Children have First Amendment rights. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 212-14, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Tinker v. Des Moines Independent School District,* 393 U.S. 503, 511-14, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). This is not merely a matter of pressing the First Amendment to a dryly logical extreme. The murderous fanaticism displayed by young German soldiers in World War II, alumni of the Hitler Jugend, illustrates the danger of allowing government to control the access of children to information and opinion. Now that eighteen-year-olds have the right to vote, it is obvious that they must be allowed the freedom to form their political views on the basis of uncensored speech *before* they turn eighteen, so that their minds are not a blank when they first exercise the franchise. And since an eighteen-year-old's right to vote is a right personal to him rather than a right that is to be exercised on his behalf by his parents, the right of parents to enlist the aid of the state to shield their children from ideas of which the parents disapprove cannot be plenary either. People are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble.

(*American Amusement Machine Ass'n v. Kendrick,* 244 F.3d 572, 576-77 (7th Cir. 2001)) The State of Illinois gathered more "evidence" for its restriction on video games:

> Dr. Craig Anderson, a psychologist and professor at Iowa State University, testified on behalf of the defendants. Dr. Anderson summarized research, including his own, regarding the relationship between minors' exposure to violent video games and aggressive thoughts and behavior. Based on this research, Dr. Anderson testified that "it seems clear that exposure to violent video games increases aggressive behavior, aggressive thinking, physiological arousal, aggressive feelings, and is also associated with a decrease in prosocial behavior."

(*Entertainment Software Ass'n. v. Blagojevich*, 404 F. Supp. 2d 1051, 1059 (N.D. Ill. 2005)) More recent research has discredited the opinions of psychologists such as Dr. Anderson on the effects of videogames, but that is the way with science: it is a tentative understanding, subject to revision[2]. This is bare censorship in the defense of a current opinion of those who conduct social science—an opinion which differs dramatically from the consensus of a few years ago; and which will be a different consensus a few years hence.  The current-thing always thinks itself unquestionably true. But history shows not even Newton's physics will go unchallenged. It is not the job of the government to enshrine the current-thing.

What matters to the Court is the duty to protect fundamental rights.  As should be the case here, the state statutes were invalidated because they were

---

[2] The tentative nature of conclusions in social science are well-known. "The famous reproducibility project estimated that only 25% of published significant results are replicable." https://replicationindex.com/2023/01/08/which-social-psychologists-can-you-trust/ While this Court may not substitute its judgment for the legislature on the question of policy; this Court should not sacrifice the fundamental guarantees of our constitutional order to a policy which may be overturned tomorrow (as have so many other sureties of recent legislatures).

unconstitutional, in part because it infringed upon the First Amendment rights of

minors:

> We think it important first to reaffirm our observation in *American Amusement Machine Association v. Kendrick*, 244 F.3d 572, 576 (7th Cir.2001), that "[c]hildren have First Amendment Rights." The implication of this observation is that our narrow tailoring inquiry must be broader than the question of whether adults will be affected by the challenged legislation. The Constitution also requires us to ask whether legislation unduly burdens the First Amendment rights of minors. And for good reason — as we observed in *AAMA* history has shown the dangers of giving too much censorship power to the State over materials intended for young persons. *See AAMA*, 244 F.3d at 577.

(*Entertainment Software Ass'n v. Blagojevich*, 469 F.3d 641, 646-47 (7th Cir.

2006)) Since that time, it is commonly held by the courts that such restrictions

violation the First Amendment:

> The issue of regulating violent video games to minors has been decided in the Seventh and Eighth Circuit, both of which have found that the attempted regulation in those districts violates the First Amendment. Amer. Amusement Mach. Ass'n v. Kendrick. , 244 F. 3d 572 (7th Cir. 2001), Interactive Digital Software Ass'n v. St. Louis County, 329 F.3d 954 (8th Cir. 2003). Several other District Courts have similarly held such acts to be unconstitutional. *See* Video Software Dealers Ass'n v. Maleng, 325 F.Supp.2d 1180  (W.D. Wash. 2004), Entertainment Software Ass'n v. Blagojevich, 404 F.Supp.2d 1051  (E.D. Ill. 2005) ("E.S.A.") (granting preliminary injunction), Video Software Dealers Ass'n v. Schwarzenegger, 401 F.Supp 2d 1034  (N.D. Cal. 2005) (granting preliminary injunction).

(*Entertainment Software Ass'n v. Granholm*, 426 F. Supp. 2d 646, 649-50 (E.D.

Mich. 2006)) The point of such cases is that First Amendment protections are

afforded to minors, even in instances where the minor seeks access to speech

which the legislature has determined is harmful.

This court should so hold likewise and reverse the lower court.

This is not to say that legislatures cannot prohibit certain types of speech that may be transmitted to a minor. But that is not what has happened here; nor is that precise question before this Court. For example, obscene speech can be prohibited on the ground that it is not protected by the First Amendment:

> Though we deal here with restrictions not limited to obscenity, we note that obscenity is not within the class of speech protected by the First Amendment. (*Ginsberg* v. *New York* (1968) 390 U.S. 629 [20 L.Ed.2d 195, 88 S.Ct. 1274]; *Roth* v. *United States* (1957) 354 U.S. 476 [1 L.Ed.2d 1498, 77 S.Ct. 1304].) The state may adopt a standard of obscenity applicable to minors which is broader than that applicable to adults and which denies minors access to materials to which adults could not be denied access. (*Ginsberg* v. *New York, supra,* 390 U.S. 629.)
>
> "Nevertheless, minors are entitled to a significant measure of First Amendment protection . . . and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them. [Citations omitted.]" (*Erznoznik* v. *City of Jacksonville* (1975) 422 U.S. 205, 212-213 [45 L.Ed.2d 125, 133, 95 S.Ct. 2268].) "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." (*Erznoznik, supra,* 422 U.S. at pp. 213-214 [45 L.Ed.2d at p. 133].)

(*American Booksellers Assn. v. Superior Court*, 129 Cal.App.3d 197, 201 (1982))

The State of Colorado never found the speech at issue obscene; nor could it;

Moreover, Colorado did not ban the speech for all purposes and by all persons: if it were obscene, it could be banned on the ground that it is *not protected* rather than it is "harmful."

The Supreme Court has already spoken on this issue has expressly rejected

the rationale advanced by Colorado herein:

> The California Act is something else entirely. It does not adjust the boundaries of an existing category of unprotected speech to ensure that a definition designed for adults is not uncritically applied to children. California does not argue that it is empowered to prohibit selling offensively violent works *to adults* —and it is wise not to, since that is but a hair's breadth from the argument rejected in *Stevens*. Instead, it wishes to create a wholly new category of content-based regulation that is permissible only for speech directed at children.

> That is unprecedented and mistaken. "[M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. Jacksonville,* 422 U.S. 205, 212–213, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (citation omitted). No doubt a State possesses legitimate power to protect children from harm, *Ginsberg, supra,* at 640–641, 88 S.Ct. 1274; *Prince v. Massachusetts,* 321 U.S. 158, 165, 64 S.Ct. 438, 88 L.Ed. 645 (1944), but that does not include a free-floating power to restrict the ideas to which children may be exposed. "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik, supra,* at 213–214, 95 S.Ct. 2268.

(*Brown*, at p. 794-95)

In this particular instance, speech which is consistent with the religious and

moral traditions of millions of Americans and which has an extensive history

would be among the speech which the statute seeks to prohibit. And, if a state can

prohibit the speech under the guise of a licensure, the state would then arguably be

able to ban any speech by any person by merely exercising the "harmful" standard.

14

The courts have wisely rejected that standard to date. This Court should stand with them.

## VI.   NEITHER THE POPULARITY OF THE CENSORSHIP NOR THE JUDGE'S OWN MORAL CALCULATION ARE GROUNDS TO BAN SPEECH

It is the duty of the courts to protect individuals from the excesses of the political branches, "When a [] regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." (*Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 143, (1977); Marshall, J., dissenting)

An irony of the instant case which will strike all readers when the cases involving speech to minors is considered below, is that the speech barred today was the speech favored yesterday; and the speech favored today, was speech which the political branches previously sought to suppress. It is an accident in history that we all think we have now reached the stage of full wisdom and truth, and that the speech which a majority favors today is Truth. The First Amendment is in place just because we have never become perfectly wise.

It is the task of the Court to allow the parties to squabble over truth without 51 out of a 100 coming to rest on that which is popular today. Socrates was put to death because a majority of his fellow citizens thought it scandalous to believe the

sun was a flaming stone and not a god. The majority is rarely if ever circumspect in its authoritative pronouncements, which is why our courts have seen fit to protect the minority positions.

Here, the State of Colorado could not prohibit all persons from speaking on the subject prohibited by this statute, therefore, it cannot prohibit psychotherapists from speaking on this topic. Or stated otherwise, if the state could prohibit this speech merely because 51% of the legislature found it "wrong" or "hurtful" would mean the legislature could ban any speech if 51% of the legislature agreed.  But the First Amendment is in place precisely because a minority must have the right to speak. There is no need for the courts to protect the speech of the majority, the majority will always get what it wants.

This creates pressure upon any judge. Yet, however much the individual sympathizes with one side in any debate, the duty remains, the obligation imposed by the judicial oath "to administer justice without respect to persons;" a duty to protect the speech and religion of those whom the judge personally finds disagreeable. (*Nat'l Review, Inc. v. Mann* 140 S. Ct. 344, 347-48 (2019) ["Our decisions protecting the speech at issue in that case and the others just noted can serve as a promise that we will be vigilant when the freedom of speech and the press are most seriously implicated, that is, in cases involving disfavored speech on important political or social issues."])

16

It is no support for the law compelling (or restricting) speech that it is the will of the majority (*Wooley v. Maynard*, 430 U.S. 705, 715 (1977); *National Socialist Party v. Skokie* (1977) 432 U.S. 43 [displaying Swastikas protected speech]) It is the minority who most need protection before the Court. As Justice Stevens wrote, "[T]he federal courts — and particularly this Court — have a primary obligation to protect the rights of the individual that are embodied in the Federal Constitution." (*Harris v. Reed*, 489 U.S. 255, 267 (1989), Stevens, J., concurring; *Cobell v. Norton* 212 F.R.D. 14, 20, (D.D.C. 2002) ["the Court is mindful of its obligation to protect the free speech rights of defendants."])

Where the political process will not act to protect fundamental rights to speech, to religion, it is the duty of the court to protect those rights even for those whose beliefs and opinions do repel the majority. (*Obergefell v. Hodges*, 135 S. Ct. 2584, 2605 (2015))[3]. The Colorado statute concerns speech and religion in a counseling context which touches upon some of the most fundamental values we have as human beings and fundamental rights as those deserving the protection of

---

[3] The courts have repeatedly affirmed the First Amendment's limitation on governmental power. ( See, e.g., *Thonen v. Jenkins*  491 F.2d 722, 723 (4th Cir. 1973) ("'But, above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'"); *Mainstream Loudoun v. Board of Trustees of Loudoun* 2 F. Supp. 2d 783, 795 (E.D. Va. 1998) ("We are therefore left with the First Amendment's central tenet that content-based restrictions on speech must be justified by a compelling governmental interest and must be narrowly tailored to achieve that end."))

the Constitution. (*Obergefell v. Hodges,* 135 S. Ct. 2584, 2599 (2015).) That

Colorado may have a laudable goal is no basis upon which it may suppress

protected speech. (*Billups v. City of Charleston* 961 F.3d 673, 683-84, (4th Cir.

2020)).

To achieve its stated end, the Colorado statute maintains unconstitutional

means: it forbids and compels based upon content.  ((*Nat'l Inst. of Family & Life

Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018)) [content-based restrictions

offend the First Amendment]) [4]  It unconstitutionally favors one viewpoint and

forbids all others. ((*Matal v. Tam*,137 S. Ct. 1744, 1765-66 (2017) [viewpoint

restrictions offend the First Amendment]) By allowing only one viewpoint it seeks

to compel speech approved by the government[5]. To fail to speak as the government

demands forces one out of the economy and threatens ruin with fines and litigation.

---

[4] "Ratified in 1791, the First Amendment provides that Congress shall make no law
'abridging the freedom of speech.' Above all else, the First Amendment means that
government generally has no power to restrict expression because of its message,
its ideas, its subject matter, or its content.' [Citation.]" (*Barr v. American Assn. of
Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020); *Holloman ex Rel.
Holloman v. Harland* (11th Cir. 2004) 370 F.3d 1252, 1264 (("The Speech Clause
of the First Amendment protects at least two separate, yet related, rights: (1) the
right to freedom of expression, and (2) the right to be free from compelled
expression. *United States v. United Foods, Inc*.,533 U.S. 405, 410, 121 S.Ct. 2334,
2338, 150 L.Ed.2d 438 (2001).")
[5] First Amendment prohibits compelled speech. (*United States v. United Foods,
Inc.,* 533 U.S. 405, 410 (2001); see, *Wooley v. Maynard* 430 U.S. 705, 714-15
(1977)) The act of government *compulsion* as to speech is always demeaning and
always wrong. (*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*
(2018) 138 S. Ct. 2448, 2464 (2018) ["When speech is compelled, however,

## VII.   CONCLUSION

In conclusion, the lower court erred by upholding an unconstitutional ban on protected discourse. Irrespective of the current politics or the court's own preference, the First Amendment places a wall of separation between the government and quelling the voice of its people. The courts have been stationed upon that wall to protect the speech of the minority, no matter how small, despised, or misguided in the eyes of the court.

Dated: March 14, 2023

Respectfully submitted,

Edward C. Wilde, Esq.
Attorney for ASSOCIATIONS OF
CERTIFIED BIBLICAL COUNSELORS
LAW OFFICES OF MICHAEL S. OVERING, APC
790 E. Colorado Blvd., Ste. 320
Pasadena, CA 91101
(626) 564-8600
ewilde@digitalmedialaw.com

---

additional damage is done. In that situation, individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding "involuntary affirmation" of objected-to beliefs would require "even more immediate and urgent grounds" than a law demanding silence. *Barnette*, supra, at 633, 63 S.Ct. 1178; *see also Riley, supra*, at 796–797, 108 S.Ct. 2667 (rejecting "deferential test" for compelled speech claims).")])

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(g), the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 5373 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because, this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2302 in 14 pt. and Times New Roman.

Date: March 14, 2023

_____
Edward C. Wilde, Esq.
Attorney for ASSOCIATIONS OF
CERTIFIED BIBLICAL COUNSELORS
LAW OFFICES OF MICHAEL S. OVERING, APC
790 E. Colorado Blvd., Ste. 320
Pasadena, CA 91101
(626) 564-8600
ewilde@digitalmedialaw.com

# 10th CIR. FORM 4. DISCLOSURE STATEMENT

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

### Fed. R. App. P. 26.1 and Tenth Circuit Rule 26.1 Disclosure Statement

| | |
|---|---|
| KALEY CHILES, | |
|     Plaintiff – Appellant, | |
|     v. | Case No. 22-1445 |
| PATTY SALAZAR, in her official capacity as Executive Director of the Department of Regulatory Agencies; et al., | |
|     Defendants – Appellee. | |

Pursuant to Federal Rule of Appellate Procedure 26.1(a), (b), and/or (c), the undersigned, on behalf of Association of Certified Biblical Counselors Inc.

certifies[1] as follows:

    There is no information to disclose pursuant to Fed. R. App. P. 26.1.

Date: March 14, 2023

Edward C. Wilde, Esq.
Attorney for ASSOCIATIONS OF
CERTIFIED BIBLICAL COUNSELORS

---

[1] Pursuant to Federal Rule of Appellate Procedure 26.1(d)(3), this disclosure statement must be promptly updated whenever any of the information required under Fed. R. App. P. 26.1 changes.